# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **I.M. WILSON, INC.,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | . |
| | : | |
| **OTVETSTVENNOSTYOU "GRICHKO":** | | |
| *et al.,* | : | **NO. 18-5194** |
| *Defendants.* | : | |

## MEMORANDUM

PRATTER, J.                                                                   JULY 25, 2019

The defendants in this case—OOO Grichko, Nicolay Grishko, and Grishko S.R.O.[1]—are Russian and Czech entities that manufacture and sell ballet shoes under the name GRISHKO. They own the trademark GRISHKO everywhere in the world, except for the United States. In this country, Plaintiff I.M. Wilson, Inc. owns the GRISHKO trademarks and has since the early 1990s when Mr. Grishko wrote two letters that allowed I.M. Wilson to register the mark.

For decades, I.M. Wilson was the defendants' exclusive distributor in the United States and, until recently, the parties had an amicable working relationship. In 2016, the defendants terminated the exclusive licensing agreement under which the parties were operating, and the exclusivity of the relationship officially came to an end in March 2018. Around that time, the defendants began selling products directly to U.S. consumers, increasing their sales activities around the holidays. This prompted I.M. Wilson to seek a preliminary injunction to prevent the defendants from infringing on the U.S. GRISHKO trademarks. The defendants countered by filing

---

[1]     Although OOO Grichko is spelled with a "c", Mr. Grishko's last name and Grishko S.R.O. are spelled with an "s".

1

a motion to dismiss or stay the case pending arbitration and argue that this dispute is covered by an arbitration clause in the parties' 1992 exclusive licensing agreement.

This Memorandum addresses both motions in the order that they were filed.[2] The Court is prepared to grant I.M. Wilson's Motion for Preliminary Injunction because I.M. Wilson has demonstrated a sufficient likelihood of success on the merits, irreparable harm, and that the equities balance in its favor. The Court does so with some reticence, however, because it is questionable whether a preliminary injunction is in the public interest. Moreover, because it is by no means inevitable that I.M. Wilson will prevail at the next phase of this litigation, the Court will entertain submissions on the issue of the amount of a bond to be posted by I.M. Wilson in connection with issuance of a preliminary injunction. The Court denies the Motion to Dismiss for Failure to State a Claim or, Alternatively, Stay this Action Pending Arbitration because the agreement containing the arbitration clause was terminated, and this dispute does not relate back to that agreement.

---

[2]     The Court issued an order on February 5, 2019 stating that it would consider both motions at the same time as well as the legal basis for doing so. *See* Feb. 5, 2019 Order (Doc. No. 24). In relevant part, that Order stated:

> Both parties agree, however, and relevant case law confirms, that the Court has discretion in deciding how to proceed. *See Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 811 (3d Cir. 1989) ("[A] district court has the authority to grant injunctive relief in an arbitrable dispute, provided that the traditional prerequisites for such relief are satisfied."); *AAMCO Transmissions, Inc. v. Dunlap*, No. 11-4009, 2011 WL 3586225 (E.D. Pa. Aug. 16, 2011) (granting preliminary injunctive relief in a case subject to arbitration). The Court concludes that it would be most efficient to hear argument on both motions at once and will issue a notice scheduling a hearing on the preliminary injunction and oral argument on the motion to dismiss.

*Id.*

## I.M. WILSON'S MOTION FOR PRELIMINARY INJUNCTION

Some nine months after seeing that the defendants were selling ballet shoes in the United States, I.M. Wilson filed a Motion for Preliminary Injunction on December 4, 2018, alleging that the defendants are actively infringing on its GRISHKO trademarks. Since then, there have been numerous rounds of briefing (with and without oral arguments), several days of hearings, post-hearing submissions, and two motions to supplement the record.[3] Upon consideration of all these materials, the Court makes the following findings of fact and conclusions of law.

### I. Findings of Fact

The Court held three days of hearings on the factual issues underlying this preliminary injunction. Those hearings were held on February 15, February 27, and April 5, 2019.[4]

### A. The Parties

1. I.M. Wilson is a Pennsylvania corporation with its principal place of business located in King of Prussia, Pennsylvania. I.M. Wilson sells a variety of dance related products, including ballet shoes and pointe shoes. Feb. 15 Hrg. Tr. 36:4–6; 38:2–7.

2. I.M. Wilson is owned by Irene Wilson, a citizen of the United States. Feb. 15 Hrg. Tr. 34:9–11. Ms. Wilson danced ballet in her youth. Feb 27 Hrg. Tr. 13:20–14:16. She later obtained degrees in Russian and Communications. Feb. 15 Hrg. Tr. 34:12–17.

---

[3]     There is currently an outstanding Amended Motion for Leave to File Supplement of Preliminary Injunction Record (Doc. No. 61). The Court is granting this motion and has considered the additional materials in ruling on I.M. Wilson's motion.

[4]     At the outset of this case, the Court urged the parties to agree on limited discovery to develop a record for the preliminary injunction hearing. The parties originally believed that discovery was unnecessary, and contended that the Court could rule on the papers. As this case developed, the parties realized that some discovery indeed was required. At that point, they pursued discovery vigorously and not without animosity and antagonism.

3

3. Defendant Obchtchestvo S Organichennoy Otvetstvennostyou "Grichko" (OOO Grichko) is a Russian company that manufactures and sells dancewear products, including ballet shoes and pointe shoes. Apr. 5. Hrg. Tr. 143:8–144:3.

4. Defendant Grishko Dance, S.R.O. is a company organized under the laws of the Czech Republic. Apr. 5 Hrg. Tr. 141:15–23. Grishko Dance obtains GRISHKO-branded products, including ballet and pointe shoes, from OOO Grichko and sells these products through the website grishkoshop.com. Apr. 5 Hrg. Tr. 138:1–22; 141:24–143:7.

5. Defendant Nicolay Grishko[5] is a 60 percent owner of Defendant OOO Grichko and serves as the company's President and General Director. Apr. 5 Hrg. Tr. 141:9–13. Mr. Grishko is a 100 percent owner of Defendant Grishko Dance and serves as that company's co-administrator. Apr. 5 Hrg. Tr. 141:15–23.

## B. The Parties' Initial Dealings

6. Mr. Grishko is married to a former Russian professional ballerina, Tamara Grishko. Apr. 5 Hrg. Tr. 45:7–12. Mr. and Mrs. Grishko had friends that profited from selling Russian-made ballet shoes, which inspired Mr. Grishko to manufacture and sell Russian-made ballet shoes. Apr. 5 Hrg. Tr. 46:2–47:20.

7. In 1988, Mr. Grishko launched a "Kooperativ" (a worker-owned enterprise that differed from the historically state-owned enterprises of the past) because, at that time, the U.S.S.R. did not allow for the formation of private companies or private property ownership. Apr. 5 Hrg. Tr. 44:17–22. He named the Kooperativ "Tanyets" (the Russian word for "dance"). Apr. 5 Hrg. Tr. 48:20–49:16. Kooperativ Tanyets was formed for the purpose of manufacturing ballet and pointe shoes. Apr. 5 Hrg. Tr. 44:9–22; 48:20–25.

---

[5]    Mr. Grishko's first name is spelled Nicolay, Nikolay, and Nicolai in various documents submitted to the Court.

4

8. Each and every pair of GRISHKO ballet pointe shoes is hand crafted in Russia by skilled cobblers and inspected by quality control specialists who place unique identification numbers inside the fold of the seam within the shoes. Ex. D26.

9. In the late-1980s, Ms. Wilson wanted to start an import business with the goal of importing goods from Russia. Feb. 27 Hrg. Tr. 15:22–16:13. Ms. Wilson worked with Amtorg, an international company that matches importers with exporters. Feb. 27 Hrg. Tr. 16:18–22.

10. Ms. Wilson originally considered importing vodka, but Amtorg ultimately connected her with Mr. Grishko to discuss importing his ballet shoes. Feb. 15 Hrg Tr. 54:11–55:3; Feb. 27 Hrg. Tr. 16:18–25. Ms. Wilson made arrangements with Amtorg to travel to Russia in 1990 with the goal of meeting a ballet shoe manufacturer. Feb. 27 Hrg. Tr. 17:13–20.

11. While in Russia, Ms. Wilson met Mr. Grishko, and the parties agreed that I.M. Wilson would sell Tanyets-manufactured shoes in the United States under the brand name "GRISHKO."[6] Feb. 15 Hrg. Tr. 54:11–56:9.

## C. The Trademark License and Distribution Agreements Between the Parties

12. On April 25, 1990, I.M. Wilson entered into an exclusive trademark license and distribution agreement (ETLDA) with the Tanyets Kooperativ. Ex. D10.

13. The agreement stated that:

> [Grishko] has agreed to sell and [I.M. Wilson] has agreed to buy
> ballet shoes, toe shoes and such other footwear, athletic equipment

---

[6]  The record is unclear on who came up with the idea to sell the shoes under the GRISHKO name. Of course, Ms. Wilson contends that it was her idea. Feb. 15 Hrg Tr. 56:25–57:16. I.M. Wilson introduced into evidence an article from "Elite Personnel" in which Mr. Grishko is quoted as stating that he "didn't really want to" give the company his own name. Ex. P37. He goes on to say, "when we started our work our senior partner in the USA, Irene Wilson Ashley, suggested the company name and to establish the Grishko brand." Ex. P37. For his part, it is no surprise that Mr. Grishko appears to dispute the authenticity of this article. Apr. 5 Hrg. Tr. 121:21–127:5. Mr. Grishko says that he decided to use his last name for the brand, a practice that is in line with other manufacturers of ballet shoes. Apr. 5 Hrg. Tr. 49:18–50:11. As with a number of matters discussed in the principal witnesses' testimony, neither party's testimony on this point was particularly persuasive; however, an ultimate conclusion on this fact (like many others that occupied the parties during the hearings) is not dispositive to the outstanding motions.

> or other items as the parties hereto may later agree (the "Goods"), in quantity and assortment, at prices and according to specifications, all as attached hereto in Appendix I, which constitutes an integral part of this Agreement.

Ex. D10 at ¶ I.

14. The 1990 ETLDA granted I.M. Wilson an exclusive license to sell Grishko products in the

United States. Ex. D10 at ¶ XV. In that regard, the agreement stated:

> The Seller hereby grants the Buyer an exclusive right, for the duration of this Agreement, to use the name "Grishko" in connection with the sale of the Goods in the United States. In consideration of such right, the Buyer shall pay the Seller a royalty equal to 10% of the value of each shipment of Goods.

Ex. D10 at ¶ XV.

15. The agreement remained in effect for one year and automatically renewed for successive

one-year terms unless a party provided notice that it was terminating the agreement at least 90 days

prior to the "anniversary of [the] Agreement." Ex. D10 at ¶ XVIII.

16. The agreement further provided that I.M. Wilson was the exclusive distributor of

GRISHKO products in the United States during the pendency of the agreement and for a period of

one year after the agreement's termination. Ex. D10 at ¶ XIV.

17. Any alterations or additions to the agreement were "valid only if in writing and signed by

persons duly authorized by both parties." Ex. D10 at ¶ XVIII.

18. The agreement further provided that:

> Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination of [sic] invalidity thereof, shall be finally settled by arbitration in accordance with the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce. The tarbitral [sic] tribunal shall be composed of three arbitrators the place of the arbitration shall be Stockholm, Sweden. The language(s) to be used in the arbitral proceeding shall be English.

6

> This Agreement shall be governed by and construed in accordance
> with the Laws of the Kingdom of Sweden.

Ex. D10 at ¶ XVII.

19. On March 1, 1992, the parties entered into an identical agreement that substituted Grishko, Inc. for the Tanyets Kooperativ. Ex. D11.[7]

## D. Ownership of the GRISHKO Trademark in the United States

20. The parties agreed that I.M. Wilson should register the trademark in the United States. Feb. 15 Hrg. Tr. 58:20–60:6; Apr. 5 Hrg. Tr. 69:18–70:7.

21. On July 24, 1992, Ms. Wilson completed a trademark application for "dancing shoes" using the mark "GRISHKO." Ex. D9 at pp. 42–43 of 138. In that application, Ms. Wilson signed a declaration that stated she "declares that she is properly authorized to execute this application on behalf of the applicant; [and] she believes the applicant to be the owner of the trademark sought to be registered . . . ." Ex. D9 at 42–43 of 138.

22. On August 5, 1992, Mr. Grishko signed a letter that stated, "I agree that I.M. Wilson, Inc. is the owner of the Trademark, GRISHKO and its goodwill in the United States of America. I further consent to the use of my name in that trademark." Ex. P2. That letter was signed by Mr. Grishko, typed on OOO Grichko letterhead, and affixed with the OOO Grichko seal. Ex. P2; Apr. 5 Hrg. Tr. 98:6–19.

23. Ms. Wilson did not pay Mr. Grishko anything in return for the rights conveyed by this letter. Feb. 27 Hrg. Tr. 49:20–22.

24. On October 7, 1992, the U.S. Patent and Trademark Office refused I.M. Wilson's trademark application. Ex. D9 at 35 of 138. The examining attorney refused:

> the registration because the mark consists of or comprises matter
> which may falsely suggest a connection with Nikolai Grishko, a

---

[7]    A copy of the 1992 ETLDA is attached to Ex. D11 at 101–112 of 138.

> renowned manufacturer of dancing shoes in Russia. . . . While the
> evidence attached indicates that there may be a connection between
> the applicant and Mr. Grishko, the application file does not
> demonstrate this.

Ex. D9 at 35 of 138.

25. The denial continued:

> If the foreign manufacturer does own the mark in a foreign country,
> the applicant must provide proof of its right to register the mark in
> the United States. This proof may consist of: (1) a written
> assignment of rights in the United States by the foreign owner to the
> applicant, (2) a written consent from the foreign owner to the
> applicant's registration of the mark in the United States, or (3) a
> written agreement between the parties designating the applicant as
> owner in the United States. . . . If the applicant cannot provide this
> proof, the examining attorney must refuse registration because the
> applicant is not the owner of the mark.

Ex. D9 at 36 of 138.

26. On October 27, 1992, I.M. Wilson's counsel, Mr. Maleson, filed a response in which he

quoted the August 1992 letter but inadvertently failed to attach a copy of the document. Ex. D9 at

32–34 of 138.

27. On January 15, 1993, the PTO issued a Final Action again denying the registration. Ex.

D9 at 28–30 of 138. The examining attorney concluded that I.M. Wilson's response "cannot be

taken as an effectual resolution of the issues raised by the refusal of registration. This is largely

because the documents referred to in the response were not submitted." Ex. D9 at 28 of 138.

28. On January 27, 1993, Mr. Maleson then submitted the August 1992 letter. Ex. D9 at 25–

27 of 138.

29. The PTO reviewed the August 1992 letter and concluded that it was an "incomplete

response to the Office action dated January 15, 1993 because it does not include a written consent

to the *registration* of the name 'Grishko.'" Ex. D9 at 22–24 of 138 (emphasis in original). Because

the omission appeared to be inadvertent, the PTO gave I.M. Wilson time to complete its response.

8

30. On March 30, 1993, Mr. Grishko wrote a letter to I.M. Wilson stating "In addition to the consent to I.M. Wilson, Inc. that I previously granted on August 5, 1992, I hereby grant I.[M]. Wilson, Inc. the right to register the trademark GRISHKO in the U.S. patent and trademark office." Ex. P3. This letter was on Grishko letterhead but did not include the Grishko seal. Ex. P3. I.M. Wilson submitted this letter to the PTO. Ex. D9 at 21 of 138. The PTO issued a notice of publication. Ex. D9 at 15 of 138.

31. Although the August 1992 and March 1993 letters were drafted in English, Mr. Grishko did not translate either into Russian prior to signing them because they were "clear" and he could "understand" them.[8] Apr. 5 Hrg. Tr. 103:24–104:20.

32. I.M. Wilson's July 1992 trademark application was registered on November 30, 1993 as Registration No. 1,807,637 (hereinafter the '637 Registration). Ex. D9 at 7 of 138.

### E. Mr. Grishko Applies for Trademark Registrations

33. The parties appear to have had an amicable relationship for the next few years. On March 25, 1999, I.M. Wilson faxed a letter to Mr. Grishko in which she stated, "I appreciate your reassurances that no goods will be shipped into the United States or Canada other than those destined for I.M. Wilson, Inc. and certainly your word I trust." Ex. D46. She also attached documents related to the '637 Registration, including the August 1992 letter. Ex. D46.

34. On May 20, 1999, Mr. Grishko applied to register the marks GRISHKO (the stylized logo) and NIKOLAY GRISHKO (standard character) in connection with "clothing, namely, knitwear, underclothing, leotards and shaping; headgear, shoes, pointe footwear, and slippers for use in modern, jazz, folk and character dancing; and footwear for gymnastics." Ex. D29 at 511–13.

---

[8]     Mr. Grishko testified through a translator at the April 5th hearing, although he testified in English as well at points. Often, he commenced to respond to questions spoken in English without awaiting the Russian translation. It also appears that the parties often communicated with each other in English over the years of their dealings.

35. The PTO denied the application because the "mark, when used on or in connection with the identified goods, so resembles" the '637 Registration. Ex. D30 at 501. The applications were deemed abandoned on March 8, 2000 and May 23, 2000. Exs. D33 and 38.

## F.  I.M. Wilson's 2007 Federal Trademark Registration

36. The '637 Registration lapsed in 2003 and the PTO deemed the mark abandoned.[9] Ex. D9; Feb. 15 Hrg. Tr. 64:5–8; Feb. 27 Hrg. Tr. 70:13–71:2.

37. I.M. Wilson re-filed its trademark application for GRISHKO on March 30, 2007. Ex. P1.

38. The PTO denied the application because it needed a "substitute specimen," inquired as to the significance of the mark, and noted that if "the name shown in the mark identifies a particular living individual, the applicant must submit a written consent from that individual, authorizing the applicant to register the name." Ex. D13 at 199–201.

39. I.M. Wilson, via its attorney Mr. Maleson, submitted follow-up materials. Ex. D13 at 194–98. The PTO again denied the application because the follow-up materials did not address whether

---

[9]     The testimony around this lapse was thoroughly inconsistent. Ms. Wilson contends that the lapse was "inadvertent." Feb. 15 Hrg. Tr. 65:3–7. She alleges that I.M. Wilson realized that the registration had likely come up for renewal but, when the company called Mr. Maleson's office, they found out he "became ill, stopped practicing" or, perhaps, died. Feb. 27 Hrg. Tr. 71:14–24. Ms. Wilson recalled that they then contacted another attorney to handle the registration. Feb. 27 Hrg. Tr. 71:14–24. However, the record reflects that Mr. Maleson (very much alive) filed I.M. Wilson's next trademark application. Ex. D13 at 207–09. Ms. Wilson's testimony about the relationship with her company's lawyer, Mr. Maleson, was, at best, odd and, ultimately, not especially persuasive (or controlling).

Mr. Grishko alleges that, after the PTO denied his trademark applications, he revoked his consent for I.M. Wilson's registration and demanded that I.M. Wilson transfer the '637 Registration to him. Apr. 5 Hrg. Tr. 81:22–82:24. The parties then allegedly compromised and agreed that I.M. Wilson would simply let the registration lapse. Apr. 5 Hrg. Tr. 82:25–83:6. Mr. Grishko provides no documentary evidence to support this narrative.

The Court recognizes that these events took place well over a decade ago and does not expect the parties' memories to be flawless. With that being said, however, the Court does not find either narrative compelling. The only thing the Court is certain of is that the '637 Registration lapsed, I.M. Wilson went on to file other registrations for the GRISHKO trademark, those registrations became incontestable, and Mr. Grishko acknowledged that I.M. Wilson owned those registrations well after he allegedly requested that I.M. Wilson let the '637 registration lapse.

10

the mark was associated with the name of an individual or the significance of the mark. Ex. D13 at 190–91.

40. On August 13, 2008, a new attorney for I.M. Wilson, Jennifer L. Dean, submitted a request for reconsideration after final action and submitted the August 1992 and March 1993 letters from Mr. Grishko. Ex. D13 at 177–89.

41. This application was registered as Reg. No. 3,568,809 (hereinafter the '809 Registration) on February 3, 2009. Ex. P1.

### G. I.M. Wilson's Current Federal Trademark Registrations

42. I.M. Wilson filed six subsequent applications for GRISHKO trademarks for other goods and services. Ex. P1. The PTO requested consent during the prosecution of each of them. I.M. Wilson submitted the August 1992 and March 1993 letters, and claimed the '809 registration as a prior trademark registration, in support of the registrations listed below. Feb. 27 Hrg. Tr. at 108:9–110:18.

43. I.M. Wilson currently owns these seven trademark registrations:

- Reg. No. 3,568,809 filed March 30, 2007 and registered February 3, 2009
- Reg. No. 3,915,733 filed December 4, 2009 and registered February 8, 2011
- Reg. No. 3,915,742 filed December 9, 2009 and registered February 8, 2011
- Reg. No. 3,915,946 filed February 4, 2010 and registered February 8, 2011
- Reg. No. 4,303,495 filed February 9, 2011 and registered March 19, 2013
- Reg. No. 4,303,496 filed February 9, 2011 and registered March 19, 2013
- Reg. No. 4,746,900 filed September 9, 2014 and registered June 2, 2015

Ex. P1.

44. The '809, '733, '946, and '742 registrations are now incontestable. Ex. P8.

11

### H. Mr. Grishko Acknowledges that I.M. Wilson Owns the GRISHKO Mark in the United States

45. On March 31, 1999, I.M. Wilson received a letter signed by Mr. Grishko that stated "I guarantee that nobody in the United States will receive any GRISHKO trademarked goods from GRISHKO Ltd. in Moscow" and "I fully share your opinion that I.M. WILSON, INC. should take all necessary measures to protect its interests in the USA and Canada as the owner of the GRISHKO trademark[.]"[10] Ex. P10.

46. On August 11, 2009, Kelly Widener Yandolino of dance retailer En Arabesque received a fax signed by Mr. Grishko that stated his company registered the GRISHKO trademark "all over the world with the exception of the USA." Ex. P11. The fax goes on to say, "I, Nikolay Grishko, the owner of the Grishko trademark in the whole world, except the USA . . . ." Ex. P11. Mr. Grishko acknowledges that the fax bears his signature. Apr. 5 Hrg. Tr. 112:1–7.

47. On September 17, 2014, Mr. Grishko responded to an e-mail from Ms. Wilson in which she stated she was thinking about selling her business and the GRISHKO trademark in the United States. Ex. P12. Mr. Grishko stated, "I have no idea if it is time or not for you to sell your business and the Grishko trademark in the US. Anyway you are perfectly within your rights." Ex. P12. He goes on to say that he will sell products to "any deserving customer" but will stop selling products to anyone who is undeserving. Ex. P12.

---

[10] The defendants seem to allege that this letter is fraudulent. Apr. 5 Hrg. Tr. 107:1–19; Defs.' Reply to Plff.'s FFCL at ¶¶ 15–19 (Doc. No. 48). Although the defendants at one point intimated that they planned to use a handwriting expert to challenge this document, that never occurred. Instead, the defendants ask the Court to conclude that the documents were altered by comparing various documents entered into evidence. The defendants' points are intriguing, but the Court has neither the inclination nor the expertise to undertake a forensic analysis of these documents. Instead, the Court merely notes and acknowledges that Mr. Grishko contends he never signed or authorized this document.

## I. The Relationship Between the Parties Deteriorates

48. In March 2016, I.M. Wilson filed a lawsuit against the largest online dance retailer, Discount Dance Supply (DDS). Doc. No. 13-3, Ex. J. I.M. Wilson sued DDS for purchasing products under a different brand owned by the defendants called 1737. Doc. No. 13-3, Ex. J; Feb. 27 Hrg. Tr. 78:18–80:25.

49. On April 14, 2016, the defendants notified I.M. Wilson that they were terminating the exclusive distributorship under the 1992 ETLDA. Doc. No. 13-3, Ex. L. I.M. Wilson objected to the notice of termination on the basis that the 1992 ETLDA required 90 days' notice prior to the agreement's March 1st anniversary. Ex. D36.

50. On August 5, 2016, Mr. Grishko challenged I.M. Wilson's claim of trademark ownership by initiating a cancellation proceeding before the Trademark Trial and Appeal Board (TTAB) on the grounds that each of the registrations was subject to cancellation for "fraud in the procurement of registration." *See* TTAB Proc. No. 92064185 (Filed Aug. 5, 2016) (http://ttabvue.uspto.gov/ttabvue/v?qt=adv&procstatus=All&pno=92064185&propno=&qs=&propnameop=&propname=&pop=&pn=&pop2=&pn2=&cop=&cn=). Those proceedings are suspended pending the outcome of this lawsuit, though this Court did not participate in any way in the suspension.

51. Around March 2018, the defendants took the position that they were permitted to sell GRISHKO-branded products in the United States.

52. Grishko Dance operates the website grishkoshop.com. Apr. 5 Hrg. Tr. 141:24–143:7. The defendants have started selling GRISHKO-branded products in the United States through the grishkoshop.com website. Feb. 27 Hrg. Tr. 154:17–155:25; 156:24–157:5.

53. The defendants are taking steps to advertise to U.S. customers. Ex. P7 (allowing customers to select USA as their country of origin on the grishkoshop.com website and posting on Instagram

to promote grishkoshop.com Black Friday sales); Ex. P9 (promoting grishkoshop.com as the top result on Google in the U.S.).

54. As of January 2019, the defendants ceased shipping GRISHKO-branded products to I.M. Wilson. Apr. 5 Hrg. Tr. 162:20–163:1.

### J. Effects of the Defendants' Entrance into the U.S. Market

55. I.M. Wilson's store in New York City has received phone calls from customers seeking assistance with grishkoshop.com orders. Feb. 27 Hrg. Tr. 132:11–13; 133:5–7; 134:8–19. I.M. Wilson did not keep track of these calls. Feb. 27 Hrg. Tr. 152:3–5. Customers also emailed I.M. Wilson for help with grishkoshop.com orders. Ex. P16.

56. I.M. Wilson's retailers have also reached out to the company supposedly because they believe that I.M. Wilson is selling to customers directly via grishkoshop.com. Ex. P13 ("So, I see you have launched a new website for dancers direct."); Ex. P14 ("I must admit if this practice of offering the Grishko pointe shoes at wholesale to the customer continues I would be forced to discontinue carrying them."); Ex. P15 ("Our customers are forgoing our services to purchase at this website. We cannot compete with the prices that they are offering as they are too close to whole sale [sic] prices that we pay for."); Ex. P27 ("My customers want to know why they can get Grishko items cheaper from Grishko shop than me. It has hurt business.").

57. On Monday, May 20, 2019, the defendants emailed I.M. Wilson's retailers a letter from Mr. Grishko. Doc. No. 54-1, Ex. A; Doc. No. 54-2, Ex. A. In that letter, Mr. Grishko stated that I.M. Wilson "has made unfounded threats of retaliation against retailers who purchase products through anyone other than" I.M. Wilson. Doc. No. 54-1, Ex. A. The letter further stated that I.M. Wilson had limited inventory and that Grishko Russia will no longer be providing I.M. Wilson with genuine GRISHKO products. Doc. No. 54-1, Ex. A. In closing, the letter stated, "we are confident that the Court ruling will be issued within the coming days and that it will be in our

14

favor. Once the Court has denied [I.M. Wilson's] request, we look forward to supplying you with the full range of authentic Grishko brand products." Doc. No. 54-1, Ex. A.

58. On June 17, 2019, the defendants e-mailed I.M. Wilson's retailers with "Guidelines for Identifying Genuine 'Made in Russia' Grishko Pointe Shoes." Doc. No. 60-2, Ex. B. The letter alleges that I.M. Wilson is selling GRISHKO-branded shoes that are not made by Grishko Russia. Doc. No. 60-2, Ex. B. The document includes guidelines and photographs for a side-by-side comparison of how to spot the differences between genuine Grishko Russia products and shoes I.M. Wilson is selling.[11] Doc. No. 60-2, Ex. B.

59. I.M. Wilson has received correspondence from at least three customers cancelling their orders as a result of Grishko's correspondence. Doc. No. 60-1, Ex. A ("Please cancel all pending orders immediately that we have with you, IM Wilson."); Doc. No. 60-1, Ex. B ("Since you guys no longer offer authentic Grishko pointe shoes we can't work with IM Wilson Inc. our studios with [sic] not accept Grishkos at the moment until we know the future of IM Wilson Inc."); Doc. No. 60-1, Ex. C ("Per my attached letter I would like to cancel all orders and back orders.").

## II. Conclusions of Law

60. In ruling on a request for a preliminary injunction,[12] a district court is required to examine four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff will suffer irreparable harm if relief is not granted; (3) the balance of equities; and (4) the public interest. *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014);

---

[11]     I.M. Wilson allegedly began working with a Chinese manufacturer after the defendants stopped providing them with products. The Chinese-made ballet shoes are sold as "GRISHKO" ballet shoes.

[12]     The defendants also argue that I.M. Wilson's claims are barred by the doctrine of unclean hands. The defendants contend that I.M. Wilson's "acts of bad faith, fraud, and unconscionable litigation tactics are littered throughout the history of this case." Defs.' PFFCL at 68 (Doc. No. 44). The defendants fail to point to specific instances of bad faith and instead cast broad aspersions meant to malign I.M. Wilson's principals' character. The Court will not entertain this defense in the absence of evidence introduced on the record.

15

*Opticians Ass'n of America v. Independent Opticians of America*, 920 F.2d 187, 191–92 (3d Cir. 1990). The movant must "meet the threshold for the first two 'most critical' factors," and if "these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017).

### A. Likelihood of Success on the Merits

61. A likelihood of success on the merits "requires a showing significantly better than negligible but not necessarily more likely than not . . . ." *Reilly*, 858 F.3d at 179. To succeed on the merits of its Lanham Act claims, I.M. Wilson "must demonstrate that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) the defendant's use of the mark to identify goods or services causes a likelihood of confusion." *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). The same standard applies to unfair competition claims brought pursuant to § 43(a) of the Lanham Act, *see id.*, and common law infringement claims. *See First Am. Mktg. Corp. v. Canella*, No. 03-812, 2004 WL 250537, at *2 (E.D. Pa. Jan. 26, 2004) (listing elements of common law trademark infringement claim).

### 1. Validity, Legal Protectability, and Ownership

62. Under the Lanham Act, a federally registered trademark is "prima facie evidence of the validity of the registered mark[.]" 15 U.S.C. § 1115(a). Furthermore, "validity, legal protectability, and ownership are proved" when "the mark at issue is federally registered and has become incontestable," thereby satisfying the first two prongs of a trademark infringement claim. *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000). "It is well established that a distributor may own the trademark in goods it does not manufacture." *Premier Dental Prod. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 853 (3d Cir. 1986).

63. "A trademark becomes incontestable after the owner files affidavits stating that the mark has been registered, that it has been in continuous use for five consecutive years, and that there is no pending proceeding and there has been no adverse decision concerning the registrant's ownership or right to registration." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 n.7 (3d Cir. 1994); 15 U.S.C. § 1065. The conclusive presumption of ownership established by an incontestable registration can be challenged under a limited number of circumstances. 15 U.S.C. § 1115(b)(1)–(9) (listing defenses or defects in incontestable registrations such as fraud, abandonment, and that the mark is functional). In this case, it is undisputed that I.M. Wilson owns four incontestable GRISHKO trademarks.

64. The defendants challenge I.M. Wilson's ownership of the GRISHKO mark on a number of different grounds.

65. Their main argument rests on whether Mr. Grishko's August 1992 letter was an assignment of the rights to the GRISHKO mark for all time or a consent to use the mark during the pendency of the exclusive licensing agreement. The Court denies this argument because I.M. Wilson's four incontestable registrations cannot be challenged on these grounds.

66. The defendants also argue that I.M. Wilson obtained the registrations by fraud and that they should be cancelled because Mr. Grishko revoked his consent for I.M. Wilson to register his name. However, the defendants have not presented evidence of fraud on the trademark office or that Mr. Grishko revoked his consent prior to when I.M. Wilson filed its current registrations.

67. Finally, the defendants argue in late-stage briefing that they are also challenging the incontestable registrations on the grounds that I.M. Wilson is misrepresenting the source of its

goods. The Court declines to address this argument because the defendants failed to raise it in an opening brief or during the hearings and, as such, waived it.[13]

68. Because the defendants have not successfully challenged I.M. Wilson's four incontestable registrations, those registrations prove "validity, legal protectability, and ownership . . . ."

*Commerce Nat. Ins.*, 214 F.3d at 438

## a. Effect of Incontestable Registrations

69. The defendants challenge I.M. Wilson's ownership of the GRISHKO mark on the grounds that the August 1992 letter that I.M. Wilson used to obtain its incontestable trademarks is a consent, not an assignment. According to the defendants, this 1992 letter was not an assignment of all

---

[13]    "An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice to bring that issue before this court.'" *Laborers' Intern. Union of North America, AFL-CIO v. Foster Wheeler Energy Corp.*, 26 F.3d 375, 398 (3d Cir. 1994) (quoting *Simmons v. City of Phila.*, 947 F.2d 1042, 1066 (3d Cir. 1991) (plurality opinion)) (alteration in original); *Gorum v. Sessoms*, 561 F.3d 179, 186 n.4 (3d Cir. 2009) (quoting *Foster Wheeler*, 26 F.3d at 398); *Hausknecht v. John Hancock Life Ins. Co. of New York*, 334 F. Supp. 3d 665, 675 n.5 (E.D. Pa. 2018) ("However, Plaintiffs only raised this contention in their Reply brief in support of their summary judgment motion. Thus, Plaintiffs waived that argument.").

In this case, the Court cannot conclude that the defendants raised an argument under § 1115(b)(3) in anything that might be considered an opening brief. Strictly speaking, the defendants' opening brief was the response they filed on January 11th in opposition to I.M. Wilson's motion, which made no mention of § 1115(b)(3). However, given the discovery and testimony presented at the preliminary injunction hearing, it is reasonable to consider the defendants' proposed findings of fact and conclusions of law as their opening brief. Even so, the defendants made no mention of this argument in that filing either.

At most, the defendants made a passing reference to § 1064(3), which permits cancellation of a registration at any time for reasons including if the registrant is using the mark "so as to misrepresent the source of the goods or services on or in connection with which the mark is used." 15 U.S.C. § 1064(3). However, the only arguments that the defendants put forth under this section are related to whether I.M. Wilson's trademarks may be cancelled because Mr. Grishko revoked his consent and, thus, the trademarks were obtained contrary to 15 U.S.C. § 1052(c). *See* Defs.' PFFCL at 57–8 (Doc. No. 44). Those arguments are discussed *infra* at ¶¶ 80–83 and are unrelated to the arguments the defendants make about misrepresentation of source in later filings. *See* Defs.' Reply to Plff.'s PFFCL at 14–17 (Doc. No. 48); Defs.' Closing Brief at 9 (Doc. No. 53).

"Absent further briefing, the Court will not determine this issue at this stage of the proceedings." *United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp. 2d 106, 126 n.14 (E.D. Pa. 2011) (citing *Foster Wheeler*, 26 F.3d at 398). This is not to say that the defendants are foreclosed from challenging I.M. Wilson's incontestable trademarks on this basis at a later stage of this litigation. They may do so if they raise the argument in a timely fashion, and they may well be successful with it.

rights to the GRISHKO mark for all time. Instead, the defendants contend that the letter should be read in connection with the 1992 ETLDA and, as such, any rights to the GRISHKO mark would terminate when the parties' exclusive licensing agreement terminated.

70. The defendants' focus on whether the August 1992 letter was a consent or an assignment[14] is unavailing in this case because I.M. Wilson owns four incontestable registrations, which are "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b); *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 196 (1985); *Commerce Nat. Ins.*, 214 F.3d at 438; *Urban Outfitters v. BCBG Max Azria Group, Inc.*, 511 F. Supp. 2d 482, 491 (E.D. Pa. 2007).

71. The Lanham Act provides for a limited number of instances in which a party can challenge the validity of an incontestable registration. *See* 15 U.S.C. § 1115(b)(1)–(9); *Park 'N Fly*, 469 U.S. at 196 ("Congress expressly provided in §§ 33(b) and 15 that an incontestable mark could be challenged on specified grounds . . . ."). The defendants' argument that the August 1992 letter was a consent, rather than an assignment, does not fall within the Lanham Act's list of permissible challenges to an incontestable registration.[15]

---

[14]     The Court recognizes that assignment, license, and consent are often used interchangeably but have different meanings in the context of trademark law. "An 'assignment' of a mark is an outright sale of all rights in that mark[.]" 3 McCarthy on Trademarks and Unfair Competition § 18:1 (5th ed.). Under the Lanham Act, assignments of federally registered trademarks must be done in writing. 15 U.S.C. § 1060(3). "A 'license' of a mark is a limited permit to another to use the mark[.]" McCarthy § 18:1. And, a "'consent to use' is a promise not to sue for a defined type of usage which is not an infringement." *Id.* When the agreement is ambiguous as to whether it is an assignment, a license, or a consent, "substance prevails over the name given it by the parties." *Id.* at §§ 18:1 & 5.

[15]     Even if the defendants could challenge I.M. Wilson's incontestable registrations on this basis, they would be unsuccessful. The defendants argue that, because this is a relationship between a foreign manufacturer (Grishko) and an exclusive distributor (I.M. Wilson), there is "a rebuttable presumption of initial trademark ownership in favor of the manufacturer[.]" *Covertech Fabricating, Inc. v. TVM Building Products, Inc.*, 855 F.3d 163, 171 (3d Cir. 2017). This presumption applies "in the absence of a contractual

19

72. As such, the Court will consider the challenges to I.M. Wilson's incontestable registrations that are permitted under the statute.

## b. Fraud

73. The defendants argue that I.M. Wilson's registrations were obtained fraudulently because I.M. Wilson was aware that Mr. Grishko revoked his consent for I.M. Wilson to register the GRISHKO mark in the United States, but I.M. Wilson continued registering the mark anyway.

74. A party fraudulently procures a trademark registration when the "applicant knowingly makes false, material representations of fact in connection with his application." *In re Bose Corp.*, 580 F.3d 1240, 1243 (Fed. Cir. 2009) (quoting *Torres v. Cantine Torresella S.r.l.*, 808 F.2d 46, 48 (Fed. Cir. 1986)); *Alliance Bank v. New Century Bank*, 742 F. Supp. 2d 532, 551 (E.D. Pa. 2010). The "intent to deceive can be inferred from indirect or circumstantial evidence." *Covertech*, 855 F.3d at 175. A party alleging fraud "bears a heavy burden of proof" and must demonstrate the fraudulent behavior with "clear and convincing evidence." *In re Bose Corp.*, 580 F.3d at 1243; *Covertech*, 855 F.3d at 175; *Alliance Bank*, 742 F. Supp. 2d at 551. Furthermore, courts have

---

agreement." *Id.* The Court of Appeals for the Third Circuit has further stated that "courts must be cautious in scenarios that do not involve clear written documents of assignment." *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 822 (3d Cir. 2006).

    In this case, there are two clear writings. Mr. Grishko first stated "I agree that I.M. Wilson, Inc. is the owner of the Trademark, GRISHKO and its goodwill in the United States of America. I further consent to the use of my name in that trademark." Ex. P2. He later stated that he granted I.M. Wilson the right to register the mark. Ex. P3. I.M. Wilson then went on to register those trademarks. In light of these writings, it is difficult to see that the presumption of trademark ownership in favor of the foreign manufacturers should apply in this case.

    This case is also analytically distinct from cases the defendants cite to that discuss the validity of an assignment that *transfers ownership of an already registered mark* because the letter at issue gave I.M. Wilson the authority to register the mark in the first instance. *UBU/Elements, Inc. v. Elements Pers. Care, Inc.*, No. CV 16-2559, 2016 WL 3418696, at *1 (E.D. Pa. June 22, 2016) (quoting *Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 623 F.3d 61, 63 (2d Cir. 2010)) (stating that district courts should not be precluded "from allowing any challenge to the recorded assignment of an incontestable registration, since that would 'improperly conflate[ ] incontestability with the analytically distinct issue of whether a *subsequent transfer of the marks* was valid.") (emphasis added) (alteration in original).

"explained that '[m]ere negligence is not sufficient to infer fraud or dishonesty.'" *Alliance Bank*, 742 F. Supp. 2d at 551 (quoting *In re Bose Corp.*, 580 F.3d at 1244) (alteration in original).

75. According to the defendants, Mr. Grishko attempted to register the marks GRISHKO (the stylized logo) and NIKOLAY GRISHKO (standard character) in 1999 but was denied because the marks were too similar to I.M. Wilson's '637 registration. Mr. Grishko allegedly told Ms. Wilson that he wanted her to let her registration lapse. I.M. Wilson's '637 registration lapsed in 2004. I.M. Wilson then began filing new registrations in 2007 and submitted the August 1992 and March 1993 letters to demonstrate that she had Mr. Grishko's consent. In using these letters, the defendants allege that I.M. Wilson intentionally made false representations in connection with the GRISHKO trademarks because she knew that Mr. Grishko no longer consented to the registration. However, these are not the facts currently in the record.

76. There are, undoubtedly, discrepancies in both parties' stories when it comes to the 2004 lapse of the original '637 registration.

77. Ms. Wilson testified that it was a mere oversight but also said that she thought the lapse may have occurred because her attorney became ill or passed away. However, that same attorney later completed future filings on Ms. Wilson's behalf. It also seems rather odd that I.M. Wilson would use the 1992 and 1993 letters 15 years later to re-register the GRISHKO marks as opposed to obtaining new consents.

78. For his part, Mr. Grishko's story of asking I.M. Wilson to let the registration lapse also lacks credibility. Although Mr. Grishko allegedly wanted the registration for himself, he took no action between 2004 and 2007, while I.M. Wilson's registration had lapsed, and he further waited until 2016 to challenge the new registrations. Mr. Grishko actually acknowledged that I.M. Wilson

21

owned the registration in 2009 and 2014.[16] *See* Ex. P11. ("I, Nikolay Grishko, the owner of the Grishko trademark in the whole world, except the USA . . . ."); Ex. P12 ("I have no idea if it is time for you to sell your business and the Grishko trademark in the US. Anyway you are perfectly within your rights.").

79. Although the Court is not convinced by either party's narrative, at this time, the defendants have not proffered the "clear and convincing" evidence required of them to demonstrate fraud and challenge I.M. Wilson's incontestable marks on this basis. *Covertech*, 855 F.3d at 175; *In re Bose Corp.*, 580 F.3d at 1243; *Alliance Bank*, 742 F. Supp. 2d at 551.

### c.  Consent to Register Mr. Grishko's Name

80. The defendants allege that I.M. Wilson's current incontestable registrations are subject to cancellation because they were obtained *after* Mr. Grishko already revoked his consent for I.M. Wilson to register the mark. This argument rests on the defendants' story that Mr. Grishko permitted I.M. Wilson to register the mark in 1992 and later asked I.M. Wilson not to renew the '637 mark. The Court will not cancel I.M. Wilson's registrations on this basis because, as noted, there is simply no evidence that Mr. Grishko revoked his consent for I.M. Wilson to register his name.

81. Any trademark that consists "of or comprises a name, portrait, or signature identifying a particular living individual" requires that individual's consent. 15 U.S.C. § 1052(c).[17] "A consent by a person to *use* of his or her name as a mark does not necessarily qualify under § 2(c) as a

---

[16]      Mr. Grishko also allegedly acknowledged that I.M. Wilson was the owner of the mark in 1999. Ex. P10. Because the defendants are alleging that this letter is fraudulent and there is no proof as to whether or not the letter is genuine, the Court will not consider the letter.

[17]      As addressed at length at footnote 13, *supra*, the defendants also ask the Court to cancel I.M. Wilson's marks under § 1052(c). Once again, this section prohibits *registration* of a trademark without the individual's consent. It does not provide a basis for *cancellation* of the trademark. A party can file a petition to cancel a trademark that was obtained in violation of § 1052(c) pursuant to § 1064(3).

consent to federal registration of the name as a trademark. Thus, a sufficient consent must be a consent to register the mark, not merely a consent to use." 2 McCarthy on Trademarks and Unfair Competition § 13:37 (5th ed.) (internal footnote omitted) (emphasis in original). *See Reed v. Bakers Engineering & Equipment Co.*, 100 U.S.P.Q. 196, 199 (Jan. 27, 1954) ("Consent to register must be distinguished from consent to use. There may very well be consent to use without any consent to register. And neither is consent to register sufficient under the statute unless it is a written consent as specified in the statute."); *Hot Stuff Foods, LLC v. Mean Gene's Enters., Inc.*, 468 F. Supp. 2d 1078, 1092 (D.S.D. 2006) (same).

82. In *Mean Gene's*,[18] 468 F. Supp. 2d at 1086, Gene Okerlund (a host for televised professional wrestling) entered into a personality endorsement agreement to lend his name "Mean Gene" to food products. The food products company later registered "Mean Gene's Burgers" without a written consent from Mr. Okerlund.[19] *Id.* at 1087. The court concluded that the personality endorsement agreement was a consent to use Mr. Okerlund's name but was not a consent to register it. *Id.* at 1092. The court further ordered the cancellation of the "Mean Gene's Burgers" trademark because a written consent was required but not provided prior to registration pursuant to § 1052(c). *Id.*

83. In this case, Mr. Grishko provided the August 1992 letter (a consent to use) and March 1993 letter (a consent to register). Although the defendants argue that he later revoked these consents, as discussed *supra* at ¶¶ 75–78, there is no evidence of this revocation other than Mr. Grishko's own testimony. Instead, the evidence demonstrates that the '637 mark lapsed in 2004,

---

[18] The Court acknowledges and accepts that some might find it entirely apt—or at least humorous— that this particular Court invokes *Mean Gene's*.

[19] The food products company also attempted to register "Mean Gene's Pizza"; however, it abandoned that trademark application after the PTO requested a written consent. 468 F. Supp. 2d at 1087– 88.

I.M. Wilson refiled the registrations in 2007, and Mr. Grishko acknowledged that I.M. Wilson owned the mark in 2009 and 2014, *after* he had allegedly already revoked his consent. The defendants have not provided a basis on which to cancel I.M. Wilson's trademarks.

## 2. Confusion

84. I.M. Wilson argues that the defendants' use of the GRISHKO mark in the United States is likely to cause confusion. The defendants' likelihood of success on the merits arguments focus exclusively on whether I.M. Wilson owns the mark; they never actually address whether "the defendant's use of the mark to identify goods or services causes a likelihood of confusion."[20] *Victoria's Secret Stores*, 237 F.3d at 210.

85. The Court of Appeals for the Third Circuit "has held that where the identical mark is used concurrently by unrelated entities, the likelihood of confusion is inevitable." *Pappan Enterprises, Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 804 (3d Cir. 1998); *Opticians Ass'n*, 920 F.2d at 195 ("[L]ikelihood of confusion is inevitable, when, as in this case, the identical mark is used concurrently by unrelated entities.").[21] There is no dispute that the defendants are selling ballet

---

[20] The only time the defendants actually address confusion is in their response to I.M. Wilson's Proposed Findings of Fact and Conclusions of Law. *See* Defs.' Reply to Plff.'s PFFCL at 19–20 (Doc. No. 48). Instead of addressing confusion, however, the defendants merely argue that I.M. Wilson's "assertion of likelihood of confusion is actually an acknowledgement that [I.M. Wilson] is misrepresenting the source of the genuine Grishko goods" under 15 U.S.C. § 1115(b)(3). *Id.* As the Court has already noted, the defendants waived this argument by failing to timely raise it. *See supra* note 13.

[21] Additionally, the Court of Appeals for the Third Circuit has "adopted a non-exhaustive list of factors, commonly referred to within our Circuit as the '*Lapp* factors,' based on an early case in which they were set forth." *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 319 (3d Cir. 2015) (citing *Kos Pharmaceuticals, Inc. v. Andrx Corp.*, 369 F.3d 700, 709 (3d Cir. 2004)). The factors include: (1) the degree of similarity between the owner's mark and the allegedly infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicating the care and attention one expects would be given when making a purchase; (4) the length of time the alleged infringer has used the mark without evidence of actual confusion arising; (5) the intent of the alleged infringer in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods are marketed through the same channels; (8) the extent to which the target markets are the same; (9) the perceived relationship of the goods, whether because of their near-identity, similarity of function, or other factors; and (10) other facts suggesting that the prior owner might be expected to expand into the alleged infringer's market. *Id.*

slippers and pointe shoes bearing the GRISHKO mark in the United States. This is undoubtedly causing confusion.

86. "In short, since statutory incontestability established both the [GRISHKO] marks' validity and the [I.M. Wilson's] ownership, along with the attendant right to exclusive use, and because likelihood of confusion is an inevitable result of the concurrent use of the [GRISHKO] marks, [I.M. Wilson] has met its burden of showing a probability of success on the merits." *Opticians Ass'n*, 920 F.2d at 195.

87. I.M. Wilson has demonstrated a sufficient likelihood of success on the merits for immediate purposes.

## B. Irreparable Harm to I.M. Wilson

88. "The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484–85 (3d Cir. 2000). Courts "may award preliminary injunctive relief upon a clear showing of a likelihood of irreparable harm." *Groupe*, 774 F.3d at 204 (internal quotation marks omitted). In coming to this conclusion, the Court is allowed to draw "fair inferences from facts in the record." *Id.* at 205. The "the availability of money damages for an injury typically will preclude a finding of irreparable harm." *Reilly*, 858 F.3d at 179 n.4.

89. A "party seeking a preliminary injunction in a Lanham Act case is not entitled to a presumption of irreparable harm but rather is required to demonstrate that she is likely to suffer

---

An analysis of the *Lapp* factors is unnecessary in this case given that the parties are using the same mark on almost identical goods. With that being said, the Court notes that the marks are identical, I.M. Wilson presented evidence that retailers and customers believed I.M. Wilson, not the defendants, was selling GRISHKO products online at a deep discount, and the defendants were aware that I.M. Wilson owned four incontestable trademarks and entered the pointe shoe market anyway.

irreparable harm if an injunction is not granted." *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 217 (3d Cir. 2014); *Groupe SEB*, 774 F.3d at 203. "Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill," and "can also be based upon the possibility of confusion." *Pappan Enters.*, 143 F.3d at 805 (citing *Opticians Ass'n*, 920 F.2d at 195–96).

90. When the record initially closed for this demand for a preliminary injunction, monetary damages very likely would have sufficed. I.M. Wilson presented only limited evidence that consumers believed it was operating grishkoshop.com and undercutting retailers' prices. It also presented testimony referring to only a few phone calls from consumers to I.M. Wilson's store in New York with inquiries related to grishkoshop.com. This testimony presented, at best, some evidence that the defendants' entrance into the market may have resulted in a loss of control of reputation, loss of trade, or loss of goodwill for I.M. Wilson. However, rather surprisingly, Mr. Grishko thereafter sent two important communications that ultimately change the landscape of the Court's analysis on this important issue.

91. It is undisputed that the defendants stopped providing I.M. Wilson with products in January of this year (as they are permitted to do now that the 1992 exclusive licensing agreement has ended). This apparently led to a supply problem for I.M. Wilson, who sent a letter to retailers on March 28th stating that I.M. Wilson was "facing an interruption in service at the factory, which in turn leads to longer delivery times for our shipments." Grishko Decl. (Doc. No. 56-1, Ex. B). Mr. Grishko then on May 20, 2019 sent a letter to all U.S. retailers stating that the defendants had terminated their relationship with I.M. Wilson, included with the letter information about this litigation, and then said that I.M. Wilson will no longer be able to provide customers with genuine GRISHKO brand "Made in Russia" pointe shoes. Plff.'s Mot. to Supp., Ex. A (Doc. No. 54-1).

Mr. Grishko further stated, "I am writing this to you because, unfortunately, [I.M. Wilson] has made unfounded threats of retaliation against retailers who purchase products through anyone other than [I.M. Wilson]." *Id.*

92. After the May 20th letter, I.M. Wilson then allegedly began working with a Chinese manufacturer and started supplying retailers with Chinese versions of GRISHKO models. Mr. Grishko again contacted U.S. retailers stating that the defendants were no longer supplying I.M. Wilson with their shoes, that I.M. Wilson was distributing shoes and attempting to pass off shoes as the defendants' own, and then Mr. Grishko provided retailers with a photographic guide of how to identify the defendants' products. He further stated, "We have also heard rumors that [I.M. Wilson] has threatened to sue retailers who don't purchase through [I.M. Wilson]. Please know that if [I.M. Wilson] ever initiated such a lawsuit, Grishko would defend its valued retail customers at no cost." Gili Decl. at Ex. B (Doc. No. 61-2).

93. In support of the veracity of this repeated statement as to I.M. Wilson's litigious nature, the defendants present the Court with a declaration from Camille Marie Nardolilo-Cherr of Boutique of the Dance in Naples, Florida. Nardolilo-Cherr Decl. (Doc. No. 56-2). Ms. Nardolilo-Cherr attests that she met Ms. Wilson at a trade show in 2018 and told Ms. Wilson that she (Ms. Nardolilo-Cherr) sells GRISHKO products she receives through a Canadian distributor. *Id.* Ms. Wilson allegedly then became angry, told Ms. Nardolilo-Cherr that she was only permitted to sell GRISHKO products in the United States if she purchased through I.M. Wilson and said Ms. Nardolilo-Cherr "needed to buy shoes from her or else she would sue [Ms. Nardolilo-Cherr] and have someone come to [Ms. Nardolilo-Cherr's] store and take all of [Ms. Nardolilo-Cherr's] Grishko products, and shut [the store] down." *Id.*

27

94. Without commenting on or even doubting the veracity of Ms. Nardolilo-Cherr's statement, the Court must nonetheless observe that it has not heard her testify or even read a deposition transcript in which I.M. Wilson had the opportunity to cross-examine her. The Court has merely been presented with a one-sided recitation of this event. The defendants, however, seem to have used this reported interaction to tell I.M. Wilson's retailers that I.M. Wilson will sue them should they purchase GRISHKO products from anyone other than I.M. Wilson. It is difficult to see how it is possible for a communication such as this *not* to harm I.M. Wilson's reputation and goodwill. As such, with these additions to the record (ironically supplied by the defendants) I.M. Wilson has actually managed to demonstrate a likelihood of irreparable harm.[22]

95. I.M. Wilson has demonstrated irreparable harm.

## C. Balance of Equities

96. "The third factor a district court must consider before granting preliminary injunctive relief is the harm defendant might suffer should the relief be granted. In considering this harm, the district court must undertake to balance the hardships to the respective parties." *Pappan*, 143 F.3d at 805. The defendants argue that they are likely to suffer much greater harm if a preliminary

---

[22]     The defendants further argue that I.M. Wilson's claims of irreparable harm are negated by the fact the I.M. Wilson delayed "in bringing suit for over two years after objecting to the operation of the grishkoshop.com website." Defs.' PFFCL at 65 (Doc. No. 44). I.M. Wilson is not precluded from seeking a preliminary injunction on this basis because, "under the doctrine of progressive encroachment, the owner of a trademark is not [] required to sue 'until the likelihood of confusion caused by the accused use presents a significant danger to the mark.'" *Urban Outfitters*, 511 F. Supp. 2d at 509 (quoting *McCarthy* § 31:20 (4th ed. 2006)). A party is not obligated to immediately file suit when the level of infringement is fairly low or a similar mark is used on a different type of product or service. *Id.* (citing *McCarthy* § 31:20). Instead, it is only when "the accused use moves closer or increases in quantity that the doctrine of progressive encroachment requires the trademark to remain alert and to promptly challenge the new and significant acts of infringement." *Id.* (quoting *McCarthy* § 31:20).

     The defendants began selling products in earnest in March 2018, when the exclusivity of the 1992 agreement ended. I.M. Wilson presented evidence that the defendants scaled their presence up in November 2018 to take advantage of Black Friday shoppers. This included a more user-friendly website with options for U.S. customers and promotion of grishkoshop.com as the top result on Google. I.M. Wilson filed this suit shortly thereafter.

injunction is issued than I.M. Wilson would if the Court were to deny the motion. The argument seems to rest on the fact that the defendants would be precluded from selling their products in the U.S. market. Although it is true that a preliminary injunction would prevent the defendants from selling GRISHKO-branded products in the United States during the pendency of this case, the Court does not see the balance of hardships tipping in the defendants' favor as a result.

97. First, the defendants arguably could return to supplying I.M. Wilson with GRISHKO-branded products. Given the antagonistic nature of these proceedings, the Court understands that this might not be expected to happen.

98. Second, there is nothing to indicate that an injunction would irreparably impact the defendants' business on the one hand, but a failure to grant a preliminary injunction on the other hand might do that to I.M. Wilson's. Even with a preliminary injunction in place, the defendants will be able to sell their products everywhere else in the world other than in the United States. Budding and busy ballerinas are dancing throughout the world. If they ultimately succeed on the merits, they can seek to recover money damages from I.M. Wilson for lost sales, and the proposed bond can provide some comfort in that regard.

99. The balance of equities weighs in I.M. Wilson's favor.

### D. Public Interest

100. "Public interest can be defined a number of ways, but in a trademark case, it is most often a synonym for the right of the public not to be deceived or confused." *Opticians Ass'n*, 920 F.2d at 197; *see also Pappan*, 143 F.3d at 807. "As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff." *American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

101. This is one of those few cases where the Court actually concludes that the public interest does not favor the plaintiff, even though I.M. Wilson has demonstrated both a likelihood of success on the merits and irreparable injury.

102. This case presents a unique problem in that I.M. Wilson currently holds four incontestable GRISHKO trademarks but no longer sells or has access to what the public has come to know as GRISHKO products (i.e., those made by the defendants). Ultimately, this Court believes the split ownership of the trademark and associated products is confusing to the public, where people are expecting to purchase Russian-made ballet items when they purchase GRISHKO products and are instead purchasing whatever products I.M. Wilson is now selling to which it simply affixes the name "GRISHKO." Although I.M. Wilson confidently assures the Court that I.M. Wilson can put the GRISHKO trademark on any type of goods it wishes because it owns the mark, that is a somewhat troubling assertion from the perspective of imagining a consumer keen on seeing Russian-made ballet slippers on the dancer's feet.[23] And the fact that a preliminary injunction would prevent the public in this country from having the ability to purchase the defendants' products is undoubtedly against such a public interest.

103. This factor weighs in the defendants' favor.

## E. Conclusion

104. The Court concludes that I.M. Wilson meets "the threshold for the first two 'most critical' factors" of a preliminary injunction: likelihood of success and irreparable harm. *Reilly*, 858 F.3d at 179. Because "these gateway factors are met," the Court may consider the two remaining

---

[23] For example, contemplating a slightly different "foot fault", if an entity other than Nike owned the trademark "Air Jordan" in Canada and sold "Air Jordan" shoes, it hardly seems that anyone would pay a premium for Canadian Air Jordans. Indeed, a customer who paid top dollar for Canadian Air Jordans believing they were Nikes would likely feel duped and as though they had purchased a counterfeit product. It is not hard to foresee a similar dilemma here for the pointe-shoe wearing public.

factors—balance of equities and the public interest—and determine "if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* The first three factors tip in I.M. Wilson's favor, although the public interest does not. However, the Court concludes that by taking all four factors together, on balance, weigh sufficiently in I.M. Wilson's favor to rule that a preliminary injunction is appropriate in this case.

105. Pursuant to Rule 65(c), this Court "may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *Sprint Commc'ns Co. L.P. v. CAT Commc'ns Int'l, Inc.,* 335 F.3d 235, 239 (3d Cir. 2003) ("Generally, a bond is a condition of preliminary injunctive relief."); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 903 F.2d 186, 209–10 (3d Cir. 1990) (concluding "that the district court erred in failing to require a bond" when it granted a preliminary injunction).

106. Given that this Court's ruling will prevent the defendants from selling GRISHKO-branded products in the United States during the pendency of these proceedings, a reasonable bond is required to protect the defendants' interests. Because neither party has briefed the issue of an appropriate amount for a bond, the Court will require both parties to submit a brief proposal in addition to the reasons that the amount they propose is appropriate.

## THE DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM OR, ALTERNATIVELY, STAY THIS ACTION PENDING ARBITRATION

The defendants filed a motion to dismiss or, alternatively, stay this action pending arbitration. They seek to compel arbitration as set forth in the arbitration clause in the 1992 ETLDA. The Court denies the motion because the arbitration provision terminated along with the 1992 ETLDA, and this dispute does not relate back to that agreement while it was in effect.

31

## I. Legal Standard

In evaluating whether there is a valid agreement to arbitrate, a district court must "initially decide whether the determination is made under Fed. R. Civ. P. 12(b)(6) or 56." *Sanford v. Bracewell & Guiliani*, LLP, 618 F. App'x 114, at *2 (3d Cir. 2015). "[W]hen it is apparent, based on the face of a complaint, and documents relied upon in the complaint, that certain of a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay." *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (citation and quotations omitted). But if "the complaint and its supporting documents are unclear regarding the agreement to arbitrate, or if the plaintiff has responded to a motion to compel [or stay] arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then the parties should be entitled to discovery on the question of arbitrability before a court entertains further briefing on the question." *Id.*

The defendants contend that the Court should treat this under a Rule 12(b)(6) standard. I.M. Wilson does not take a position on the standard the Court should apply. I.M. Wilson briefly references, but does not attach, the 1992 ETLDA. Compl. at 6 (Doc. No. 1). The defendants did, however, attach the agreement to the motion to dismiss or stay the case. *See* Grishko Decl. at Ex. A (Doc. No. 12-2). Although the parties conducted discovery on the motion for preliminary injunction, they did not request discovery on the issue of arbitrability. The Court agrees with the defendants that Rule 12(b)(6) standard is appropriate in this case. With that being said, this motion turns on the purely legal question of whether the arbitration provision in the 1992 ETLDA covers this dispute. As such, the outcome would be the same under either a motion to dismiss or a summary judgment standard.

32

## II. Discussion

"An arbitration provision in an international commercial agreement is governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ('CREFAA')." *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 448–49 (3d Cir. 2003). In a dispute regarding an international commercial agreement, "a court must address four factors to determine whether the arbitration agreement falls under CREFAA." *Id.* "If the answers are all in the affirmative, the court must order arbitration unless it determines the agreement is null and void." *Id.* The four factors a court must consider are whether (1) "there is 'an agreement in writing to arbitrate the subject of the dispute,' at issue"; (2) "the agreement provide[s] for arbitration in the territory of a signatory of" CREFAA; (3) "the agreement arise[s] out of a legal relationship, whether contractual or not, which is considered as commercial", and; (4) either "a party to the agreement is not an American citizen" or the commercial relationship between the parties has "some reasonable relation with one or more foreign states." *Id.* at 449 & n.13. The only factor at issue in this case is the first one.[24]

In the United States, CREFAA is implemented by the Federal Arbitration Act (FAA). 9 U.S.C. §§ 201–208; *Century Indem. Co. v. Certain Underwriters at Lloyd's, London, subscribing to Retrocessional Agreement Nos. 950548, 950549, 950646*, 584 F.3d 513, 522 (3d Cir. 2009). "CREFAA reinforces a strong federal policy in favor of arbitration over litigation." *Standard Bent Glass*, 333 F.3d at 450. However, a court should not compel arbitration simply because one party demands it. *Lloyd's*, 584 F.3d at 523. In both the domestic and international arbitration contexts,

---

[24]     The parties do not dispute that requirements (2) through (4) are met. The arbitration clause in the 1992 ETLDA provides for arbitration in Sweden (which is a signatory to CREFAA), the ETLDA is commercial in nature, and Nicolay Grishko is a Russian citizen and OOO Grichko is a Russian corporation. Grishko S.R.O. was not a signatory to the agreement but is a later-created Czech company.

before "compelling a party to arbitrate . . . , a court must determine that (1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." *Id.*

## A. Agreement to Arbitrate and Effect of Termination

Both parties agree that there at least *was* an agreement to arbitrate disputes pursuant to the 1992 ETLDA. *See* Findings of Fact at ¶ 18, *supra.* The parties signed the 1992 ETLDA, which contained the following arbitration clause:

> Any dispute, controversy or claim arising out of or in connection with this Agreement, or the breach, termination of [sic] invalidity thereof, shall be finally settled by arbitration in accordance with the Rules of the Arbitration Institute of the Stockholm Chamber of Commerce. The tarbitral [sic] tribunal shall be composed of three arbitrators the place of the arbitration shall be Stockholm, Sweden. The language(s) to be used in the arbitral proceeding shall be English.
>
> This Agreement shall be governed by and construed in accordance with the Laws of the Kingdom of Sweden.

Ex. D10 at ¶ XVII.

Both parties also agree that the defendants terminated the 1992 ETLDA but they dispute what effect the termination had on the arbitration clause.

## B. Effect of the Termination of the 1992 ETLDA

"[A]n expired contract has by its own terms released all its parties from their respective contractual obligations, except obligations already fixed under the contract but as yet unsatisfied." *Litton Financial Printing Div. v. N.L.R.B.*, 501 U.S. 190, 206 (1991). In the collective bargaining context, the Supreme Court has stated that arbitration clauses survive the termination of the contract when the dispute arose under the contract. *Id.* at 205–06. "A postexpiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed

34

contractual right survives expiration of the remainder of the agreement." *Id.* But I.M. Wilson points to two cases in which courts held that termination of the contract also terminated the arbitration clause contained therein.

First, in *Vantage Technologies Knowledge Assessment, LLC. v. College Entrance Examination Bd.*, 591 F. Supp. 2d 768 (E.D. Pa. 2008), the parties had a contract containing an arbitration clause. The parties were contractually required to renew in writing; however, they were unable to agree on new terms in 2002 and the contract lapsed. *Id.* at 769. The parties continued operating without a contract until they were able to come to an agreement—that did not contain an arbitration clause—in 2008. *Id.* The court concluded that, because the contract terminated in 2002, the arbitration clause was no longer in effect. *Id.* at 771. It stated that, although "federal policy favors arbitration and doubts concerning the scope of coverage should be resolved accordingly, this policy cannot be invoked to create an arbitration provision in a contractual relationship where no such provision exists." *Id.* (internal citations omitted).

Second, in *Bogen Commc'ns, Inc. v. Tri-Signal Integration, Inc.*, No. 04-6275, 2006 WL 469963, *4 (D.N.J. Feb. 27, 2006), the parties did not renew their contract that included an arbitration clause but continued their business relationship. The court concluded that the narrowly-written arbitration clause did not survive this lapse. *Id.* ("The fact that [the parties] continued their business relationship does not mean that the same rights and obligations under the expired contract persisted." The Court of Appeals for the Third Circuit affirmed. *Bogen Commc'ns, Inc. v. Tri-Signal Integration, Inc.*, 227 F. App'x 159, 161 (3d Cir. 2007) ("The District Court did not err in refusing to order arbitration because [the plaintiff] chose not to renew the contract that contained the arbitration clause. The dispute over termination did not arise until more than two years after the original contract expired and does not relate back to that contract.").

This case is somewhat factually analogous to *Vantage* and *Bogen*.[25] It is undisputed that the defendants sent a letter terminating the 1992 ETLDA on April 4, 2016. Per the terms of the contract, a party was required to give 90 days' notice of termination prior to the contract's anniversary on March 1st, which meant the defendants' termination did not become effective until March 1, 2017. Furthermore, under the contract, I.M. Wilson retained its rights as the exclusive distributor for the defendants' products in the United States for one year after termination (i.e., until March 1, 2018). At around that time, the defendants began selling products directly in the United States with the GRISHKO mark and, the defendants contend, I.M. Wilson became a non-exclusive distributor. Over a year after the termination, on December 3, 2018, and six months after I.M. Wilson lost its exclusivity, I.M. Wilson filed this lawsuit alleging that the defendants are infringing on I.M. Wilson's trademarks. Given that the defendants undisputedly terminated the contract in this case, the only way the arbitration provision governs is if this dispute relates back to the time when the 1992 ETLDA was in operation and is covered by the arbitration provision. *See Bogen Commc'ns*, 227 F. App'x at 161.

The Court concludes that the current trademark infringement dispute does not relate back to the 1992 ETLDA. That agreement stated that the defendants would provide I.M. Wilson with products and gave I.M. Wilson an "exclusive right, for the duration of this Agreement, to use the name 'Grishko' in connection with the sale of the Goods in the United States." In August 1992, Mr. Grishko wrote a letter that stated that I.M. Wilson *owned* the GRISHKO trademark and its goodwill in the United States and that he consented to I.M. Wilson using his name. He later wrote

---

[25]     In *Valeri v. Mystic Industries, Corp.*, No. 12-2526, 2013 WL 180354, at *3 n.6 (E.D. Pa. 2013), this Court distinguished the facts before it from those in *Vantage* and *Bogen*. The central issue in *Valeri* was whether the plaintiff properly invoked the termination clause of the contract, which the Court concluded was inherently different than *Vantage* and *Bogen* because the contracts in those cases were undisputedly terminated at least two years prior to the litigation.

another letter that consented to registration of his name. I.M. Wilson used those letters to register the GRISHKO trademarks. Although the 1992 ETLDA required all modifications to be done in writing and signed by both parties, neither of these letters referenced the 1992 ETLDA and the letters are only signed by Mr. Grishko. This leads the Court to conclude that these letters were distinct and apart from the 1992 ETLDA.

Furthermore, this is not a "dispute, controversy or claim arising out of or in connection with [the] Agreement, or the breach, termination of [sic] invalidity thereof[.]" Ex. D10 at ¶ XVII. Although the defendants attempt to frame this litigation as a trademark *ownership* dispute that arises out of the 1992 ETLDA, rather than a trademark *infringement* dispute, it is not. I.M. Wilson owns four incontestable GRISHKO trademarks. Those trademarks are proof of ownership, *Commerce Nat'l Ins. Servs.*, 214 F.3d at 438, and there are a limited number of ways to challenge them. *See* 15 U.S.C. § 1115(b)(1)–(9). Ownership of the GRISHKO marks is, quite frankly, not up for debate at this time because the defendants have not successfully challenged them on permissible grounds. *See supra* at pp. 16–24. I.M. Wilson's lawsuit seeks to protect its ownership of those marks. It obtained that ownership separately from the now terminated 1992 ETLDA, which contained the arbitration provision.

Federal courts should resolve disputes in favor of arbitration when appropriate. *Medtronic AVE, Inc. v. Advanced Cardiovascular Sys., Inc.*, 247 F.3d 44, 55 (3d Cir. 2001). However, the Court will not compel arbitration here because there is no valid agreement to arbitrate these claims, and the dispute at hand does not does not relate back to the arbitration clause in the now terminated 1992 ETLDA.

37

## CONCLUSION

For the reasons set out in this Memorandum, the Court grants I.M. Wilson's Motion for Preliminary Injunction and denies the defendants' Motion to Dismiss for Failure to State a Claim or, Alternatively, Stay this Action Pending Arbitration. An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE