## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **I.M. WILSON, INC.,** | : | |
| *Plaintiff* | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | |
| | : | |
| **OTVETSTVENNOSTYOU** | : | |
| **"GRICHKO,"** *et al.,* | : | **NO. 18-5194** |
| | : | |
| *Defendants* | : | |

## MEMORANDUM

PRATTER, J.                                                    NOVEMBER _13_, 2020

Baryshnikov graced the stage of the American Ballet Theatre. Balanchine set Tchaikovsky in motion. And Marc Chagall designed murals for ballets at the Metropolitan Opera House. The ballet world is replete with successful partnerships between Russia and the United States. Here, however, the ongoing drama of a once famed partnership has leapt off stage and into the courtroom.

Counterclaim plaintiffs in this case—OOO Grichko, Nicolay Grishko, and Grishko S.R.O. (collectively, "Grishko")[1]—are Russian and Czech entities that manufacture and sell ballet and pointe shoes under the name GRISHKO. In the early 1990s, Grishko and I.M. Wilson partnered to distribute Grishko-branded products in the United States via an exclusive licensing agreement. Around that time, Mr. Grishko wrote two letters that allowed I.M. Wilson to register the GRISHKO house mark[2], the ownership of which, among other things, is currently contested here.

---

[1]      Although OOO Grichko is spelled with a "c", Mr. Grishko's last name and Grishko S.R.O. are spelled with an "s".

[2]      Relevant throughout this Memorandum is the difference between a house mark and a product mark. A house mark refers to the source of a line of products; it functions as a brand identifier. GRISHKO, Nike, and Apple are all examples of house marks. By contrast, a product mark refers to a mark that identifies a specific product that may be sold under a house mark. The parties here contest ownership not only of the

The partnership lasted until the music stopped in 2016, when Grishko terminated the exclusive licensing agreement. The exclusivity arrangement officially ended in March 2018 and Grishko began directly selling to U.S. customers.

In response to Grishko's solo entrée into the U.S. dance market, I.M. Wilson filed an initial complaint and motion for preliminary injunction against Grishko in December 2018. Although the Court initially granted I.M. Wilson preliminary injunctive relief, the Court has since vacated the preliminary injunction.[3] At the Court's invitation, Grishko has now amended its counterclaims for the third time against I.M. Wilson and the Individual Counterclaim Defendants—Irene Wilson, Christine Wilson, Justin Wilson, and Leonard Gage, officers of I.M. Wilson, Inc.[4] In a medley of claims designed to keep the Court on its toes, Grishko alleges 13 counterclaims. I.M. Wilson and the individual counterclaim defendants both move to dismiss or strike with prejudice all 13 counterclaims. Doc. Nos. 166, 168. The Court heard oral argument on these two motions and now addresses both motions in this Memorandum.

These counterclaims can broadly be trifurcated into (1) Lanham Act and common law claims arising from I.M. Wilson's use of disputed marks and trade dress, (2) claims arising from the parties' since-terminated licensing agreement, and (3) claims arising from I.M. Wilson's

---

house mark but also the product marks used to identify the various lines of pointe shoes. The Nova pointe shoe, Air Force, and iPod are all examples of product marks. However, because the parties refer to the product marks as "model marks," the Court likewise adopts this nomenclature.

[3]     The Court subsequently reconsidered this injunction, after finding that "[e]njoining the defendants from selling GRISHKO-branded products in the U.S. in no way rectifies the irreparable harm the Court found to be caused by Mr. Grishko's communications." *I.M. Wilson, Inc. v. Grichko*, 2019 WL 5394113, at *5 (E.D. Pa. Oct. 22, 2019).

[4]     This Memorandum refers to the Wilsons by their first names.

2

actions while this litigation is pending.  For the reasons that follow, the Court grants in part and

denies in part I.M. Wilson's and the individual counterclaim defendants' motions.

**BACKGROUND**

### I.      The Parties

I.M. Wilson, a Pennsylvania corporation operating in King of Prussia, Pennsylvania, sells

a variety of dance-related products, including ballet shoes and pointe shoes.  Irene is the founder

and president of I.M. Wilson.  The other counterclaim defendants include (1) Leonard Gage, I.M.

Wilson's Chairman; (2) Christine Wilson, I.M. Wilson's Secretary and Treasurer; and (3) Justin

Wilson, the "Chief Business Officer" who "provides consulting services" to I.M. Wilson.

OOO Grichko is a Russian company that manufactures and sells dancewear products,

including ballet shoes and pointe shoes.  Grishko Dance, S.R.O. is a Czech company that obtains

GRISHKO-branded products from OOO Grichko and sells these products through the website

grishkoshop.com.[5]   Nicolay Grishko holds an ownership interest in the Grishko group of

companies, which collectively sell products in more than 70 countries.  These parties collectively

identify themselves as "Grishko."

Relevant here, Grishko produces several lines of pointe shoes, each bearing unique model

names—or "model marks."[6]   Grishko alleges that it is exclusively responsible for selecting,

adopting, and using the model marks.  Grishko's applications to register certain of the model marks

with the U.S. Patent and Trademark Office (USPTO) are pending.

---

[5]      Grishko does not actually allege any facts about Grishko Dance, S.R.O.  This is provided
exclusively as background information.

[6]      These include the "Nova," "Nova Pro," "Nova Flex," "Fouette," "Maya I," "Alice," "Triumph,"
and "2007" model pointe shoes.

**II.     1992 Exclusive Trademark Licensing and Distribution Agreement (the 1992 Agreement)**

In April 1990, I.M. Wilson and Mr. Grishko's "kooperativ" formalized their relationship in an exclusive trademark licensing and distribution agreement (the 1990 Agreement).[7] This agreement was followed by a nearly identical agreement that I.M. Wilson and Grishko entered into in March 1992. The 1992 Agreement provides:

> [Grishko] has agreed to sell and [I.M. Wilson] has agreed to buy ballet shoes, toe shoes and such other footwear, athletic equipment or other items as the parties hereto may later agree (the "Goods"), in quantity and assortment, at prices and according to specifications, all as attached hereto in Appendix I, which constitutes an integral part of this Agreement. . . .

> XV.     License

> The Seller hereby grants the Buyer an exclusive right, for the duration of this Agreement, to use the name "Grishko" in connection with the sale of the Goods in the United States. In consideration of such right, the Buyer shall pay the Seller a royalty equal to 10% of the value of each shipment of Goods . . . .

3d Am. Counterclaims, Ex. B. ¶¶ I, XV (Doc. No. 148). According to the agreement, "[a]ny alterations or additions to this Agreement are valid only if in writing and signed by persons duly authorized by both parties." *Id.* ¶ XVIII. The agreement automatically renewed each year for successive one-year terms provided neither party advised the other of its intent to terminate. *Id.* ¶ XVIII. The agreement also contained a one-year "black out period" clause prohibiting Grishko from selling Grishko-branded products in the U.S. through any entity other than I.M. Wilson for a year following the termination of the agreement.

---

[7]     Before 1992, the Soviet Union did not permit companies to be privately-owned. Instead, Mr. Grishko formed an ownership structure called a "kooperativ" for selling his ballet shoes. After the Soviet Union collapsed, the Russian Federation permitted private company ownership. Thus, Mr. Grishko replaced his kooperativ with Grishko, Inc. This change warranted a new agreement with I.M. Wilson.

4

### III.    I.M. Wilson's Federal Trademarks

Grishko alleges that while memorializing the 1992 Agreement, Irene proposed to Mr. Grishko that the parties should register the GRISHKO trademark with the USPTO. Irene proposed to register the GRISHKO trademark in I.M. Wilson's name to allow the company to enforce the trademark rights domestically for the duration of the 1992 Agreement. Mr. Grishko purportedly gave Irene permission to proceed based on the understanding that I.M. Wilson would own the registration so long as that I.M. Wilson remained in an exclusive relationship with Grishko. In August 1992, Mr. Grishko signed a two-line document that Ms. Wilson presented to him in English stating: "I agree that I.M. Wilson, Inc. is the owner of the Trademark, GRISHKO and its goodwill in the United States of America. I further consent to the use of my name in that trademark[,]" ("the August 1992 document"). Am. Compl., Ex. B (Doc. No. 138-2). The writing is silent regarding the model marks and Grishko's trade dress.

After the USPTO rejected the August 1992 document, Mr. Grishko signed another document Ms. Wilson presented to him in English in March 1993 which stated: "In addition to the consent to I.M. Wilson, Inc. that I previously granted on August 5, 1992, I hereby grant I. [sic] Wilson, Inc. the right to register the trademark GRISHKO in the U.S. patent and trademark office[,]" ("the March 1993 document"). *Id.* at Ex. C.[8]  Grishko alleges that Mr. Grishko did not understand or intend that complete ownership of the GRISHKO trademark would pass to I.M. Wilson through either document. Instead, Grishko alleges that Mr. Grishko understood his relationship with I.M. Wilson to remain as an exclusive licensor/licensee relationship and that the

---

[8]    Although Grishko did not actually attach the August 1992 and March 1993 documents as exhibits to the third amended counterclaims, a court may consider "'matters . . . integral to the claim" and "items appearing in the record of the case.'" *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006) (quoting 5B Charles A. Wright & Arthur R. Miller, FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed. 2004)).

writing was time and purpose limited.

I.M. Wilson relied on those documents to obtain its first GRISHKO trademark registration in November 1993. Some years later, the USPTO declined to register Mr. Grishko's applications for the marks GRISHKO and NICOLAY GRISHKO due to the existence of I.M. Wilson's registration. After learning that he was barred from registering the GRISHKO and NICOLAY GRISHKO marks, Mr. Grishko called Irene to revoke his consent to I.M. Wilson owning the GRISHKO trademark registration and to demand that I.M. Wilson transfer the registration to him. Instead, I.M. Wilson and Grishko allegedly reached an agreement that I.M. Wilson would not renew that registration upon its expiration. Apparently in accordance with this agreement, I.M. Wilson did not file a renewal application, resulting in the cancellation of the registration in September 2004.

In March 2007, I.M. Wilson filed an application with the USPTO to register the GRISHKO house mark in connection with "ballet slippers; dance shoes; dance tights; dance leotards; and dance dresses." 3d Am. Counterclaims ¶ 85 (Doc. No. 148). I.M. Wilson did not initially submit the August 1992 or March 1993 documents to the USPTO. After the USPTO demanded additional materials from I.M. Wilson, I.M. Wilson, through Christine and Irene, eventually submitted the August 1992 and March 1993 documents to support its application, despite Mr. Grishko apparently having orally revoked his consent. The USPTO permitted the application to mature into a registration in February 2009. I.M. Wilson then used this registration, as well as the August 1992 and March 1993 documents, to apply for and obtain various other registrations. I.M. Wilson currently owns seven federal trademarks consisting of or incorporating the GRISHKO name, four of which are now incontestable under Sections 15 and 33 of the Lanham Act. Pub. L. 79-489, 60 Stat. 427. According to Grishko, the individual counterclaim defendants, as members of I.M.

6

Wilson's board of directors, "approved, authorized, consented," "acquiesced" "instructed and/or participated" in such conduct.  3d Am. Counterclaims (Doc. No. 148) ¶¶ 102-03.

Mr. Grishko initiated a cancellation proceeding before the Trademark Trial and Appeals Board alleging, among other things, that the registrations should be cancelled due to fraud in the procurement of registration.  Those regulatory proceedings are suspended pending the outcome of this suit.

### IV.    Termination of the 1992 Agreement

Due to the deterioration of the parties' relationship, Grishko issued a Notice of Termination of the 1992 Agreement in April 2016, with termination effective "at least as early as March 1, 2017." *Id.* ¶ 119.  Grishko alleges that I.M. Wilson ceased operating as Grishko's exclusive U.S. trademark licensee and became a non-exclusive distributor of Grishko-branded ballet pointe shoes in the United States.  Grishko demanded that I.M. Wilson assign all its trademark registrations to Grishko, which I.M. Wilson refused to do so.  Grishko discontinued its sales through I.M. Wilson in or around January 2019, shortly after I.M. Wilson initiated this action.  Grishko asserts that I.M. Wilson subsequently began using a third-party Chinese manufacturer to produce its shoes, which has allegedly caused widespread consumer confusion as to the source of I.M. Wilson's products.  To wit, I.M. Wilson's "Made in China Grishko Pointe Shoes" are allegedly identical to Grishko's Made in Russia line of shoes, but, as Grishko contends, ultimately inferior products.  Grishko asserts that using the Grishko house and model marks and trade dress on the shoes manufactured in China constitutes trademark and trade dress infringement, trademark dilution, and unfair competition.

### V.    False Advertising

Although I.M. Wilson had enjoyed exclusivity within the United States, Grishko alleges

7

that I.M. Wilson, through the actions of Irene and Justin, falsely advertised itself as the "Exclusive

Distributor for North America." At the time, Grishko had exclusive licensing and distribution

agreements with a third party in Canada and non-exclusive arrangements with third parties in

Mexico, of which I.M. Wilson was allegedly aware. *Id.* ¶¶ 113-14. Grishko alleges that I.M.

Wilson's false advertisements caused "immediate problems" with its Canadian and Mexican

distributors. *Id.* ¶ 115.

I.M. Wilson allegedly continues to advertise online that it is the exclusive U.S. distributor

of Grishko-branded pointe shoes even though the exclusive licensing arrangement has been

terminated. *Id.* ¶ 241.

## VI.   I.M. Wilson's Correspondence with U.S. Dance Retailers Pending this Litigation

After "consulting" Mr. Gage and Christine, Irene sent various correspondence to U.S.

dance retailers that Grishko alleges contained various false statements. *Id.* ¶ 159. Specifically,

Grishko references a July 1, 2019 letter signed by Irene on behalf of I.M. Wilson stating:

"[Grishko] began a major campaign to undercut us and you, our valued retailers, through their

trademark-infringing sales via grishkoshop.com . . . . You may have received a letter from Nikolay

Grishko on I.M. Wilson's GRISHKO letterhead containing unfortunate and misleading claims."

Shishkova Decl., Ex. B (Doc. No. 76-1). Following this Court's order granting the preliminary

injunction, Irene and I.M. Wilson's counsel's each notified retailers that Grishko was enjoined

from selling GRISHKO-branded products in the United States before the injunction formally took

effect.[9] *Id.* at Ex. C, D.

---

[9]      Although Grishko did not actually attach the correspondence as exhibits to the third amended counterclaims, once again, a court may consider "'matters . . . integral to the claim" and "items appearing in the record of the case.'" *Buck*, 452 F.3d at 260.

### VII. Allegations Pertaining to each Individual Counterclaim Defendant[10]

#### A. Allegations about Irene

As I.M. Wilson's founder and President, Irene "oversees" and directs I.M. Wilson's day-to-day operations." 3d Am. Counterclaims ¶ 10 (Doc. No. 148). Grishko alleges that Irene, like Christine, "participated in the decision [to fraudulently obtain a GRISHKO trademark], and directed [I.M. Wilson], to file the [application for the first allegedly infringing trademark]." *Id.* ¶ 85. Irene also "spearheaded" I.M. Wilson's "advertising efforts" and, with Justin, "engaged in other improper conduct, including, without limitation, a false advertising scheme." *Id.* ¶ 112. "Upon information and belief[,]" Irene, alongside Mr. Gage and Christine, "agreed that sending out correspondences to U.S. retailers would benefit" I.M. Wilson. *Id.* ¶ 159. According to Grishko, Irene also allegedly mischaracterized the Court's preliminary injunction order to U.S. retailers.

#### B. Allegations about Christine

As I.M. Wilson's Secretary and Treasurer, Christine is "involved in all executive decision-making" and closely assists Irene with operating I.M. Wilson's day-to-day affairs. She is also allegedly involved in the company's marketing efforts. According to Grishko, Christine participated in the decision to fraudulently obtain a GRISHKO trademark, and directed I.M. Wilson to file the application for the first allegedly infringing trademark. *Id.* ¶ 85. Christine allegedly responded to Office Actions from the USPTO and signed declarations in support of I.M. Wilson's trademark application, despite knowing that I.M. Wilson did not have Mr. Grishko's consent to register the GRISHKO trademark. *Id.* ¶ 104.

---

[10] Grishko alleges that each individual counterclaim defendant attended annual meetings and stockholders and special meetings of directors "after which decisions are made and resolutions related thereto are approved, ratified, and confirmed." 3d Am. Counterclaims ¶¶ 11, 13, 14, 17 (Doc. No. 148).

### C. Allegations about Mr. Gage

Grishko alleges that as I.M. Wilson's Chairman, Mr. Gage is "involved in all executive decision-making"; "accompanied [Irene] to Moscow, Russia to conduct business with Mr. Grishko"; and "chairs [I.M. Wilson's] annual meetings of stockholders and special meetings of directors." *Id.* ¶¶ 12-13 (Doc. No. 148). Grishko also alleges that Irene "consulted" with Mr. Gage about "sending out correspondence to U.S. retailers" that would "benefit" I.M. Wilson. *Id.* ¶¶ 159; *see also id.* ¶¶ 265, 276.

### D. Allegations about Justin

As Chief Business Officer, Justin "provides consulting services to the company, particularly with regard to marketing of product." *Id.* ¶¶ 14, 15. In November 2015, in correspondence with Grishko's Director of Sales for North America, Justin requested that he be the "primary contact" for I.M. Wilson. *Id.* ¶ 15. Justin and Irene "actively participate in developing and managing the content" for I.M. Wilson's website. *Id.* ¶ 129.

### STANDARD OF REVIEW

Rule 12(b)(6) governs I.M. Wilson's and the Individual Counterclaim Defendants' motions to dismiss Grishko's counterclaims. *Axalta Coating Sys., LLC v. Midwest II, Inc.*, 217 F. Supp. 3d 813, 818 (E.D. Pa. 2016). The counterclaimant must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

To survive a motion to dismiss, the counterclaimant must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Allegations must be enough "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The question is not whether the claimant "will ultimately prevail . . . but whether his complaint [is] sufficient to cross the federal court's

threshold." *Skinner v. Switzer*, 562 U.S. 521, 530 (2011) (citation and internal quotation marks omitted).

In evaluating the sufficiency of a complaint, the Court adheres to certain well-recognized parameters. For one, the Court "must consider only those facts alleged in the complaint and accept all of the allegations as true." *ALA, Inc. v. CCAIR, Inc.*, 29 F.3d 855, 859 (3d Cir. 1994); *see also Twombly*, 550 U.S. at 555 (stating that courts must "assum[e] that all the allegations in the complaint are true (even if doubtful in fact)"). The Court accepts as true all reasonable inferences emanating from the allegations and views those facts and inferences in the light most favorable to the nonmoving party. *See Revell v. Port Auth.*, 598 F.3d 128, 134 (3d Cir. 2010).

DISCUSSION

## I. Counterclaims Relating to Trademarks and Trade Dress

The Court first considers Grishko's Lanham Act and common law counterclaims arising from I.M. Wilson's use of disputed marks and trade dress. There are several issues common to Grishko's counterclaims under the Lanham Act and their common law counterparts. The Court addresses these arguments at the outset, as they are dispositive to the viability of those counterclaims.

### A. Whether Grishko Has Pled Certain Elements Common to Counts 2, 3, 4, 5, 9, 10, and 13

These counts[11] allege various causes of action under federal and state trademark law based on I.M. Wilson's alleged infringement of Grishko's house mark, model marks, sole mark, and

---

[11]     This section applies to the following counts brought against all counterclaim defendants: (1) Count 2: Federal Unregistered Trademark Infringement; (2) Count 3: Common Law Trademark and Trade Dress Infringement; (3) Count 4: Common Law Unfair Competition; (4) Count 5: Trademark Dilution; (5) Count 9: False Advertising; (6) Count 10: Unfair Competition / False Designation of Origin; and (7) Count 13: Federal Trademark Infringement.

trade dress.[12]   Each of these claims hinges on these common legal and factual issues:   (A) ownership of the house mark and the unregistered model marks and trade dress, (B) whether Grishko's alleged trade dress is legally protectable, (C) whether there is a likelihood of confusion between I.M. Wilson's and Grishko's products, and (D) whether Grishko states a claim against the individual counterclaim defendants in these counts.  The Court discusses each of these common issues in turn.

### 1.  Disputed Ownership

To bring a trademark infringement claim, a complaint must allege, in part, that the mark is owned by the plaintiff. *Zaslow v. Coleman*, 103 F. Supp. 3d 657, 663 (E.D. Pa. 2015) (citation omitted).  I.M. Wilson contends that each of Counts 2, 3, 4, 5, 10, and 13 must fail because Grishko cannot establish ownership of the registered house mark or the unregistered model marks. Accordingly, I.M. Wilson urges the Court to dismiss these six claims out of hand.

I.M. Wilson contests Grishko's ownership in three ways:  *First*, I.M. Wilson asserts that the August 1992 writing forecloses Grishko's ownership of the house mark *and* the unregistered model marks and trade dress. *Second*, I.M. disputes Grishko's claim that it is a mere license holder. *Third*, I.M. Wilson contends that its incontestable federal registrations of the GRISHKO house mark conclusively establish its ownership of the house and model marks.  For the reasons stated below, the Court rejects each of I.M. Wilson's ownership arguments.

### a.  The August 1992 Writing Is Ambiguous

Much of the parties' dispute boils down to two lines of text.  I.M. Wilson relies on the August 1992 writing Mr. Grishko signed purportedly conveying ownership of the GRISHKO house mark

---

[12]     Grishko has developed a line of Grishko brand ballet products, including, various models of pointe shoes bearing unique model name trademarks.  Doc. No. 148 ¶ 37 (listing various Model Marks).

12

and its goodwill to I.M. Wilson. Grishko disputes the validity and scope of the document and its

legal effects. The Court thus is charged with deciding whether the plain text conclusively

forecloses Grishko's ownership claims or whether to credit Grishko's pleadings that the letter was

not intended to constitute an irrevocable transfer of Mr. Grishko's own surname.[13]

As a preliminary matter, the Court must determine whether the August 1992 writing is clear

or ambiguous. *Allegheny Int'l, Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir.

1994). Unsurprisingly given its length, the writing does not contain a choice of law provision.

Nor did the parties did not conduct a choice of law analysis. But the applicable choice-of-law

rules require that the Court read this document through the lens of Pennsylvania law.[14]

"When the terms of a contract are clear and unambiguous, the intent of the parties is to be

ascertained from the document itself." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (citing

---

[13]    I.M. Wilson contends that this Court has "already recognized that [it] is the longstanding owner of the GRISHKO trademark." Doc. No. 168 at 12. However, even without regard to the fact that what is now under consideration is the counterclaim, "[t]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *See University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *United States v. Cen-Card Agency/C.C.A.C.*, 724 F. Supp. 313, 316 (D.N.J. 1989) (determination made at preliminary injunction stage was not law of the case). Nor, because of the different burdens, are the Court's findings of fact binding here for purposes of evaluating the allegations in a motion to dismiss.

[14]    "A federal court exercising federal question jurisdiction over a federal claim and supplemental jurisdiction over related state law claims applies the choice-of-law rules of the state of the forum." *Neopart Transit, LLC v. Mgmt. Consulting, Inc.*, No. CV 16-3103, 2017 WL 714043, at \*11 (E.D. Pa. Feb. 23, 2017). The Third Circuit Court of Appeals has repeatedly applied Pennsylvania's flexible choice-of-law rule to contract claims. *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 403 (3d Cir. 2016) (quoting *Griffith v. United Air Lines, Inc.*, 416 A.2d 796, 805 (Pa. 1964)). As relevant here, Pennsylvania law looks to the contracting parties' residences and places of incorporation, and the location of the contract's preparation, when determining what law applies. *See Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 233 (3d Cir. 2007) (citing Restatement (Second) of Conflicts of Laws § 188(2) (Am. Law. Inst. 1971)).

Here, the writing purports to effect the transfer of a trademark for a product sold throughout the United States and around the globe. So no particular state has a substantial connection to the substance of the document or its performance. Even so, if any one state can lay claim to this document, it is Pennsylvania: I.M. Wilson, which is headquartered in King of Prussia, PA, prepared the writing at issue, and the negotiations between I.M. Wilson and Grishko likely emanated from Pennsylvania (at least in part). The Court thus applies Pennsylvania law to this document.

*Kripp v. Kripp*, 578 Pa. 82 (2004)). The Supreme Court of Pennsylvania has identified two kinds of ambiguity: patent and latent. Patent ambiguity is facially apparent and "arises from the defective, obscure, or insensible language used," *Allegheny Int'l*, 40 F.3d at 1424; latent ambiguity exists where "extraneous or collateral facts . . . make the meaning of a written agreement uncertain" despite clear and unambiguous language, *id.*

The language is clear and unambiguous regarding the ownership of the house mark. Mr. Grishko purportedly agrees that I.M. Wilson is the owner of the GRISHKO house mark and its goodwill. Doc. No. 138-2. Not surprisingly, I.M. Wilson urges the Court to conclude its analysis there. The Court disagrees.

At a minimum, there is latent structural ambiguity in the August 1992 writing regarding the house mark. First, there is the obvious issue of extraordinary brevity. The Court would not ordinarily expect an agreement irrevocably transferring the ownership of a valuable mark— particularly one's own surname—to be concluded in two lines of text. Second, the writing is silent on the issue of consideration. I.M. Wilson contends that ownership was in exchange for its ongoing efforts to invest in and develop the U.S. market for Grishko products. Doc. No. 1. ¶ 16. Grishko maintains that the writing was a temporary assignment for I.M. Wilson to register the trademark with the USPTO and a formality to finalize protections for the mark. Doc. No. 148 ¶¶ 64-65. Neither of these interpretations are apparent from within the four corners of the document. Instead, both parties have advanced these narratives in their respective pleadings. Finally, certain collateral circumstances create ambiguity. Notably, I.M. Wilson drafted the document and presented it to Mr. Grishko in English—not his native language.

At the motion to dismiss stage, the Court does not resolve the issue of whether the August 1992 letter should be properly interpreted as a valid conveyance of the house mark and its goodwill

14

or whether the letter was time and purpose limited as Grishko suggests. The Court takes notice of factual issues that will need to be resolved, including extrinsic or parol evidence to address whether this was an otherwise gratuitous transfer. *In re Somerset Reg'l Water Res., LLC*, 949 F.3d 837, 846 (3d Cir. 2020) (the court may consider parol evidence to explain or clarify ambiguities). So, although the Court acknowledges the fact of the letter, at this time it does not read the writing as the conveyance of the unencumbered house mark.

Second, there is patent ambiguity surrounding the transfer of the model marks, sole mark, and trade dress. I.M. Wilson asserts that the alleged conveyance in August 1992 of the GRISHKO house mark *and its goodwill* also transferred along with that the rights to those marks and trade dress. Am. Compl., Ex. B (Doc. No. 138-2) (emphasis added). So doing, I.M. Wilson relies on the "assignment in gross" doctrine which prohibits a transfer of the trademark without its associated goodwill. Failure to assign goodwill voids the trademark assignment. *Beauty Time, Inc. v. VU Skin Sys., Inc.*, 118 F.3d 140, 150 (3d Cir. 1997). Grishko responds that even if the document did assign the GRISHKO trademark's goodwill, it did not assign the model and sole marks.

The Court finds that Grishko has pled enough facts to challenge the validity of the August 1992 document. And, the Court is not persuaded that I.M. Wilson's acquisition of "goodwill" necessarily included the model marks. Despite the multiple rounds of briefing on this precise point, I.M. Wilson continues to dance around the issue. It has been unable to cite any on-point case law for the proposition that the transfer of a house mark and its goodwill automatically transfers the unregistered model marks.[15] I.M. Wilson is correct that goodwill is an inseparable

---

[15]     The parties submitted dueling case law and administrative guidance regarding shared ownership of a trademark. I.M. Wilson cites exclusively to case law from the 1980s for the general proposition that trademarks must be owned by a single source. Defendants rely on the USPTO Manual that suggests that

part of a trademark.  2 McCarthy on Trademarks and Unfair Competition § 18:2 (5th ed. 2017).

But I.M. Wilson takes a leap of logic by eliding two distinct concepts:  house mark goodwill and

product mark goodwill.  The Court has not found a case which squarely answers the issue.

At least one court has concluded that the goodwill symbolized by certain trademarks did

*not* include the transfer of unregistered product marks and trade dress.  *Hetronic Int'l, Inc. v.*

*Hetronic Germany GmbH*, No. CIV-14-650-F, 2019 WL 3003679, at *31 (W.D. Okla. Mar. 22,

2019).  As here, the document at issue in *Hetronic* only referenced the transfer of the house mark

and its goodwill.  The court did not expansively read goodwill to capture the unregistered marks,

as I.M. Wilson asks the Court to do.

And, a leading trademark treatise explains the difference between goodwill that follows the

house mark and that which is associated with the model marks.  The former pertains to the

"commercial enterprise" writ large, while a "product mark pertains only to the goodwill of a

product or a particular article."  4 Callmann on Unfair Comp., Tr. & Mono. § 17A:5.  They are

conceptually and practically distinct.  The treatise explains that "an exclusive transfer of a

trademark apart from the business organization can only be done with respect to product marks.

House marks are inseparable from the organization."  *Id.*  Callmann thus suggests that product

marks can be disassociated from the house mark—quite the opposite of I.M. Wilson's argument.

In light of the foregoing, the Court considers the contested ownership of the model marks,

sole mark, and trade dress is not foreclosed by the language of the August 1992 letter.  Although

there is facially clear language (transferring the house mark and *its* goodwill), the writing is silent

---

trademarks can have multiple owners and a case holding that evidence is capable of "decoupl[ing] the
product marks from the famous house mark" where product marks have independent significance.  *Bose
Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1375 (Fed. Cir. 2002).  Suffice it to say, neither effort
wins the day yet.

16

regarding these other marks.[16] To accept I.M. Wilson's interpretation that the model marks were transferred requires the Court to read expansively the concept of goodwill, where, at least here, its scope is ambiguous.

For this reason, it is not appropriate to resolve the scope of the agreement now before fact discovery and the consideration of extrinsic evidence. Contract disputes which are not resolved as a matter of law require discovery into course of dealing and performance, trade usage, and the parties' expectations at a minimum. Indeed, absent a contract with specific terms, "to decide who owns the name may require a court to examine all relevant circumstances, including the history of the parties' relation to each other and their likely understandings . . . in order to reach an equitable decision." *Bell v. Streetwise Records, Ltd.*, 761 F.2d 67, 76 (1st Cir. 1985).

### b. The Parties' Licensing Relationship

I.M. Wilson alleges that Grishko fails to plead ownership of the unregistered model marks because it cannot establish that it was the "first to use" these marks. To plead ownership of the unregistered marks a party must allege that it was the first to adopt the mark in commerce, that it has continuously used the mark, and the mark is inherently distinctive or has acquired secondary meaning. *Douglas v. Osteen*, 317 F. App'x 97, 99 (3d Cir. 2009) (citations omitted). Grishko responds that the first use test is inapplicable here because of (1) the parties' former licensee/licensor relationship, or, alternatively, (2) the parties' manufacturer/distributor relationship. I.M. Wilson's sales of pointe shoes bearing the model and sole marks and trade dress in the United States are thus properly Grishko's sales due to the parties' relationship.

The Court first considers whether Grishko entered into a licensing agreement with I.M. Wilson. It is hornbook law that a licensee's use of a trademark inures to the benefit of a non-using

---

[16]    For example, if the writing intended to assign the house and model marks, the parties may have included a schedule listing all the marks to be transferred.

licensor.  2 McCarthy on Trademarks § 18:46.  "Use of a trademark need not always be made

directly by the trademark owner and is often made 'with the permission' of the owner via a

licensing agreement."  *Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823 (3d Cir. 2006)

(quoting 2 McCarthy on Trademarks § 18:46).  Because Grishko introduced all but one of the

model marks while I.M. Wilson was acting as its licensee, I.M. Wilson's use of the marks were on

behalf of, and so for the benefit of, Grishko.  I.M. Wilson responds that Grishko failed to plead

that it specifically licensed the model marks to I.M. Wilson, although—absent the exclusive

licensing agreement—it offers no alternative basis for its right to use the model and sole marks

and trade dress at all.

   The Court is perplexed by I.M. Wilson's claim that it did not operate as an "exclusive

licensee" when the plain language of Section XV ("License") of the March 1992 agreement

granted I.M. Wilson "an exclusive right . . . to use the name 'GRISKHO.'"  Doc. No. 148 at 97.

And I.M. Wilson has previously referred to the March 1992 agreement, during this litigation, as

an agreement to sell GRISHKO products "subject to an exclusive license."  Doc. No. 5-1 (Irene

Wilson Declaration).

   I.M. Wilson claims that the August 1992 writing, which it reads as an unencumbered

conveyance, supplanted the March 1992 exclusive license agreement.  But, at least as to the motion

to dismiss, Grishko pleads enough allegations to cast doubt on the validity of the writing, including

whether it carries contractual force.  *See supra* Section I.A.1.a.

   And although the model and sole marks are not explicitly referenced in the licensing

agreement, Grishko plausibly alleges that I.M. Wilson only had permission to use those marks

because of their licensing relationship.[17]   Accordingly, the Court finds, at least at the motion to dismiss stage, Grishko alleges enough facts that the relationship between the parties was that of a licensor and licensee.

In the alternative, Defendants describe the relationship as one between a manufacturer and distributor.   The appellate court in *Covertech Fabricating Inc. v. TVM Bldg. Products* acknowledged that the first use test is an "imperfect fit" when considering an "exclusive and noncompetitive manufacturer-distributor relationship." 855 F.3d 163, 170 (3d Cir. 2017).  Grishko relies on *Covertech* for the rebuttable presumption that the manufacturer retains the initial trademark ownership in an infringement dispute between a manufacturer and distributor. However, this presumption only applies where there is no agreement between the parties setting out the trademark ownership. *Id.* at 171.  At a minimum, the parties entered into the March 1992 exclusive licensing agreement.  So, the analysis in *Covertech* is inapplicable here.

### c.  Grishko's Challenges to I.M. Wilson's Incontestable Trademarks

I.M. Wilson alleges that its incontestable federal registrations for the GRISHKO house mark foreclose Grishko's ownership claims to the house mark as well as to the model and sole marks, and trade dress.  A registered mark becomes incontestable when it has been in continuous use for five consecutive years after its registration and is still used in commerce. 15 U.S.C § 1065. Once a mark becomes incontestable, registration is "conclusive evidence of the validity of the registered mark."  15 U.S.C § 1115(b).  The presumption of ownership established by an incontestable registration can be challenged under a limited number of circumstances. *I.M. Wilson, Inc. v. Otvetstvennostyou Grichko*, 394 F. Supp. 3d 721, 737 (E.D. Pa. 2019).

---

[17]     Moreover, an unwritten trademark license agreement can be implied based on the objective conduct of the parties. *Doebler*, 442 F.3d at 824 (citing *Villanova Univ. v. Villanova Alumni Educ. Found., Inc.*, 123 F. Supp. 2d 293, 308 (E.D. Pa. 2000)).

Grishko offers three arguments to rebut I.M. Wilson's claim that its incontestable trademarks preclude its claims. First, Grishko contends that I.M. Wilson's alleged ownership of the GRISHKO house mark registration is irrelevant to determining ownership of the model marks—the names used to identify the specific pointe shoes. Second, Grishko alleges that, because I.M. Wilson's use of the house mark inured to Grishko's benefit pursuant to a licensing agreement, it acquired common law rights in the house mark. Finally, Grishko claims I.M. Wilson committed fraud on the USPTO and misrepresentation of source. These arguments are addressed in turn.

*First*, for the reasons articulated above, the Court rejects that the August 1992 letter clearly transferred ownership of the model and sole marks and trade dress. Accordingly, the incontestable federal registrations for the GRISHKO house mark do not squarely determine the ownership of these other marks.

*Second*, Grishko argues that it has acquired common law trademark rights in the GRISHKO house mark, Doc. No. 148 ¶ 212, which it claims as a basis to contest an otherwise incontestable registration. 15 U.S.C. § 1065. Common law marks are obtained simply through use of the trademark in connection with the business or product. A party claiming common law protection in a mark must establish both that it has used the mark prior to federal registration of the mark and that such use has continued to the present. *Watec Co. v. Liu*, 403 F.3d 645, 654 (9th Cir. 2005). Grishko must show common law senior rights prior to I.M. Wilson's 1993 registration of the house mark.

I.M. Wilson contends that Grishko cannot plead any sales prior to terminating the 1992 Agreement that were made *independent* of I.M. Wilson. Rather, any sales or marketing campaigns were the result of I.M. Wilson's efforts to build the Grishko brand in the United States. But that point is orthogonal because Grishko has pled common law rights based on the parties' licensing

20

relationship. Courts have held that a distributor's use of a mark pursuant to a licensing agreement provided "continuous use" to defeat a claim of incontestability. *See, e.g.*, *Watec Co. v. Liu*, 403 F.3d 645, 654 (9th Cir. 2005); *Harrison-Hoge, Inc., v. Panther Martin S.R.L.*, 2008 WL 905892, at \*34-35 (E.D.N.Y. Mar. 31, 2008). To the extent that I.M. Wilson maintains that the August 1992 writing supplanted the licensing agreement—and so severed Grishko's claim to common law rights—that determination depends on whether the writing was properly an assignment of the house mark. The Court reiterates that the writing is itself ambiguous.

*Finally*, Grishko challenges the incontestability of the house mark by alleging that I.M. Wilson committed fraud on the USPTO. Despite knowing that the USPTO required the individual's consent before registering a mark bearing that individual's name, Doc. No. 148 ¶ 90, Griskho alleges that I.M. Wilson did not obtain renewed consent from Mr. Grishko to register the '869 Application in 2007. Instead, because Mr. Grishko allegedly revoked his consent in 1999, Griskho contends that I.M. Wilson submitted outdated documents but misrepresented them as valid. Doc. No. 148 ¶ 97.

The Court previously considered and rejected these same allegations of fraud at the preliminary injunction phase. *See I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko"*, 397 F. Supp. 3d 721, 738 (E.D. Pa. 2019), *order vacated in part on reconsideration sub nom. I.M. Wilson, Inc. v. Grichko*, No. CV 18-5194, 2019 WL 5394113 (E.D. Pa. Oct. 22, 2019), *and appeal dismissed sub nom. I.M. Wilson Inc. v. Grishko Dance SRO*, No. 19-2953, 2019 WL 8008960 (3d Cir. Oct. 29, 2019). Grishko failed to proffer the "clear and convincing" evidence then required to demonstrate fraud or that Mr. Grishko revoked his consent. *Id.* at 739.

However, the pleading standards to allege fraud are more forgiving then those required to support a preliminary injunction. Fed. R. Civ. P. 9(b). A party must allege "the circumstances of

the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged.'" *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 778 (3d Cir. 2018) (citation omitted). I.M. Wilson faults Grishko for not stating the date and time of Mr. Grishko's alleged revocation. Grishko does, however, plead that Mr. Grishko revoked his consent after learning around September 7, 1999 that I.M. Wilson's '637 Registration barred him from registering his own name. Doc. No. 148 ¶ 82. And Grishko pleads that I.M. Wilson allowed the '637 Registration to lapse in 2003. Accordingly, when I.M. Wilson sought to register the GRISHKO trademark on March 30, 2007, it did so with the knowledge that Mr. Grishko had allegedly revoked his consent. That Grishko pleads the revocation was made orally does not mean that the pleadings are not sufficiently particularized.[18] Rather, the locus of the fraud was I.M. Wilson's failure to obtain Mr. Grishko's consent in 2007.

A finding of fraud would strip the mark of its "incontestable registration" status. *Specialized Seating, Inc. v. Greenwich Indus., LP*, 616 F.3d 722, 728 (7th Cir. 2010); 6 McCarthy on Trademarks and Unfair Competition § 31:60 (5th ed.). I.M. Wilson argues that cancellation of a trademark registration "does not change the ownership of the trademark or allow others to use

---

[18]    Finding that the allegations may be adequate to survive a Rule 12(b)(6) motion does not mean, however, that Grishko will prevail on the fraud claim, nor is the Court's finding here incompatible with its earlier decision. And, while the Court was not convinced by either party's narrative offered at the preliminary injunction stage, nor will the Court "weigh the credibility of the parties' positions" at the motion to dismiss stage. *Bagic v. Univ. of Pittsburgh*, 773 F. App'x 84, 87 (3d Cir. 2019) (internal quotation omitted).

    Although it is not bound by its findings, the Court notes that the Trademark Trial and Appeal Board of the USPTO found that Grishko adequately pled fraud. Those proceedings are currently suspended pending resolution here. I.M. Wilson, Inc., Cancellation No. 92064185 (T.T.A.B. Dec. 14, 2017) https://ttabvue.uspto.gov/ttabvue/v?pno=92064185&pty=CAN&eno=25 (applying Federal Rule of Civil Procedure 9(b)).

    The Court reminds the parties that proving fraud in a trademark cancellation leaves Grishko with "little or no room for speculation or surmise." *Yocum v. Covington*, 216 U.S.P.Q. 210, 217 (T.T.A.B. 1982). Indeed, the party against whom fraud is alleged enjoys "considerable room for honest mistake, inadvertence, erroneous conception of rights, and negligent omission." *Id.*

the trademark." *Cyclone USA, Inc. v. LL&C Dealer Serv., LLC*, No. 03-9992, 2007 WL 9662337, at *26 (C.D. Cal. 2007). So, even were Grishko to prevail on the fraud theory, at most, the marks would revert to an unregistered status but still be the property of I.M. Wilson.

Grishko counters that cancellation of the registrations would revert to them. First, Grishko have alleged common law senior rights in the GRISHKO house mark. Second, Grishko contests the validity of the August 1992 letter. *See supra* Section I.A.1.a. For the reasons articulated above, the Court finds that Grishko has plausibly asserted common law rights in the house mark based on the licensing agreement and the validity of the writing.

Grishko also challenges the registrations based on I.M. Wilson's later decision to manufacture goods in China. Switching to an arguably inferior manufacturer without more does not rise to misrepresentation sufficient to warrant cancelling the registration. *Cyclone USA, Inc. v. LL&C Dealer Serv., LLC*, No. 03-992, 2007 WL 9662337, at *31 (C.D. Cal. Nov. 8, 2007). The alleged misrepresentation is not a cognizable ground to cancel an incontestable registration.

The August 1992 writing, upon which I.M. Wilson bases its ownership of the house mark and its incontestable registrations, is ambiguous. Absent extrinsic evidence, the Court is unable to resolve that ambiguity in favor of either I.M. Wilson or Grishko. And, because I.M. Wilson has failed to cite on-point case law establishing that the ownership of Model Marks is precluded, as a matter of law, by the August 1992 writing or the incontestable GRISHKO house mark, the Court finds that Grishko sufficiently pleads ownership of the Model Marks. The Court will not dismiss Counts 2, 3, 4, 5, 10, and 13 on the threshold issue that Grishko does not own either the house or model or sole marks.

### 2. Protectable Trade Dress

I.M. Wilson also moves to dismiss Grishko's counterclaims alleging federal and state trade dress infringement on the grounds that Grishko fails to establish that the alleged trade dress is

protectable.[19] The Court disagrees.

Trade dress refers to the "total image or overall appearance of a product." *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 308 (3d Cir. 2014) (citation omitted). It broadly includes, among other things, "size, shape, color or color combinations, texture, graphics, or even a particular sales technique." *Id.* To plead trade dress infringement under the Lanham Act, a plaintiff must establish that "(1) the allegedly infringing design is non-functional; (2) the design is inherently distinctive or has acquired secondary meaning; and (3) consumers are likely to confuse the source of the plaintiff's product with that of the defendant's product." *McNeil Nutritionals, LLC v. Heartland Sweeteners, LLC*, 511 F.3d 350, 357 (3d Cir. 2007). A plaintiff must also articulate "the specific elements which comprise its distinct dress." *Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 309 (3d Cir. 2014). I.M. Wilson argues that Grishko fails to plead (1) articulated, specific elements of its claimed trade dress; (2) non-functionality; and (3) secondary meaning.[20]

## a. Articulation of the Specific Elements of the Trade Dress

The Supreme Court has not specified what facts are sufficient to identify a protectable trade dress. Indeed, whether a party has alleged trade dress entails the sort of factual review rarely conducted by courts at the motion to dismiss stage. The Third Circuit Court of Appeals has expressed that, with a motion to dismiss, the party seeking to protect a design must give "adequate notice of what overall look it wishes to protect." *Fair Wind Sailing*, 764 F.3d at 310.

In its Third Amended Counterclaims, Grishko alleges new details concerning its trade

---

[19] Courts within this Circuit evaluate federal and state trade dress infringement claims with the same standards. See, e.g., *Patient Transfer Sys., Inc. v. Patient Handling Sols., Inc.*, No. CIV. A. 97-CV-1568, 1999 WL 54568, at *7 (E.D. Pa. Jan. 29, 1999).

[20] I.M. Wilson does not allege that consumers are likely to confuse the source of the products.

24

dress:

> Each Grishko pointe shoe has a distinctive overall appearance, separate and apart from the shoe's functionality, which includes the configuration and combination of one or more of its GRISHKO trademark, the Model Marks, the Model Marks' font style, color, and, shape, the Sole Mark, sole markings, size markings, width markings, stitch patterns and other nonfunctional elements that U.S. consumers are familiar with representing genuine Grishko products sourced from Grishko Ltd. in Russia (the "Grishko Trade Dress")....
>
> More specifically, the Grishko Trade Dress is comprised, in part, by the configuration and combination of one or more of (1) pink satin with matching trim, as depicted in the photographs above,[21] on the exterior, extending slightly inwards for about two (2) centimeters with a visible stitch line on the inner seam; (2) the particular Model Mark affixed to the inner sole with the words "HANDMADE BY GRISHKO Ltd" in between two horizontal lines, underneath the Model Mark; (3) the sub-mark "PRO," "Flex" etc. to the right of the Model Mark when applicable per the particular shoe; (4) the white inner sole upon which the Model Mark and above-referenced designations are affixed, extending outwards towards the exterior of the shoe; (5) the unique identification number inside the fold of the left inner seam, below the stitch line; (6) the Sole Mark on the top portion of the outer sole, underneath the ballet pointe shoe when the shoe lays naturally, horizontal to the ground; (7) the size and width markings directly below the Sole Mark; and (8) the GRISHKO mark below the size and width markings towards the bottom of the outer sole in a somewhat-circular formation with the words "HANDMADE IN RUSSIA" comprising the bottom half of the circle; and (9) the stitch patterns as depicted in the above-photographs.

3d Am. Counterclaims ¶¶ 45-46.

I.M. Wilson first argues that because Grishko has insufficiently pled ownership of the model marks and has not pled ownership of the GRISHKO marks, neither can be part of Grishko's trade dress. For the reasons articulated above, the Court finds that Grishko has pled ownership of the model marks and, accordingly, will consider these marks as part of the alleged trade dress.

---

[21]    In its Third Amended Counterclaims, Grishko includes photographs of eight model marks, the sole mark, and the identification numbers.

Similarly, based on Grishko's alleged licensing relationship and the ambiguity surrounding the August 1992 writing, the ownership of the GRISHKO house mark is a matter not ripe for resolution at the motion to dismiss stage. The Court will consider the house mark, for the time being, as a component of the trade dress. *See Interlink Prod. Int'l, Inc. v. F & W Trading LLC*, 2016 WL 1260713, at *12 (D.N.J. Mar. 31, 2016) ("Interlink's trademarks can be a part of its trade dress.").

I.M. Wilson argues that the remainder of Grishko's articulation of its trade dress "invites speculation as to their scope and meaning." Doc. No. 168 at 13. The Court disagrees. Although ¶ 45 is vague, ¶ 46 includes enough detail (and accompanying photographs) to meet the pleading requirements in *Fair Wind Sailing*. 764 F.3d 303, 309-10 (3d Cir. 2014) (dismissing claim where trade dress was "simply a hodgepodge of unconnected pieces of its business" rather than a "composite visual effect"). To be sure, use of pink satin for the exterior of the pointe shoes made of an unremarkable shade of pink is not unique. But Grishko also alleges that they are the only manufacturer that places a "unique identification number that can be used to identify the specific individual who inspected" the shoe. Doc. No. 148 ¶ 43. And Grishko spells out the components of its pointe shoes and the locations of each of those identifying elements. Allegations of trade dress which include a description of the product, photographs, associated trademarks have been held sufficient to withstand dismissal. *See, e.g.*, *Interlink*, 2016 WL 1260713; *Truinject Corp. v. Nestle Skin Health, S.A.*, No. CV 19-592-LPS-JLH, 2020 WL 70981 (D. Del. Jan. 7, 2020), *report and recommendation adopted sub nom. Truinject Corp. v. Nestle Skin Health. S.A.*, No. CV 19-592-LPS-JLH, 2020 WL 1270916 (D. Del. Mar. 17, 2020).

### b. Non-Functionality

I.M. Wilson next contends that Grishko has not adequately pled that the trade dress is non-functional. Limiting the scope of trade dress protection to nonfunctional features strikes a balance between protecting and promoting competition. *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am.*

26

*Corp.*, 977 F.3d 261, 265 (3d Cir. 2020) (holding that the chocolate covering on a cookie is functional and thus not protectable as trade dress).

The Supreme Court set forth a two-step inquiry for determining functionality in *TrafFix Devices Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001). First, "a feature is functional if it is useful," *Ezaki Glico*, 977 F.3d at 265, or "if it affects the cost or quality of the article," *TrafFix*, 532 U.S. at 32. If functionality cannot be determined under this first step, courts next evaluate whether the feature "is one the exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." *TrafFix*, 532 U.S. at 32.

A feature that is arbitrary or ornamental is not functional. *Fair Wind Sailing*, 764 F.3d at 309. Certain aspects of the alleged trade dress could be seen as inherently functional (*i.e.*, "the unique identifier number" used to identify the cobbler that inspected the shoes, the placement and orientation of the size and width markings). Even so, other aspects of the trade dress are plausibly inherently aesthetic (*i.e.*, the pink satin trim, white inner sole, stitch patterns, and diamond sole mark)[22]—and thus nonfunctional. Notably, "[t]he fact that individual elements of the trade dress may be functional does not necessarily mean that the trade dress as a whole is functional; rather, functional elements that are separately unprotectable can be protected together as part of trade dress." *Fair Wind Sailing*, 764 F.3d at 311 (internal citations omitted). Although I.M. Wilson emphasizes potentially functional purposes of the various elements of the alleged trade dress, the Court finds that the elements, taken together, could plausibly achieve a nonfunctional "composite tapestry of visual effects." *Id.* (citation omitted).

### c. Secondary Meaning

Finally, I.M. Wilson urges the Court to find that Grishko has not adequately alleged

---

[22]     Grishko alleges that the diamond pattern on the sole is not designed for traction or any other functional purpose and is purely aesthetic.  Doc. No. 148 ¶ 40.

27

secondary meaning. "Secondary meaning exists when the mark is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products of services." *Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000). Secondary meaning can be created through "extensive advertising which creates in the minds of consumers an association between the mark and the provider of the services advertised under the mark." *Id.* The Third Circuit Court of Appeals has enumerated the following non-exhaustive list of factors for courts to consider in determining secondary meaning:

> (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and (11) actual confusion.

*Id.* (internal citation omitted). "At the motion to dismiss stage, th[e] Court need not conclusively determine that the [marks] have acquired secondary meaning[,]" or find facts pertaining to every factor. *Lorillard Tech., Inc. v. NJ Ale House, LLC*, No. 14-2044, 2015 WL 1197531, at \*7 (D.N.J. Mar. 13, 2015).

Grishko catalogues its efforts to establish the brand: (1) Grishko is the only manufacturer of ballet pointe shoes bearing the claimed trade dress; (2) Grishko operates seven factories and employ more than 600 cobblers; (2) Grishko has used the trade dress for more than three decades; (3) Grishko has sold in excess of one million pairs of ballet shoes bearing the claimed trade dress; (4) Grishko has sold ballet shoes bearing this trade dress with aggregate retail values ranging between \$45 million and \$60 million dollars; (5) Grishko has engaged in extensive advertising efforts to reach these figures; (6) retailers and U.S. ballet shoe customers have come to identify the products bearing the trade dress as being sourced by Grishko, Ltd.; (7) I.M. Wilson copied Grishko's Made in Russia products by engaging a Chinese manufacture to produce ballet shoes

28

after January 2019.

I.M. Wilson responds that the trade dress itself has not *independently* acquired secondary meaning. I.M. Wilson supports this proposition with *Carson Optical, Inc. v. Prym Consumer USA, Inc.*, 11 F. Supp. 3d 317, 343-44 (E.D.N.Y. 2014). There, the plaintiffs failed to allege secondary meaning in part because they did not plead that the advertisements and sales stressed or emphasized the alleged trade dress. Although courts in the Second Circuit apply stringent standards for alleging these claims, courts in this Circuit are more flexible as to claimants.[23]  No court within this Circuit has relied on or followed in whole or in part *Carson Optical* to screen for secondary meaning.

At the motion to dismiss stage, the Court finds that Grishko plausibly alleged secondary meaning by alleging length of use, exclusivity of use, the size of the company, the alleged fact of copying, and the number of sales.

For these reasons, Grishko has satisfied the threshold elements to plead its trade dress is protectable for purposes of alleging federal and common law infringement, unfair competition, and trademark dilution.

### 3. Likelihood of Confusion

I.M. Wilson does not challenge the third element to plead federal and state law trademark and trade dress infringement. So the Court will only briefly consider whether Grishko has sufficiently pled direct confusion. The Third Circuit has articulated ten factors to evaluate whether

---

[23]     *See, e.g.*, *Profoot, Inc. v. MSD Consumer Care, Inc.*, No. 11-7079, 2012 WL 1231984, at *3 (D.N.J. Apr. 12, 2012) (finding that plaintiff sufficiently pled secondary meaning by alleging that plaintiff exerted millions of dollars in advertising which, at least in part, resulted in the product becoming a consistent leader in its market); *Hampden Eng'g Corp. v. Shear Tech., LLC*, No. 15-7424, 2017 WL 1839284, at *2 (D.N.J. May 5, 2017) (finding that plaintiff sufficiently plead secondary meaning by alleging that the products had been marketed under plaintiff's brand for "sufficient periods of time," ranging from 10 to 23 years).

the similar marks create a likelihood of confusion. *Interspace Corp. v. Lapp, Inc.*, 721 F.2d 460 (3d Cir. 1983). Where, as here, the "products are directly competing, and the marks are clearly very similar, a district judge should feel free to consider only the similarity of the marks themselves" and need not consider the remaining *Lapp* factors. *A& H Sportswear v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 214 (3d Cir. 2000).

With this guidance, the Court finds that Grishko has adequately pled a likelihood of confusion. Grishko alleges that, after the exclusive distribution period ended, I.M. Wilson engaged a Chinese manufacturer to brand its pointe shoes with the house, model, and sole marks and trade dress placed them in direct competition with Grishko's shoes in the United States. Grishko maintains that I.M. Wilson's shoes are intended to confuse the purchasing public into thinking that they are Grishko's Made in Russia pointe shoes. And, Grishko alleged upon information and belief that U.S. retailers purchased I.M. Wilson's Made in China shoes under the false impression that they were buying Grishko's Made in Russia shoes. Ultimately, the likelihood of confusion analysis is a factual question which is hardly resolved at the motion to dismiss stage. But given these considerations, Grishko has adequately pled this element of its infringement claims.

#### 4. Allegations Regarding the Individual Counterclaim Defendants

In addition to counterclaiming against I.M. Wilson, Grishko alleges various claims against the company's corporate officers. Courts may impose liability on corporate officers in two ways: by piercing the corporate veil or under a participation theory. *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978). Grishko seeks to hold each of the individual counterclaim defendants liable based on this latter theory. A corporate officer may be held personally liable for his or her participation in tortious activity by the corporation, "but only where the officer 'specifically direct[s] the particular act to be done or participate[s], or cooperate[s] therein.'" *Moore v. Johnson & Johnson*, 907 F. Supp. 2d 646, 663 (E.D. Pa. 2012) (citation omitted). Thus, participation theory

30

makes actionable an executive's misfeasance, that is, the improper performance of an act, but not nonfeasance, *i.e.*, the omission of an expected act. Moreover, "'[p]articipation theory' applies only in *tort*, not contract." *Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp. 3d 494, 507 (E.D. Pa. 2014).

The Third Circuit Court of Appeals has recognized that a corporate officer is individually liable for the torts he commits under the Lanham Act. *Donsco, Inc., v. Casper, Corp.*, 587 F.2d 602, 606 (3d Cir. 1978). Courts within this Circuit have routinely held individual corporate officers to be proper defendants for alleged violations of the Lanham Act under the participation theory.[24] *Pennsylvania State Univ. v. Keystone Alternatives LLC*, No. 1:19-CV-02039, 2020 WL 1082647, at *6 (M.D. Pa. Mar. 5, 2020). *See, e.g.*, *Brown v. Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 618 (E.D. Pa 2010) (individual employee's use of disputed mark which allegedly caused customer confusion and diverted customers from plaintiff's business stated claims for unfair competition and trademark infringement); *Max Daetwyler Corp. v. Input Graphics, Inc.*, 541 F. Supp. 115, 116 (E.D. Pa. 1982) (allegations that individual corporate officers were personally involved in the allegedly tortious acts of unfair competition sufficient under *Donsco*); *Playboy Enters., Inc. v. Universal Tel-A-Talk, Inc.*, No. CIV. A. 96-6961, 1998 WL 767440, at *7 (E.D. Pa. Nov. 3, 1998) ("The liability of a corporate officer who actively participates in the infringing acts is distinct from the liability resulting from the piercing of the corporate veil. . . ."). Notably, "no such level of specificity is required to state a claim" against individual corporate officers for participating in the allegedly tortious acts. *Gentex Corp. v. Abbott*, 978 F. Supp. 2d 391, 403 (M.D. Pa. 2013). Because Grishko's counterclaims of trademark, trade dress, and unfair competition, among others, are "essential tortious in nature," individual liability is theoretically available. *See*

---

[24]    For these purposes, the pleading standards for federal trademark claims and state law claims are materially the same.

*Klitzner Indus., Inc. v. H.K. James & Co.*, 96 F.R.D. 614, 616 (E.D. Pa. 1983).

But merely alleging that an individual controls the operations and assets of the company is insufficient. Rather, there must be allegations that the individuals personally committed, directed, induced, or determined the policies resulting in the allegedly tortious activity. *Id.* Some of Grishko's allegations against the individual counterclaim defendants do not meet this pleading standard.[25]

However, Grishko does allege, among other things, that Irene (1) initially proposed that I.M. Wilson register the GRISHKO mark with the USPTO in I.M. Wilson's name; (2) drafted the August 1992 writing and represented that the writing was necessary for the registration; (3) was notified by Mr. Grishko that he revoked his consent to register the GRISHKO mark; (4) supplied the USPTO with outdated documents to renew a registration despite Mr. Grishko having already revoked his consent and represented their validity. The Court finds these allegations sufficient to state a claim against Irene for her alleged involvement in the trademark and trade dress infringement, the unfair competition, and trademark dilution claims.

Similarly, Grishko alleges that Christine, among other things, (1) participated in the registration efforts with the USPTO; (2) authorized the submissions to the USPTO which she allegedly knew to include outdated documents; and (3) is involved in I.M. Wilson's marketing efforts. The Court likewise finds these allegations at least sufficiently adequate to state Christine's personal involvement in the allegedly tortious infringement, unfair competition, and trademark dilution claims. Grishko thus asserts that Irene and Christine were personally involved both in

---

[25]   Grishko generally argues that all the individual counterclaim defendants should be held liable under the participation theory because they all (1) attended annual meetings and stockholders and special meetings of directors "after which decisions are made and resolutions related thereto are approved, ratified, and confirmed," 3d Am. Counterclaims ¶¶ 11, 13, 14, 17, (Doc. No. 148); (2) manage the affairs of the company; and (3) are "the principal owners and operators of [I.M. Wilson]", *id.* ¶ 19.

transferring ownership of and registering the house mark, which Grishko maintains was time and purpose limited. Because ownership of the marks is disputed, at this preliminary stage, Irene and Christine may be named as co-defendants.

The Court will dismiss Mr. Gage and Justin as counterclaim defendants for the trademark infringement, unfair competition, and dilution claims. Grishko asserts in only conclusory fashion that Mr. Gage is involved in the business and serves as its chairman. Allegations about Justin's involvement are limited to his participation in the false advertising campaign, (Count 9), *see infra*, but are not relevant to pleading personal involvement in the remaining trademark claims.

### B. Count 13: Federal Trademark Infringement

Grishko alleges that I.M. Wilson is infringing its rights in the federal GRISHKO marks by selling its Chinese manufactured products after the "black-out" period ended. To plead federal trademark infringement, Grishko must plead that (1) it has a valid and legally protectable mark; (2) it owns the mark; and (3) I.M. Wilson's use of the mark to identify the goods and services causes a likelihood of confusion. 15 U.S.C. § 1114(1)(a).

As detailed in Section I.A.1, *supra*, the parties dispute the threshold requirement of ownership. I.M. Wilson relies on its incontestable registrations for the house mark, which Grishko maintains should be cancelled based on alleged fraud on the USPTO. I.M. Wilson relies on its incontestable registrations and the August 1992 writing. For the reasons articulated above, the Court finds that the first two elements are at least plausibly met, although the Court has noted the challenges in proving fraud. I.M. Wilson does not challenge the likelihood of confusion element. But the Court finds that this third element is also adequately pled. *See supra* Section I.A.3.

Accordingly, the Court denies I.M. Wilson, Irene, and Christine's motion to dismiss but dismisses the claim against Justin and Mr. Gage.

### C.  Count 3:  Common Law Trademark and Trade Dress Infringement

Grishko alleges that I.M. Wilson has adopted a mark and trade name that is confusingly identical to the GRISHKO house mark, model marks, and trade dress in violation of Pennsylvania common law.[26]  54 Pa. Stat. Ann. § 1126.  "The elements of common law trademark infringement under Pennsylvania and federal law are identical," although the state-law claim does not require the goods to travel in interstate commerce.  *Standard Terry Mills, Inc. v. Shen Mfg. Co.*, 803 F.2d 778, 780 n. 4 (3d Cir.1986).  For this reason, the Court need not repeat its discussion of the elements of trademark infringement.  Because the Court finds that Grishko has stated enough facts to survive motion to dismiss brought by I.M. Wilson, Irene, and Christine on the federal claim, the common law claims also survive.

As for Grishko's claim for common law trade dress infringement, the Court finds that Grishko's revised and expanded allegations address the elements to plead infringement.  *See supra* Sections I.B, I.C.  I.M. Wilson has not contested the third element—likelihood of confusion— although Grishko alleges that I.M. Wilson's products are now "identical" to Grishko's Made in Russia line.  Doc. No. 148 ¶ 182.  For this reason, I.M. Wilson, Irene, and Christine's motions to dismiss Count 3 are denied.

The Court will dismiss Count 3 against Justin and Mr. Gage because Grishko has not alleged sufficient facts of their personal involvement.  *See supra* Section I.A.4.

### D.  Count 10:  Lanham Act Unfair Competition and False Designation of Origin

In Count 10 Grishko asserts false designation of origin, known more broadly as unfair competition, under Section 43(a) of the Lanham Act.  *Am. Greetings Corp. v. Dan-Dee Imports, Inc.*, 807 F.2d 1136, 1140 (3d Cir. 1986); 15 U.S.C. § 1125(a).  Grishko contends that I.M.

---

[26]  Although Grishko purports also to assert federal trade dress infringement, the Court has not discerned which of the 13 counts addresses this claim.

Wilson's line of Made in China Grishko Pointe Shoes and use of Grishko's trade dress falsely designate the origin of I.M. Wilson's products. Claims for federal trademark infringement under 15 U.S.C. § 1114 and federal unfair competition are measured by identical standards. *A& H Sportswear v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000). Nevertheless, the Court recounts the elements of a false designation claim here:

> (1) the defendant used a false designation of origin; (2) the use occurred in interstate commerce; (3) the alleged false designation is likely to cause confusion, mistake, or deception regarding the origin, sponsorship, or approval of defendant's goods or services by another; and (4) plaintiff is or is likely to be damaged as a result.

*See American Tel. and Tel. Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1428 (3d Cir. 1994); 15 U.S.C. § 1125(a). As previously explained, false designation claims effectively function as "passing off" claims "because the defendant has allegedly used the plaintiff's trademark to brand its own products as the plaintiff's." *Alpha Pro Tech, Inc. v. VWR Int'l LLC*, 984 F. Supp. 2d 425, 453 (E.D. Pa. 2013).

With the exception of challenging Grishko's ownership to the house and model marks and trade dress, I.M. Wilson does not otherwise address Grishko's allegations. The Court finds that Grishko's allegations—if proven true—state a claim for false designation of origin. As is by now a refrain, Grishko has pled ownership of the model marks and trade dress and has cast doubt on the validity of the ownership of the house mark. I.M. Wilson's use of the model marks, sole mark, and trade dress, along with the Grishko name would be likely to confuse consumers as to whether I.M. Wilson's pointe shoes were manufactured by Grishko in Russia or were being passed off as Made in Russia. To be clear, Grishko alleges that I.M. Wilson is using identical marks. (Doc. No. 148 ¶ 175.) Grishko contends that I.M. Wilson's current manufacturer produces a shoe of inferior quality, which not only confuses consumers because the shoes appear similar, but may be dangerous if the shoe cannot support the dancer. (Doc. No. 148 ¶ 248.) Should a dancer wearing

35

an allegedly harmful shoe—but believing it to be a Grishko—suffer an injury, so too would Grishko's business and reputation. Section 43(a) of the Lanham Act is designed to reach this type of conduct, and, although ownership remains disputed, the Court declines to dismiss Count Ten on that basis.

For the reasons articulated above, the Court will not dismiss Count 10 against I.M. Wilson, Irene, and Christine but does dismiss it as to Justin and Mr. Gage.

### E. Count 4: Common Law Unfair Competition

Grishko also brings a claim for unfair competition under Pennsylvania common law and incorporates all allegations supporting the federal infringement claim. The common law cause of action mirrors the Lanham Act's cause of action for unfair competition, although the former does not require that the goods travel in interstate commerce. *See Louis Vuitton Malletier and Oakley, Inc. v. Veit*, 211 F. Supp. 2d 567, 582 (E.D. Pa. 2002); *A&H Sportswear, Inc. v. Victoria's Secret Store, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) (enumerating the elements of unfair competition under Pennsylvania law). Thus, the Court finds that Grishko has sufficiently pled common law unfair competition for the same reasons detailed in its analysis of unfair competition under the Lanham Act. *See supra* Section I.D. And, as above, the Court will not dismiss Count 4 against I.M. Wilson, Irene, and Christine but will dismiss it against Justin and Mr. Gage.

### F. Count 5: Pennsylvania Trademark Dilution Claim

Grishko asserts that I.M. Wilson's pointe shoes carrying the GRISHKO house mark, Model Mark, and sole mark since the termination of the exclusive licensing agreement are diluting the brand. A prima facie trademark dilution claim under Pennsylvania law requires that (1) the plaintiff own a mark that qualifies as "famous"; (2) the defendant is making commercial use in the Commonwealth of a mark or trade name; (3) the defendant's "use began after the plaintiff's mark became famous;" and (4) the defendant's "use causes dilution by lessening the capacity of the

36

plaintiff's mark to identify and distinguish goods or services." *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000). I.M. Wilson contends that Grishko fails to adequately plead fame "in the Commonwealth."

Before 2006, Pennsylvania's trademark dilution statute mirrored the elements to prove federal trademark dilution under Section 43(c) of the Lanham Act. So, parties alleging trademark dilution often brought both federal and state law claims. And because the statutes tracked each other, the claims would rise and fall together. The Third Circuit Court of Appeals, interpreting the pre-2006 version of the federal trademark dilution law, recognized that a mark could attain "niche fame" to maintain a dilution claim. Niche fame was fame within a specific geographic area or among a subset of consumers. It allowed protection where both parties operated in the same or related market, provided the mark had a high degree of fame within that market. *Times Mirror Magazines*, 212 F.3d at 164-65.

In 2006, Congress enacted the Trademark Dilution Revision Act (TDRA) which amended Section 43(c). The TDRA made two changes relevant here: first, the Act inserted a "general consuming public" standard, which has been interpreted by commentators and courts to "effectively preclude[] niche fame."[27] *Dille Family Tr. v. Nowlan Family Tr.*, 276 F. Supp. 3d 412, 435 (E.D. Pa. 2017); 4 McCarthy on Trademarks § 21:105 at n.4 (collecting cases). Second,

---

[27]     The "general consuming public standard" has closed the door on most claims alleging trademark dilution under federal law. Fame for purposes of claiming trademark infringement is distinct from fame for dilution under federal law, with the latter requiring a "more stringent showing." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012) (evidence did not establish that COACH, used on leather-goods and handbags, was a "famous" mark for dilution claim); 4 McCarthy On Trademarks and Unfair Competition § 24:104 at 24–290 (4th ed. 2011). For example, Nike, Delta airlines, and Citibank have all been held to be famous marks, 4 McCarthy On Trademarks and Unfair Competition § 24:107, while the App Store, University of Texas's "longhorn" logo, and Maker's Mark trade dress of red dripping wax on the whiskey bottle top have not, *id.* § 24:109. So, even though all trademarks are distinctive, few are indeed have achieved household name status. Indeed, Professor McCarthy has suggested that 5a mark or trade dress should attain 75% recognition among the general consuming public of the United States before it is considered "famous" for dilution purposes. 4 McCarthy on Trademarks § 21:106.

the TDRA lessened the pleading party's burden to require only a likelihood of dilution. Pennsylvania's statute, however, continues to require a showing of actual dilution and has not been amended to include the "general consuming public" standard. *Compare* 54 Pa. Stat. and Cons. Stat. Ann. § 1124, *with* 15 U.S.C. § 1125(c)(1).

The Third Circuit has not yet addressed whether the niche market remains a viable theory for Pennsylvania anti-dilution claims. At least one court in the Circuit has interpreted the state law to preclude niche fame based on the amendments to the federal law. *Componentone, L.L.C. v. Componentart, Inc.*, No. 02: 05CV1122, 2007 WL 4302108, at *1 (W.D. Pa. Dec. 6, 2007). The *Componentone* court emphasized that "niche market fame" was a "creature of judicial construction of federal law" and does not appear in the Pennsylvania anti-dilution statute. *Id.* at *3. Whether the niche fame theory is viable is dispositive to whether Grishko has pled that its marks and trade dress are "famous."

The Court will not read in the Trademark Dilution Revision Act's elimination of the niche market theory here. First, this court is bound by the Third Circuit Court of Appeals' decision in *Times Mirror Magazines*. The appellate court, interpreting the then-federal law, recognized niche fame. At that time, state and federal standards had been in lockstep. Because the appellate court recognized the niche theory for the federal claim, it was likewise available for the state claim. The Third Circuit, as noted, has not yet spoken on this issue.[28] Second, this Court does not sit as a super-legislature. In the 14 years since the TDRA, Pennsylvania has chosen not to reform its state anti-dilution law to conform with the federal standards. To the extent the Commonwealth is not inclined to follow the TRDA, this is the legislature's prerogative. Principles of federalism restrain

---

[28]     While the Court is loath to place a bet on what cases progress where or when, much less to what result, this issue is unlikely to reach a Pennsylvania state court given removal jurisdiction, and the fact that parties often plead both federal and state law trademark claims.

this Court from reading in a stricter standard than the law currently provides.

Finding thus that "niche fame" remains a viable theory under Pennsylvania law, Grishko's claim survives. Both Grishko and I.M. Wilson compete for the same consumers. Grishko's pleadings are entirely focused on the "fame" the brand has amassed in the performing arts community and the name recognition it enjoys among dancers. Doc. No. 148 ¶ 58. It emphasizes that, although it is a global brand, it licensed its branded products for over three decades through its partnership with I.M. Wilson, headquartered in Pennsylvania. It alleges that its marks and trade dress are recognized by Pennsylvania's premier professional ballet company—the Pennsylvania Ballet—in addition to the "American Ballet Theatre, West Ballet, and other organizations throughout the United States," 3d Am. Counterclaims ¶ 191 (Doc. No. 148). And, Grishko alleges it advertises "separately in magazines, in trade journals, during trade shows, through social media, and by various other means." *Id.* ¶¶ 51, 56, 195. Accepting these facts as true, the Court finds that Grishko has pled enough facts demonstrate the fame of the marks in Pennsylvania. *See CPC Properties, Inc. v. Dominic, Inc.*, 2013 WL 4457338, at *5 (E.D. Pa. Aug. 21, 2013) ("CRAB FRIES" trademark alleged to be famous due to "extensive advertising efforts," inclusion on bar signage and menus, and continuous use since 1978). Grishko is not required—at this stage—to conduct consumer surveys attesting to any alleged fame. Further, the sole case relied on by I.M. Wilson is inapposite. The plaintiff in *Reed v. Chambersburg Area School District* alleged only that the marks at issue were registered and carried "extensive goodwill." 951 F. Supp. 2d 706, 728 (M.D. Pa. 2013).[29] Grishko's pleadings surpass those in *Reed*.

Because the Court finds these pleadings are adequate at this stage, the Court will not

---

[29]    The Court takes notice that Reed's claim was dismissed without prejudice for failure to plead any facts to support a finding that the marks were famous. The court there did not distinguish between allegations sufficient to plead fame writ large and fame within the Commonwealth of Pennsylvania.

dismiss Count 5 against I.M. Wilson. Nor will the Court dismiss Count 5 against Irene and Christine. *See supra* Section I.A.4.

### G. Count 9: False Advertisement Claim

In Count 9, Grishko alleges that I.M. Wilson and certain of the individual counterclaim defendants disseminated false advertising, in violation of the Lanham Act. Specifically, I.M. Wilson falsely held itself out to be the exclusive distributor for North America when it only held that distinction within the United States. Doc. No. 148 ¶ 240. Grishko alleges that I.M. Wilson's advertisements harmed its relationship with distributors in Canada and Mexico and impacted its ability to enter into new exclusive distribution and licensing agreements worldwide. And, Grishko alleges that I.M. Wilson continues to advertise online as the exclusive wholesale distributor for Grishko-branded products. Doc. No. 148 ¶ 241.

As an initial matter, to state a Section 43(a) claim, "a litigant's interest must fall within the 'zone of interests' protected by the statute, and the litigant must have suffered injuries that were proximately caused by a violation of the statute.'" *Telebrands Corp. v. Everstar Merchandise Co., Ltd.*, No. 17-2878, 2018 WL 585765, at *8 (D.N.J. Jan. 29, 2018) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128-34 (2014)). "Proximate cause" requires a showing "economic or reputational injury flowing directly from the deception wrought by the defendant's advertising," which "occurs when deception of *consumers* causes them to withhold trade from the [claimant.]" *Lexmark*, 572 U.S. at 134. (emphasis added). The Supreme Court in *Lexmark* reaffirmed that the Lanham Act's "zone of interest" requirement is not an element of constitutional standing. Rather, a litigant's "standing" to pursue a Section 43(a) false advertising claim refers to statutory authority under the Act. *Cf. Artesanias Hacienda Real S.A. de C.V. v. N. Mill Capital (In re Wilton Armetale, Inc.)*, 968 F.3d 273, 281 (3d Cir. 2020) (distinguishing constitutional standing from the statutory requirements of bankruptcy "standing").

I.M. Wilson argues that Grishko has not alleged adequate facts to establish suffering an injury as a result of I.M. Wilson's advertising. Doc. No. 168 at 43. Specifically, I.M. Wilson argues (1) that Grishko does not allege that I.M. Wilson's advertisements caused consumers to withhold trade from it and instead only pled injury to its reputations with retailers and (2) that it is not plausible that advertisements in the U.S. directed to U.S. consumers harmed Grishko's worldwide reputation.

I.M. Wilson incorrectly attempts to cabin the scope of "consumers" within the meaning of the Lanham Act. "[N]othing in the language of § 43(a) specifically requires a false representation be intended to influence the *ultimate consumer*, whoever that might be." *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1385 (5th Cir. 1996) (quoting *Am. Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.*, 820 F. Supp. 1072, 1077 (N.D. Ill. 1993)). The relevant "purchasing public" varies according to the specifics of the industry. *Am. Outsourcing Sols., LLC v. Banta*, No. 3:09-CV-2509, 2010 WL 11671857, at *3 (M.D. Pa. June 23, 2010) (declining on a motion to dismiss to find that alleged statements did not constitute commercial advertising). Courts have found actionable Section 43(a) claims based on communications to retailers which resulted in withheld trade. *Seven-Up Co.*, 86 F.3d at 1385; *Mylan Labs., Inc. v. Pharm. Basics, Inc.*, 808 F. Supp. 446, 459 (D.Md. 1992) (concluding that § 43(a) applied to brochures circulated only to wholesalers, physicians, and pharmacists who were not the actual consumers), *rev'd on other grounds*, 7 F.3d 1130 (4th Cir.1993).

Grishko sells goods through retail relationships as well as through wholesaling. (Doc. No. 148 ¶ 194 ("IMW traded Grishko-branded products on Grishko's behalf throughout the nation to over 400 U.S. retailers…."), ¶ 275 ("Grishko has engaged in the wholesale and retail sale business of ballet dancewear….").) Grishko pleads that I.M. Wilson's representation as the exclusive

distributor for North America caused "immediate problems" with third parties in Canada and Mexico—although they do not further specify the nature of such problems.  In addition to reputational harm from its relationships with retailers, Grishko also pleads that the false advertisements led consumers to believe—incorrectly—"that they must purchase Grishko-branded products from IMW rather than from Grishko directly (or Canadian or Mexican distributors)." *Id.* ¶ 242.

I.M. Wilson's reliance on *Telebrands* is not quite *en pointe*. *Telebrands Corp. v. Everstar Merch. Co., Ltd*, 2018 WL 585765, at *9 (D.N.J. Jan. 29, 2018).  The plaintiffs in *Telebrands* failed to allege how consumers might have acted differently had packaging on the product at issue been accurate.  There, the court emphasized that plaintiffs failed to establish how defendants' alleged misstatements on its products diverted sales from plaintiff.  *Id.*  By contrast, Grishko contends that I.M. Wilson marketing itself as the exclusive distributor for North America and now online as the exclusive wholesale necessarily diverted sales away from Grishko.  Consumers and retailers viewed I.M. Wilson as the sole purveyor of Grishko-branded products.  The Court is persuaded by the pleadings that Grishko has satisfied the statutory standing requirements to bring a false advertising claim.

Provided a party has met the statutory requirements of "standing" under the Lanham Act, the party must allege that "(1) the defendant made false or misleading statements about the nature, characteristics, qualities, geographic origins of his or another's goods, services, or commercial activities in commercial advertising or promotion; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff." *Master Cutlery, Inc. v. Panther Trading*

42

*Co.*, No. 12-4493 (JLL), 2013 WL 4517860 at *4 (D.N.J. Aug. 26, 2013).

I.M. Wilson argues that Grishko fails to plausibly allege actual deception or a tendency to deceive. Specifically, I.M. Wilson's advertisements distributed in the U.S. would not tend to deceive U.S. consumers because I.M. Wilson was the exclusive domestic purveyor of GRISHKO products. I.M. Wilson does not dispute that its advertising was false because it never was the exclusive distributor for North America. Instead, I.M. Wilson suggests that a false statement made in the United States is not cognizable for a Section 43(a) claim if the economic harm occurs outside of the United States. I.M. Wilson does not cite any authority for this proposition.

Section 43(a) is silent regarding whether foreign commerce is properly considered in the injury analysis. But the Third Circuit Court of Appeals has held that "[a]s to the second element, actual deception or a tendency to deceive is presumed if a plaintiff proves that an advertisement is unambiguous and literally false." *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011). Indeed, where a plaintiff can prove the challenged claims are "literally false," a court may grant relief "without considering whether the buying public was actually misled." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002). At no time was I.M. Wilson the exclusive distributor for North America. On this basis, Grishko has plausibly pled actual deception regarding false advertising based on I.M. Wilson's status as the exclusive North American distributor.

To the extent I.M. Wilson has held itself out as the exclusive distributor since March 2018 (the end of the blackout period), Grishko likewise sufficiently alleges false advertising. I.M. Wilson counterargues that its ownership of seven federal trademark registrations precludes a claim that the statement is false. But this response is bootstrapped to conclusively find that I.M. Wilson's trademarks are valid—which the Court finds Grishko plausibly contests at this stage. The Court

thus will not deny Grishko's false advertising claim against I.M. Wilson for holding itself out as the exclusive wholesale distributor following the blackout period.

As to the individual counterclaim defendants, Grishko also alleges that Irene and Justin were involved in the false advertising campaign.[30]   Courts within this Circuit have found that alleging corporate officer's personal involvement in a widespread campaign of false advertising is sufficient to name that individual as a defendant. *Synthes, Inc. v. Emerge Med., Inc.*, No. CIV.A. 11-1566, 2012 WL 4205476, at *34 (E.D. Pa. Sept. 19, 2012) (complaint alleged individual defendant was, "to a large extent, personally involved" in the campaign). Grishko pleads that Irene "spearheaded IMW's advertising efforts" and consulted with Justin on the company's campaign representing it to be the "Exclusive Distributor for North America."   Given the low threshold to plead the personal involvement of the corporate officers, the Court will not dismiss Count 9 against Irene and Justin.

Although Grishko earlier alleges that Christine is involved in marketing for the company, Grishko does not allege she was involved in the alleged false advertising campaign. Accordingly, the Court dismisses Count 9 against Christine.

### H.  Count 2:  Federal Unregistered Trademark Infringement

Grishko bases its federal unregistered trademark infringement claim on 15 U.S.C. § 1125(a) which creates a civil cause of action for claims of false designation of origin and false advertising. Because Grishko already plead these causes of action in Counts 9 and 10, the Court dismisses Count 2 against all counterclaim defendants as duplicative.

---

[30]     The counterclaim defendants construe Grishko's claim as "derivative of their purported right" to use the Grishko marks and trade dress but do not address the content of I.M. Wilson's advertising.

## II.  Counterclaims Arising from the 1992 Licensing Agreement

The Court next considers Grishko's three counterclaims which related to the parties' since-terminated exclusive licensing agreement.

### A.  Count 6: Breach of Fiduciary Duty

Grishko claims that the nature of the licensing partnership bound I.M. Wilson as a fiduciary.  When I.M. Wilson misrepresented the August 1992 writing merely as a consent document to protect Grishko's intellectual property rights, I.M. Wilson breached its duty to act in Grishko's best interest.  I.M. Wilson argues that Grishko's breach of fiduciary duty claim should be dismissed because (1) it is barred by Pennsylvania's two-year statute of limitations and (2) Grishko fails to plead a plausible inference of the existence of a fiduciary relationship.  The Court agrees that Count 6 is procedurally barred.

The statute of limitations begins to run "when the [claimant] knows, or in the exercise of reasonable diligence should have known, (1) that he has been injured, and (2) that his injury has been caused by another's conduct." *Blanyar v. Genova Prod. Inc.*, 861 F.3d 426, 432 (3d Cir. 2017) (internal citations and quotation marks omitted).  The application of the discovery rule requires a plaintiff to use "all reasonable diligence to inform himself or herself properly of the facts and circumstances upon which the right of recovery is based and to institute suit within the prescribed statutory period." *Id.* (quotation omitted).

Grishko argues that the clock did not begin to run until March 2017 when I.M. Wilson allegedly refused to transfer back the trademark registrations to Mr. Grishko.  But Grishko still did not file the first iteration of the counterclaims until August 2019, six months after the statute of limitations ended.[31]  Grishko has not addressed this procedural bar, nor offered any rationale for

---

[31]     Although the complaint was filed in December 2018, "under Pennsylvania law, the filing of a

why the statute of limitations should be tolled. Accordingly, the Court dismisses Count 6 against I.M Wilson and Irene Wilson and does not reach the issue of whether Grishko has failed to plead the existence of a fiduciary relationship.

### B. Count 7: Breach of Contract

Grishko next alleges I.M. Wilson and Irene Wilson breached the parties' agreement that Grishko would transfer ownership of the house mark on a time- and purpose-limited basis. According to Grishko, "around the time the parties were entering into the 1992 Agreement," the parties entered into an oral argument—which was apparently only "partially memorialized" by the August 1992 writing—that I.M. Wilson would own the registration until the 1992 exclusive licensing agreement ended. Doc. No. 148 ¶¶ 60, 220-21. Grishko alleges that I.M. Wilson breached its duty under the oral contract to transfer or assign the GRISHKO mark registration to Grishko upon the termination of the parties' exclusive relationship in 2018.

Under Pennsylvania law, a breach of contract claim requires pleading (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and, (3) resultant damages. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (applying Pennsylvania law).[32]

I.M. Wilson contends that the breach of contract claim fails because it is too indefinite to be enforced. In determining whether a contract is pled, courts consider whether the parties manifested an intention to be bound, the terms are sufficiently definite, and there was consideration. *Bennett v. Itochu Int'l, Inc.*, 682 F. Supp. 2d 469, 483 (E.D. Pa. 2010) (applying

---

complaint does not toll the statute of limitations applicable to compulsory or permissive counterclaims." *Frankentek Residential Sys., LLC v. Buerger*, 15 F. Supp. 3d 574, 581 n.13 (E.D. Pa. 2014).

[32] The parties hotly dispute whether Grishko needs to prove a breach of contract claim by a preponderance of the evidence or with "clear, direct and precise evidence," the latter being applicable when the claimant alleges the existence of an oral contract that modified a written agreement. Resolution of this dispute is reserved for summary judgment, or, in any case, closer to the time for trial by way of a motion *in limine*.

that the agreement is too uncertain to be enforced. *Legendary Art, LLC v. Godard*, 888 F. Supp. 2d 577, 588 (E.D. Pa. 2012).

As an initial matter, the Court has already detailed the pervasive ambiguities surrounding the August 1992 writing. *See supra* Section I.A.1.a. Standing alone, the August 1992 writing is not a contract. Instead, Grishko pleads that the writing must be considered along with a purported oral agreement. (Doc. No. 148 ¶ 225.)

Grishko pleads that the parties agreed that I.M. Wilson would own the trademark so long as the parties were in an exclusive licensing agreement, after which it would forfeit ownership. Grishko alleges it did not transfer the trademark gratuitously—rather it was with the "sole purpose" of ensuring that I.M. Wilson could enforce Grishko's rights domestically during the partnership. Doc. No. ¶ 222. And Grishko maintains that the parties' subsequent course of conduct—wherein I.M. Wilson functioned as Grishko's exclusive licensee—demonstrates the parties' understanding of the agreement. But, at this stage, as is by now refrain, the Court cannot determine what the writing was intended to do. Under Pennsylvania law, "where the facts are in dispute, the question of whether a contract was formed is for the jury to decide." *Ecore Int'l, Inc. v. Downey*, 343 F. Supp. 3d 459, 487 (E.D. Pa. 2018) (internal quotation omitted).

I.M. Wilson also challenges the plausibility of this claim because it is based on a factual narrative which I.M. Wilson finds to be inconsistent with Grishko's trademark claims.[33] Grishko bases its ownership claim in part by alleging that I.M. Wilson fraudulently obtained the GRISHKO trademark without Mr. Grishko's consent. To state a breach of contract claim, Grishko counterclaims that the trademark should have been transferred to Grishko upon the termination of

---

[33]    I.M. Wilson also challenges the plausibility of Grishko's unjust enrichment claim (Count 8) for the same reason.

the 1992 exclusive licensing agreement. I.M. Wilson argues this second claim presupposes that the mark is valid.

The Court does not share I.M. Wilson's concern that the pleadings are so inconsistent as to be implausible. To the contrary, Grishko's fundamental allegation is that they own the house and model marks and trade dress. Grishko maintains that the initial transfer was not an unencumbered conveyance. It is not implausible that Grishko made a limited assignment—contingent upon the parties' licensing relationship—which allowed Grishko to plausibly revoke his consent and that I.M. Wilson is in breach for failing to surrender the mark after the agreement terminated. At this stage, Grishko is entitled to plead inconsistently. *In re Processed Egg Prod. Antitrust Litig.*, No. 08-MD-2002, 2013 WL 4504768, at *2 (E.D. Pa. Aug. 23, 2013); *Langer v. Monarch Life Ins. Co.*, 966 F.2d 786, 803 (3d Cir. 1992) ("A party may certainly allege inconsistent facts in its pleadings . . . .").

For these reasons, dismissal of Count 7 against I.M. Wilson is premature. However, the Court dismisses the breach of contract claim against Irene Wilson. Liability under the participation theory is reserved for torts committed by the corporate officer, not breaches of contract. *Accurso v. Infra-Red Servs., Inc.*, 23 F. Supp. 3d 494, 507 (E.D. Pa. 2014) (quoting *Walsh v. Alarm Sec. Grp., Inc.,* 95 F. App'x. 399, 402 (3d Cir. 2004)); *see supra* Section I.A.4.

### C. Count 8: Unjust Enrichment

Grishko's unjust enrichment claim is premised on the theory that I.M. Wilson has improperly held onto the GRISHKO mark registration even after termination of the 1992 exclusive licensing agreement. Unjust enrichment under Pennsylvania law requires pleading that plaintiff (in this case, the counterclaim plaintiff) conferred a benefit on the defendant; the defendant appreciated that benefit; and that it would be inequitable for defendant to accept and retain the benefit without paying for the value of the benefit. *Reese v. Pook & Pook, LLC,* 158 F. Supp. 3d

48

271, 300-01 (E.D. Pa. 2016).

As an initial matter, I.M. Wilson argues that a claim for unjust enrichment is barred "where a written or express contract between the parties exists." I.M. Wilson does not identify which writing supposedly precludes the claim. *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999) (citation omitted). However, as one of the Court's colleagues explained:

> It is well-settled in Pennsylvania that the existence of a contract prevents a party from bringing a claim for unjust enrichment. Rule 8(d)(2) nonetheless permits a plaintiff to plead unjust enrichment in the alternative in certain circumstances, "even where the existence of a contract would preclude recovery for unjust enrichment." Such circumstances require either that (i) the contract at issue covers only a part of the relationship between the parties, or that (ii) the existence of a contract is uncertain or its validity is disputed by the parties.

*Vantage Learning (USA), LLC v. Edgenuity, Inc.*, 246 F. Supp. 3d 1097, 1100 (E.D. Pa. 2017) (footnote and citations omitted). Assuming that I.M. Wilson is relying on the August 1992 writing here to try to defeat this claim, Grishko disputes the validity, scope, and legal effects of the document. And, even if the Court concludes that the writing did transfer the house mark, the writing is still ambiguous regarding the model marks, sole mark, and trade dress, which I.M. Wilson continues to use. Accordingly, the Court does not find the existence of the 1992 Agreement bars Grishko's unjust enrichment theory.

The Court finds that Grishko adequately pleads the requisite elements of unjust enrichment. Grishko alleges that the termination of the exclusive licensing arrangement triggered the transfer of the mark's ownership. I.M. Wilson, however, continues to enjoy the benefits of exclusive ownership of the GRISHKO mark, which also prevents Grishko from registering any subsequent marks in the United States. Even if I.M. Wilson was not obligated to transfer back the house mark—I.M. Wilson's position in opposing both Counts 7 and 8—Grishko also contends I.M. Wilson retains exclusive ownership of the model marks and trade dress—which was not

transferred under the August 1992 writing.  To the extent I.M. Wilson had license to use the model marks and trade dress, it was pursuant to the now-terminated exclusive licensing agreement. Grishko alleges that I.M. Wilson's continued enjoyment of exclusivity for the model marks and trade dress was made without any payment to Grishko.  Accepting the allegations as true, retaining valuable marks and trade dress absent payment is the type of conduct that invocation of the doctrine of unjust enrichment can be used to rectify.  I.M. Wilson's motion to dismiss Count 8 thus is denied.

### III.  Counterclaims Relating to I.M. Wilson's Conduct Pending This Litigation

Counts 11 and 12 claims arise from the parties' conduct after I.M. Wilson initiated this suit.

#### A.  Count 12:  Defamation and/or Defamation *Per Se*

I.M. Wilson, Irene, and Mr. Gage move to dismiss Grishko's claim for defamation under Pennsylvania state law, and, in the alternative, the defamation *per se* claim based on various communications I.M. Wilson sent to U.S. retailers in 2019.  Grishko alleges that Irene, on behalf of I.M. Wilson, notified retailers that Grishko was (1) undercutting and undermining retailers; (2) no longer supplying high-quality products; and (3) not abiding by court orders (*i.e.*, that Grishko was violating the preliminary injunction order).

##### 1.  Defamation

Defamation law seeks to compensate for pecuniary harm to one's reputation inflicted by a defamatory statement.  To state a claim for defamation in Pennsylvania, the party must plead:

> (1) The defamatory character of the communication. (2) Its publication by the defendant. (3) Its application to the plaintiff. (4) The understanding by the recipient of its defamatory meaning. (5) The understanding by the recipient of it as intended to be applied to the plaintiff. (6) Special harm resulting to the plaintiff from its publication. (7) Abuse of a conditionally privileged occasion.

42 Pa. Cons. Stat. § 8343. But the statement must do "more than merely embarrass or annoy [the claimant]; it must provoke the kind of harm which has grievously fractured his standing in the community of respectable society." *Abdellatif v. Alza Wrae Indus. Co.*, No. 18-2297, 2019 WL 1284689, at *8 (E.D. Pa. Mar. 20, 2019) (internal quotations and citations omitted).

"It is for the court to determine, in the first instance, whether the statement of which the plaintiff complained is capable of a defamatory meaning." *Ruder v. Pequea Valley Sch. Dist.*, 790 F. Supp. 2d 377, 399 (E.D. Pa. 2011) (internal quotation omitted). The court must view the statement "in context," bearing in mind "the effect the [statement] is fairly calculated to produce, the impression if would engender, in the minds of the average persons among whom it is intended to circulate." *Remick v. Manfredy*, 238 F.3d 248, 261 (3d Cir. 2001) (internal quotation omitted).

I.M. Wilson argues that the alleged defamatory statements are opinions and true or substantially true references to the Court's decision to enjoin Defendants from selling GRISHKO-branded products in the United States. Truth and substantial truth are affirmative defenses to a claim of defamation. *Tucker v. Merck & Co., Inc.*, 102 F. App'x 247, 253 (3d Cir. 2004). Statements of opinion are not actionable.

Shortly after the Court granted the preliminary injunction, I.M. Wilson sent a cease and desist letter to DDS, one of the largest U.S. dance retailers, Doc. No. 76-1 at 13, and a letter to various retailers supposedly apprising them of the recent order, Doc. No. 76-1 at 11. I.M. Wilson maintains that because the correspondence contains true or substantially true statements about the pending litigation, those statements are not actionable. Resolution of the substantial truthfulness of the correspondence is inappropriate at the motion to dismiss stage. *RRZ Pub. Markets, Inc. v. Bond Buyer*, No. CIV. A. 94-1168, 1995 WL 20838, at *3 (E.D. Pa. Jan. 18, 1995). For purposes of resolving this motion, the Court will accept Grishko's version of the facts.

To the extent the statements in the August 2019 correspondence are not actionable, it is because they are protected as "fair reports of the lawsuit." *See Unisource Worldwide, Inc. v. Heller*, No. CIV. A. 99-266, 1999 WL 374180, at \*4 (E.D. Pa. June 9, 1999). Out-of-court statements made by parties to a proceeding enjoy a qualified privilege provided those "statements are a fair and accurate report of statements made or pleadings filed" in the proceeding and the individual does not "make his report with the sole purpose of causing harm to the person defamed." *Doe v. Kohn Nast & Graf, P.C.*, 866 F. Supp. 190, 194 (E.D. Pa. 1994) (recognizing an expansive reading of the "fair report privilege" to apply to even those claims the party intends to make during the proceedings). The August 2, 2019 cease and desist letter authored by I.M. Wilson's counsel sufficiently remains within the bounds of protected statements. The letter recounts I.M. Wilson's litigation position that it is the exclusive owner of the GRISHKO house mark and notifies the recipient of the pending litigation.

The Court finds that the August 9, 2019 letter to I.M. Wilson's retailers likewise falls within permissible bounds to be considered fair reporting. Although the letter alleges the retailers "have been undercut" by Grishko's recent sales efforts, read in context, these statements provide the basis for I.M. Wilson to seek an injunction. And, indeed, I.M. Wilson has asserted the same allegations in its publicly filed complaint and motion for preliminary injunction. Doc. Nos. 1, 5 (*i.e.*, describing Grishko's attempts to "undercut" I.M. Wilson). I.M. Wilson's reliance on *Unisource Worldwide* is not justified. There, the memorandum at issue first announced that it uncovered information that defendants may have acted improperly before notifying the recipients that plaintiff was filing a lawsuit. In denying the motion to dismiss, the court found that a reader might plausibly interpret the undisclosed facts to be the basis of the litigation. *Unisource Worldwide, Inc. v. Heller*, No. CIV. A. 99-266, 1999 WL 374180, at \*4 (E.D. Pa. June 9, 1999).

Here, I.M. Wilson has summarized its pleadings in a one-page notice to its customers.

Accordingly, although there is obviously no love lost between the parties (or, sadly, counsel in the Court's view of the demonstrated and unnecessary acrimony), the Court does not find these details to be made "for the sole purpose" of harming Grishko.

Nor does this analysis change because I.M. Wilson had not yet posted the bond for the preliminary injunction. The Court had already entered its order. I.M. Wilson's August 9 correspondence expressly notes that it was "perfect[ing] the injunction," and attached a copy of the order granting the preliminary injunction. Doc. No. 76-1 at 11. The Court rejects Grishko's attempt to fashion a defamation claim on a technicality.

What remains as a possible basis for a defamation claim is the July 1, 2019 letter to I.M. Wilson's customers. In addition to rehashing the present trademark infringement claims at the heart of this litigation, the letter also discusses the "unsatisfactory" quality of Grishko's recent shipments. Doc. No. 76-1 at 7. I.M. Wilson defends the letter as merely stating an opinion— which itself would not be actionable. Again, although the Court agrees that the statement in question is not defamatory, it is for a different reason. Statements about the quality of another's goods are more properly asserted as commercial disparagement—which, surprisingly given the 13 other claims, Grishko does not assert here. A defamatory statement, by contrast, is one which "imputes to the corporation fraud, deceit, dishonesty, or reprehensible conduct in its business in relation to said goods or product." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 924 (3d Cir. 1990). Opining on the quality of the ballet shoes does not go to the honesty and fairness of Grishko's dealings. Read in their broader context, the Court does not find that the statements are capable of defamatory meaning. Grishko does not plausibly state a claim for defamation.

## 2. Defamation *Per Se*

In the alternative, Grishko claims the statements at issue constitute defamation *per se*, which exempts Grishko from pleading special damages. "A statement is defamatory *per se* as an accusation of business misconduct if it ascribes to another conduct, characteristics or a condition that would adversely affect his fitness for the proper conduct of his lawful business." *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F. Supp. 2d 570, 580 (E.D. Pa. 1999) (citations and quotation marks omitted).[34] The statement must be more than mere general disparagement. *Id.* Typically business misconduct refers to "conduct that is illegal or connotes illegal activity." *Jungclaus v. Waverly Heights, Ltd.*, No. CV 17-4462, 2018 WL 1705961, at *4 (E.D. Pa. Apr. 9, 2018); Restatement (Second) of Torts § 573 (Am. Law Inst. 1977).

I.M. Wilson maintains that the statements at issue do not rise to the level of *per se* defamation, because, at most, they are non-actionable expressions of negative opinion or were notices of the Court's prior orders in this case. *Walker v. Grant Cent. Sanitation, Inc.*, 430 Pa. Super. 236 (1994). The Court must agree. I.M. Wilson's characterization about Grishko's product quality is qualified by the context in which the statement appeared. I.M. Wilson was notifying the retailers of the pending litigation—particularly, this Court's order enjoining Grishko at least at the time from selling any GRISHKO-branded products. I.M. Wilson's statements do not besmirch Grishko in such a way that is cognizable for pleading defamation *per se*. That I.M. Wilson had yet to post the bond at the time it sent the communications does not alter the analysis. This Court

---

[34]     The Court in *Synygy* expressed "serious reservations about whether the doctrine of defamation *per se* is appropriately applied to corporate entities." Because a corporation "cannot be embarrassed or humiliated," the rationale for *per se* liability loses its force. *Id.* at 581 n.9. The *Synygy* court, nevertheless, assumed that a statement about a corporation could constitute defamation per se. And, although the motivations behind doctrine are awkward, at best, as to a corporate plaintiff, Pennsylvania law continues to recognize it as a viable claim for corporations to assert.

had already concluded that a preliminary injunction was warranted (although it later vacated the order).[35] So for reasons previously addressed elsewhere, Grishko does not state a claim for defamation *per se* either.

Because the Court finds that the statements are covered by conditional privilege or are non-actionable negative opinions, the Court also dismisses Count 12 against Irene and Mr. Gage.[36]

## B. Count 11: Tortious Interference with Business Relations

Grishko also asserts that I.M Wilson's communications with various U.S. dance retailers, tortuously interfered with its business relations. Under Pennsylvania law, a party must establish:

(1) the existence of a contractual or prospective contractual or economic relationship between the plaintiff and a third party; (2) purposeful action by the defendant, specifically intended to harm an existing relationship or intended to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; (4) legal damage to the plaintiff as a result of the defendant's conduct; and (5) for prospective contracts, a reasonable likelihood that the relationship would have occurred but for the defendant's interference.

*Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 212 (3d Cir. 2009).

I.M. Wilson argues that Grishko fails to plausibly plead three elements of the tortious interference claim: (1) the existence of a contractual or prospective relationship; (2) the absence of privilege or justification; and (3) actual damages.

### 1. Existence of a Relationship

---

[35] The Court also previously expressed to counsel and the parties the Court's view about purporting to publicly characterize the Court's rulings.

[36] For this reason, the Court does not engage with the parties' poorly-briefed argument regarding Grishko's assertion that "Grishko is a public figure[,]" 3d Am. Counterclaims ¶ 278 (Doc. No. 148).

As an additional ground for dismissal, Mr. Gage argues that the defamation claim brought against him cannot stand because Defendants allege only that he helped Irene draft the communications without making the statements himself. In *CDI Int'l, Inc. v. Marck*, No. 04-4837, 2005 WL 327536 (E.D. Pa. Feb. 8, 2005), the Court rejected a similar "defamation by association" theory when a claimant failed to allege that the alleged defamer published any defamatory statement. *Id.* at *2. The Court agrees that defamation by association is insufficient to state a claim for defamation against Mr. Gage.

To plead tortious interference in the Commonwealth, the relationship—prospective or existing—must be "of some substance, some particularity, before an inference can arise as to its value to the plaintiff and the defendant's responsibility for its loss." *Int'l Diamond Importers, Ltd. v. Singularity Clark, L.P.*, 40 A.3d 1261, 1275 n.14 (Pa. Super. Ct. 2012). For prospective relations, a plaintiff should plead "additional facts to show 'an objectively reasonable probability that [a prospective relationship would] come into existence.'" *Kernaghan v. BCI Comm., Inc.*, 802 F. Supp. 2d 590, 592 n.1 (E.D. Pa. 2011) (citation omitted).

Grishko pleads that they "had business relations and prospective relations with U.S. retailers and consumers in 2019, including but not limited to, one of the largest retailers in the U.S.–*i.e.*, DDS." 3d Am. Counterclaims ¶ 264 (Doc. No. 148). Grishko further alleges that they were in the process of negotiating a contract with DDS during the time period at the time the Court issued its July 25, 2019 order. *Id.* ¶ 268. A prospective contractual relation contemplates something "more than a mere hope there will be a future contract" but "less than [an existing] contractual right." *Acumed LLC v. Adv. Surgical Servs., Inc.,* 561 F.3d 199, 213 (3d Cir. 2009). But because such a term is "not as susceptible of precise, exacting identification," the Third Circuit Court of Appeals has expressed some reluctance to terminate an interference with prospective contract claim at the motion to dismiss stage. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 184 (3d Cir. 1997) (reversing dismissal of a tortious interference with prospective contract claim). In the light most favorable to Grishko, the allegations that Grishko was in the process of negotiating a contract with DDS when I.M. Wilson contacted the U.S. retailers plausibly establish the existence of a prospective relationship. Accordingly, the Court finds that they have established the first element of the claim.

## 2. Absence of Privilege or Justification

I.M. Wilson asserts it was privileged in transmitting information to the retailers about the Court's now vacated order granting the preliminary injunction.[37] Pennsylvania courts require that the party asserting a tortious interference claim must show that the defendant's conduct was not justified. *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 214 (3d Cir. 2009). Grishko responds that no privilege attaches because the injunction had not issued at the time I.M. Wilson sent the offending letters. The Court has already rejected this attempt to frame the issue on a technicality. Grishko fares no better by asserting that the statements could "only be construed as intentionally false and intended to cause irreparable harm." Doc. No. 176 at 42.

Under Pennsylvania law, interference is "privileged when the actor believes in good faith that his legally protected interest may otherwise be impaired by the performance of the contract." *Schulman v. J.P. Morgan Inv. Mgmt., Inc.*, 35 F.3d 799, 810 (3d Cir. 1994). Pennsylvania courts look to Section 768 of the *Restatement (Second) of Torts* and its definition of "wrongful means" for guidance as to whether the defendant has acted with privilege or justification. *Acumed*, 561 F.3d at 215. Where the parties are competitors, there must be a showing that the defendant engaged in "independently actionable conduct" for plaintiff to succeed on a tortious interference claim. *Alpha Pro Tech, Inc. v. VWR Intern. LLC*, 984 F. Supp. 2d 425, 448 (E.D. Pa. 2013). Despite that the "independently actionable conduct" standard is prevailing law within this Circuit, neither party briefed the issue.

Instead, I.M. Wilson contends it had a duty to send notice to the retailers to apprise them that the Court had entered an order enjoining Grishko for the injunction to have its intended effect.

---

[37]     Grishko also bases the tortious interference claim on I.M. Wilson's statements denigrating the quality of Grishko's products. As noted above, this would be more properly packaged as a commercial disparagement claim.

Federal Rule of Civil Procedure 65(d)(2) provides that a preliminary injunction order binds only such persons who receive "actual notice" of the order and, pertinent here, includes the parties and "other persons who are in active concert of participation" with the parties. Fed. R. Civ. P. 65(d)(2).[38] The Court is persuaded by this argument.

Although Grishko does not explicitly package "independently actionable conduct" as such, the tortious interference claim is based on the same statements that form the basis of the defamation claims. Thus, Grishko can only plausibly plead lack of privilege if they plausibly plead a defamation claim. As discussed above, the Court finds that the defamation/defamation *per se* claims fail. For this reason, the Court rejects Grishko's attempt to bootstrap a nonviable defamation claim to satisfy the requisite independently actionable conduct.

### 3. Actual Damages

The Court rejects I.M. Wilson's final argument that Grishko did not allege actual damages and finds that Grishko's allegations on this point are sufficient to withstand the lenient Rule 12(b)(6) standard.

However, because I.M. Wilson's correspondence was privileged, Count 11 is dismissed as against I.M. Wilson, Irene, and Mr. Gage.

## IV. Count 1: Declaratory Relief

Finally, I.M. Wilson and the individual counterclaim defendants move to strike Grishko's request for declaratory relief, which they maintain mirrors I.M. Wilson's claim for declaratory judgment and is otherwise duplicative of Grishko's 12 other claims. When there is complete identify of factual and legal issues between the complaint and the counterclaim, a court may dismiss a counterclaim for declaratory relief as redundant. 6 Wright & Miller, Federal Practice &

---

[38]    Of course, it is entirely possible that Grishko could have sent the retailers a copy of the order.

Procedure § 1406 (3d ed. 2020); *Principal Life. Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 674 F. Supp. 2d 562, 566 (D. Del. 2009) (citations omitted). Dismissal is warranted only when there is "no doubt" that the declaratory judgment counterclaim will be mooted. Determining redundancy prior to trial is a challenging exercise that the Court declines to undertake at this time. The Court thus denies the counterclaim defendants' respective motions to dismiss Count 1.

CONCLUSION

For the reasons set out in this Memorandum, the Court grants in part and denies in part the Individual Counterclaim Defendants' Motion to Dismiss the Third Amended Counterclaim, Doc. No. 166, and grants in part and denies in part I.M. Wilson's Motion to Dismiss or Strike Defendants' Counterclaims, Doc. No. 168. Because Grishko has now had three opportunities to amend its counterclaims, the Court denies the request to amend. An appropriate order follows.

BY THE COURT:

**GENE E.K. PRATTER**
**UNITED STATES DISTRICT JUDGE**