IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| I.M. WILSON, INC., | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| OTVETSTVENNOSTYOU "GRICHKO" | : | |
| et al., | : | |
| Defendants[1] | : | NO. 18-5194 |

**M E M O R A N D U M**

PRATTER, J.                                                    JULY //, 2022

The *pas de deux*—a dance for two—is the centerpiece of many ballets. In its modern form, the *pas de deux* follows a standard structure: The pair enters, and the two dance together, with the *danseur* supporting the *danseuse* in a series of lifts and poses. Each then performs a solo variation, with the *danseur* showing off pirouettes and leaps before the *danseuse* demonstrates her balance and strength in pointe work. The pair then reunites in a powerful finale. At its core, the *pas de deux* is about partnership—the conflict and coordination between two dancers.[2]

This case features a *pas de deux* disrupted. Grishko handmakes ballet shoes in Russia. For nearly 30 years, Grishko partnered with I.M. Wilson, its exclusive distributor in the United States, to sell its handmade shoes under the GRISHKO trademark. With Grishko's permission, I.M. Wilson registered the GRISHKO trademark with the United States Patent and Trademark Office, and I.M. Wilson spent significant money promoting the mark in the United States. But then the business relationship deteriorated, and Grishko revoked the distribution agreement.

---

[1] The parties have used different spellings of the names for the different individuals and entities involved throughout in this case. The Court adopts the spellings used by the parties in their most recent round of briefing.

[2] *See* Sandra N. Hammond, *Pas de Deux*, *The International Encyclopedia of Dance* (Selma J. Cohen and Dance Persps. Found., eds. 2005); Robert Greskovic, *Ballet 101: A Complete Guide to Learning and Loving the Ballet* 194–95 (2005); Tobi Tobias, *Ballet Partners—Matches Not Made in Heaven*, N.Y, Times (Aug. 17, 1975).

Their dance abruptly ended, Grishko and I.M. Wilson now fight over who had ownership of the GRISHKO mark when the music stopped. I.M. Wilson asserts that Grishko permanently gave it the rights to the mark in exchange for promoting the mark in the United States. Grishko says that it did no such thing; I.M. Wilson was supposed to sign the trademark over to Grishko once their distribution agreement terminated. If I.M. Wilson is right, then it owns the mark and may sell its new made-in-China ballet shoes under the GRISHKO mark. If Grishko is right, then I.M. Wilson is liable for holding the mark hostage.

Both Grishko and I.M. Wilson have moved for summary judgment. Each insists that it was the victor in the split, pointing to the evidence in the record that supports its narrative. But the facts are not nearly so certain. The jury, not this Court, must sort through the evidence and decide who is the true owner of the GRISHKO mark. The Court thus denies each party's motion for summary judgment in primary part.

## BACKGROUND

### I. The parties sign an exclusive distribution agreement

Irene Wilson, a former ballet dancer, decided that she wanted to start a business importing Russian products into the United States. On a tour of Russia in 1990, she met Nikolay Grishko. Mr. Grishko and his team of cobblers had been handmaking pointe shoes in the Soviet Union for several years. Though Mr. Grishko had been selling 3,000 to 4,000 pairs of ballet slippers in the Soviet Union, Europe, and Japan each month, he did not yet have a ballet business presence in the United States. Seeing a business opportunity, Ms. Wilson and Mr. Grishko agreed to start a partnership. Through his collective Kooperativ Tanyets, Mr. Grishko would produce the pointe shoes, and Ms. Wilson would market and sell the shoes in the United States through her company I.M. Wilson.

2

The two companies signed a distribution agreement in April 1990. Under the agreement, Tanyets would provide "ballet shoes, toe shoes and such other footwear" to I.M. Wilson to sell in the United States. Doc. No. 230-6, at 272. In turn, I.M. Wilson would "promot[e] [and] market[]" the goods. *Id.* at 279. And I.M. Wilson would have an exclusive license in the GRISHKO mark:

XV. License

> The Seller hereby grants the Buyer an exclusive right, for the duration of this Agreement, to use the name "Grishko" in connection with the sale of the Goods in the United States. In consideration of such right, the Buyer shall pay the Seller a royalty equal to 10% of the value of each shipment of Goods.

*Id.* The agreement would last for one year, and would automatically renew unless a party provided at least 90-days' notice prior to the renewal. For the length of the agreement and for one year after, Tanyets could not "sell or otherwise supply to any other purchaser in the United States the Goods set forth in Appendix I hereto"—ballet slippers and three models of pointe shoes, one of which remains in production today—"or any Goods that are substitutes therefor." *Id.*

Two years later, in 1992, after the Soviet Union fell, Tanyets became Grishko, Inc., a private company. I.M. Wilson and Grishko, Inc. re-executed the distribution agreement, substituting Grishko, Inc. for Tanyets. The substance of the distribution agreement remained the same.

## II.    I.M. Wilson registers the trademarks

Shortly after the parties re-executed the distribution agreement, Ms. Wilson decided that she did not want to be a mere exclusive licensee. I.M. Wilson would be investing significant resources into promoting the mark, so Ms. Wilson wanted to *own* the mark. According to I.M. Wilson, Ms. Wilson requested permanent ownership, and Mr. Grishko agreed. Mr. Grishko disputes this. He does not recall ever discussing ownership of the mark with Ms. Wilson. And he insists that he never agreed that I.M. Wilson would own the mark, much less permanently. But, he

says, he did agree that I.M. Wilson should register the GRISHKO mark with the United States Patent and Trademark Office (or USPTO).

Four months later, in July 1992, I.M. Wilson filed an application with the USPTO. The USPTO rejected the application. The mark "suggest[ed] a connection with Nikolai Grishko, a renowned manufacturer of dancing shoes in Russia," but I.M. Wilson had not submitted proof that it had Mr. Grishko's permission to register the mark in the United States. Doc. No. 13-3, at 35. Under the USPTO's guidelines, if a domestic applicant seeks to register a mark used by a foreign manufacturer in a foreign county, the domestic applicant must provide proof that it has the right to register the mark in the United States. *See* Trademark Manual of Examining Procedure § 1201.06(a). To do so, the domestic applicant can show that (1) the foreign manufacturer consented to the domestic distributor registering the mark in the distributor's name, (2) the foreign manufacturer agreed or acknowledged in writing that the domestic distributor owns the mark in the United States, or (3) the foreign owner assigned its ownership of the mark to the domestic distributor. *Id.*

To prove it had the right to register the GRISHKO mark, I.M. Wilson submitted an August 5, 1992 letter from Mr. Grishko stating, "I agree that I. M. Wilson, Inc. is the owner of the Trademark, GRISHKO, and its goodwill in the Unites [sic] States of America. I further consent to the use of my name in that trademark." Doc. No. 230-7, at 240. Mr. Grishko did not draft this text, but the parties cannot remember who did—it could have been I.M. Wilson, its counsel, or the USPTO. Either way, Mr. Grishko placed the text given to him on Grishko Inc. letterhead and signed and stamped it.

The USPTO accepted this registration letter, but once again rejected the application because Mr. Grishko had not expressly consented to *registration* of his name. So I.M. Wilson

4

submitted another letter from Mr. Grishko, dated March 30, 1993. This letter stated, "In addition to the consent to I. M. Wilson, Inc. that I previously granted on August 5, 1992, I hereby grant I.Wilson, Inc. [sic] the right to register the trademark GRISHKO in the U.S. [P]atent and [T]rademark [O]ffice." Doc. No. 230-7, at 234. The USPTO then granted registration and listed the mark in I.M. Wilson's name.

Later, in 1999, Mr. Grishko filed applications of his own with the USPTO, seeking to register GRISHKO and NIKOLAY GRISHKO as marks. Pointing to I.M. Wilson's existing registrations, the USPTO rejected Mr. Grishko's applications.

In 2003, I.M. Wilson's registration lapsed, as it had forgotten, and, hence, failed, to file the required declaration that it continued to use the mark in commerce. 15 U.S.C. § 1058. I.M. Wilson refiled its trademark application, which the USPTO once again granted. I.M. Wilson then filed six more applications to use the GRISHKO mark on additional goods and services. For four of these registrations, I.M. Wilson filed affidavits of incontestability, certifying that the mark has been used continuously for at least five years and that no court has ruled against I.M. Wilson's right to use the mark. 15 U.S.C. § 1065. I.M. Wilson also filed the GRISHKO mark with U.S. Customs and Border Protection.

## III.   The parties sell shoes together for nearly 30 years

From the 1990s until the 2010s, the dance continued, and business grew significantly. Grishko became the largest manufacturer of ballet shoes in Russia, and established name recognition throughout the world. In the United States, I.M. Wilson developed a network of over 400 retailers selling GRISHKO shoes.

I.M. Wilson also ran its own website, "grishko.com," through which it sold GRISHKO shoes. I.M. Wilson placed regular advertisements in dance magazines, and it paid $100,000 each year as a sponsor of a prominent youth ballet competition. I.M. Wilson posted on social media

pages and hosted a photo contest for young dancers. I.M. Wilson also ran a brick-and-mortar store in New York City. Though the store operated at a loss, I.M. Wilson maintained it because its owners believed the store operation benefitted marketing. I.M. Wilson also attends trade shows and visits retailers. I.M. Wilson estimates, without documentation, that it spent millions in advertising and promotion. Other than placing sporadic advertisements in dance magazines, Grishko did little advertising of its own in the United States.

## IV.    The relationship sours

Then the partnership stumbled. Mr. Grishko thought that I.M. Wilson was not doing enough to promote and sell GRISHKO products. So in the 2010s, Grishko introduced a new brand of shoes, GSK, that it planned to sell through a new distributor in the United States. Grishko even went so far as to register the GSK mark with the USPTO. *See* GSK MOSCOW MADE IN RUSSIA, Registration No. 3,960,796. I.M. Wilson objected, stating that this new brand would undermine the GRISHKO brand and its goodwill. I.M. Wilson then purportedly sent a cease-and-desist letter to a retailer that had purchased these newly-branded GSK shoes, accusing the retailer of infringing the GRISHKO trademark. In response, Grishko sued I.M. Wilson in federal court, accusing it of unfair competition and tortious interference with contractual relations. *GSK Trade LLC v. I.M. Wilson Inc.*, No. 14-cv-1644 (C.D. Cal. Oct. 9, 2014). Just a few months later, the parties settled that suit, and Grishko backed away from this new brand.

Two years later, in 2016, I.M. Wilson turned around and filed a suit of its own in the Philadelphia county courts against another of Grishko's business partners, Discount Dance Supply, the largest dance retailer in the United States. I.M. Wilson accused Discount Dance Supply of tortiously interfering with its contract with Grishko because Discount Dance Supply had sold the new GSK shoes and another brand of shoes that Grishko had recently tried to introduce, called "1737." The Court of Common Pleas dismissed this suit because I.M. Wilson had failed to include

Grishko, an indispensable party to the dispute. *I.M. Wilson v. The Hill Family Corp.*, No. CP-378-2016, slip op. at 2 (Pa. Ct. C.P. Dec. 20, 2016), Doc. No. 13-3, at 114–17.

The month after I.M. Wilson filed its Common Pleas suit, Grishko terminated the distribution agreement. But it continued to provide I.M. Wilson with products until December 2018. The distribution agreement had recently been renewed, meaning that the termination would not be effective until March 1, 2017, and the distribution agreement had a one-year blackout period post-termination. Once that blackout period ended, Grishko demanded that I.M. Wilson assign its registrations, but I.M. Wilson refused.

## V.   I.M. Wilson produces and sells its own GRISHKO shoes

Grishko began selling its own products directly, encouraging customers to purchase from its website "grishkoshop.com" or from its Canadian distributor. Grishko also began sharing social media posts in English for the first time, and it opened up its own social media photo contest to dancers in the United States.

After Grishko stopped distributing its products to I.M. Wilson, I.M. Wilson hired a manufacturer in China to produce replica pointe shoes bearing the GRISHKO mark. These made-in-China shoes imitated the shape, color, stitch pattern, sole pattern, and logo location of the made-in-Russia shoes. Though some customers were satisfied with these new shoes, others were not, reporting that the shoes fit differently than the prior GRISHKO shoes and complaining that the hard portion at the front of the pointe shoe, called the box, broke while in use.

The two companies began to publicly criticize the other. Grishko sent letters to retailers stating that I.M. Wilson's shoes are not "genuine" made-in-Russia shoes. Grishko also distributed a visual guide to help retailers and customers differentiate between its made-in-Russia shoes and I.M. Wilson's made-in-China shoes.

This public spat caused widespread customer confusion. Retailers and customers contacted I.M. Wilson, seeking help with orders that had been placed directly with Grishko. Some retailers cancelled their orders with I.M. Wilson, and others refused to purchase shoes from either company.

## VI.   Grishko switches to the NIKOLAY mark

I.M. Wilson filed this suit against Grishko and Mr. Grishko, accusing them of trademark infringement, counterfeiting, cyberpiracy, and unfair competition. I.M. Wilson also moved for a preliminary injunction, seeking to prevent Grishko from using the GRISHKO mark within the United States.

The Court granted the injunction. *I.M. Wilson, Inc. v. Otvetstvennostyou "Grichko,"* 397 F. Supp. 3d 721 (E.D. Pa. 2019). So Grishko registered a new trademark, NIKOLAY, and resumed selling its made-in-Russia handmade shoes in the United States under the new mark. Three months later, the Court vacated the preliminary injunction, finding that I.M. Wilson had not actually proven that it would be irreparably harmed by Grishko's use of the GRISHKO mark. 2019 WL 5394113, at *5 (E.D. Pa. Oct. 22, 2019). Grishko continues to use the NIKOLAY mark in the United States.

In response to I.M. Wilson's complaint, Grishko filed counterclaims, accusing I.M. Wilson and its executives—I.M. Wilson's founder and president Irene Wilson, chairman Leonard Gage, chief financial officer Christine Wilson, and chief business officer Justin Wilson—of infringement, breach of contract, and false advertising. Grishko amended its counterclaims three times, and the Court denied I.M. Wilson and the executive's motion to dismiss in substantial part. 500 F. Supp. 3d 380 (E.D. Pa. 2020). The companies and the individual defendants have now all filed motions for summary judgment.[3]

---

[3] Grishko has moved to strike several exhibits, claiming the exhibits are hearsay, lack foundation, are not based on personal knowledge, or are not authenticated. To the extent that the Court relies on these objected-to exhibits, the

LEGAL STANDARDS

For a court to grant summary judgment, the movant must prove "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To be "material," the fact must have the potential to "affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). For a dispute about that fact to be "genuine," there must be enough evidence such that a reasonable jury could find for the non-movant on that fact. *Id.* The court does not "[it]self … weigh the evidence and determine the truth of the matter." *Id.* at 249. Instead, the court looks for "sufficient evidence" on which a reasonable jury could decide for the non-movant. *Id.*

DISCUSSION

### I.    Reasonable jurors could find that either I.M. Wilson or Grishko owned the GRISHKO mark

I.M. Wilson and Grishko accuse each other of common law and federal trademark infringement, counterfeiting, and unfair competition. I.M. Wilson also accuses Grishko of cyberpiracy under the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125 and violations of the Tariff Act, 19 U.S.C. § 1526. Because these claims all turn on ownership of the trademark, and the relevant elements for the state and federal infringement claims are functionally identical, the Court analyzes the claims together. *Standard Terry Mills, Inc. v. Shen Mfg. Co.*, 803 F.2d 778, 780 n.4 (3d Cir. 1986).

To win on its infringement claim, the claimant must prove (1) that it owns the GRISHKO mark, (2) that the GRISHKO mark is valid, and (3) that the other's use of the mark is likely to

---

Court finds that the evidence submitted, even if currently presented in a form that would not be admissible at trial (like an affidavit), is "*capable* of being admissible at trial" (as through live testimony) and so can be considered at summary judgment. *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc.*, 998 F.2d 1224, 1234 n.9 (3d Cir. 1993) (emphasis added). Be forewarned, however: the Court's acceptance of a particular exhibit at summary judgment does not remove or reduce the burden to prove admissibility at trial.

confuse customers. *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005). The parties do not dispute that the GRISHKO mark is valid, meaning it is protectable and has secondary meaning. Nor do they dispute that the other's use is "likely" to confuse customers and make them believe that Grishko's product is the same as I.M. Wilson's product, and vice versa: customers cannot reasonably be expected to tell apart "identical" GRISHKO marks on superficially near-identical ballet shoes. *Id.* But each side does vehemently contest that *it* is the true owner of the GRISHKO mark. This case thus rises and falls on ownership. The party that owns the mark has committed no tort; the other has likely committed many.

In many trademark cases, determining ownership is simple: who created the mark and sold the products bearing it? But, in the context of manufacturers and distributors of a trademarked product, ownership can be far more complicated. *See Covertech Fabricating, Inc. v. TVM Bldg. Prods., Inc.*, 855 F.3d 163, 170 (3d Cir. 2017). Both the product's manufacturer and its exclusive distributor have vested interests in the mark. Each has poured resources in the product, and each might consider their "business [to be] symbolized by" the mark. *Premier Dental Prods. Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 854 (3d Cir. 1986).

The initial distribution agreement between a manufacturer and distributor might expressly identify one as the owner of the mark, or they might have implicitly expected either the manufacturer or distributor to be the owner. *Covertech*, 855 F.3d at 170–71. A manufacturer and distributor might also exchange ownership of the mark later, perhaps in a separate assignment. *Id.* at 170. These agreements control. *Premier Dental*, 794 F.2d at 854. But if the parties did *not* agree on ownership, the manufacturer is the "presumptive" owner unless the distributor can prove that it, and not the manufacturer, "operated as the rightful owner," such as by controlling the mark.

*Covertech*, 855 F.3d at 171; *accord* 2 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 16:49 (5th ed.).

I.M. Wilson, the exclusive distributor of Grishko ballet shoes in the United States, claims that Grishko assigned to it permanent ownership of the GRISHKO mark in the United States. Grishko, the manufacturer of Grishko-branded ballet shoes throughout the world, asserts that it owns the GRISHKO mark and that, though it temporarily gave I.M. Wilson the right to use the mark in the United States, it did not intend to transfer ownership of that mark to I.M. Wilson, at least not permanently.

Reasonable jurors could find either company to be the owner of the GRISHKO mark. Both sides proffer plenty of evidence to support their version of the facts. The jury, not this Court, must sort through these conflicting narratives. The Court thus denies I.M. Wilson and Grishko's cross-motions for summary judgment on infringement.

### A. Reasonable jurors could find that Grishko did not clearly intend to transfer ownership to I.M. Wilson

At the beginning of the partnership, Grishko owned the mark in the United States, and I.M. Wilson had the exclusive right to use the mark in this country. The distribution agreement explicitly provides that I.M. Wilson has "an exclusive right, for the duration of this Agreement, to *use* the name 'Grishko' in connection with the sale of the Goods in the United States." Doc. No. 230-7, at 10 (emphasis added). If I.M. Wilson had been the owner of the mark, it would not have needed permission to use the mark. Though conceding this, I.M. Wilson asserts that, in the following months, Grishko transferred permanent ownership of the mark to I.M. Wilson. Grishko insists that it did no such thing.

Trademarks can be sold or transferred. *McCarthy on Trademarks* § 18.1; *Premier Dental*, 794 F.2d at 853. The "outright sale of all rights in [a] mark" is called an "assignment." *McCarthy*

*on Trademarks* § 18.1. The assignor loses all ownership rights in the mark, and all control over it. In contrast, a "license" is a "limited permit … to use the mark," while a "consent to use" is "a promise not to sue for a defined type of usage." *Id.* With both a license and a consent to use, the owner of the mark remains the owner, and can revoke the right to use the mark.

Trademarks cannot be transferred without their goodwill, or the "commercial expectations" that accompany the marks. *McCarthy on Trademarks* § 18.2. The mark is the "tangible representation" of the product's reputation. *Id.* "It allows buyers to identify the goods to which it is affixed as from a particular source and distinguishes those goods from similar merchandise of others." *Premier Dental*, 794 F.2d at 853. Absent this underlying commercial meaning, the mark means nothing. *Id.*; *McCarthy on Trademarks* § 18.2.

To decide if an agreement is an assignment or simply a license, courts apply "the usual rules of [state] contract law," with some trademark-specific modifications. *McCarthy on Trademarks* § 18.4; *see Sköld v. Galderma Lab'ys L.P.*, 917 F.3d 186, 191–92 (3d Cir. 2019). Because the foreign manufacturer is presumed to own the mark, the domestic distributor must prove that the manufacturer *clearly* intended to hand over permanent ownership of the mark. *See Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 822 (3d Cir. 2006).

The assignment of a common law trademark may be oral, but the assignment of a federally registered trademark must be in writing. *McCarthy on Trademarks* § 18.4; 15 U.S.C. § 1060(a)(3). If the parties have a written agreement, and the terms of that agreement "are clear and unambiguous," the parties' intent "is to be ascertained from the document itself." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (internal quotation marks omitted). But, if the written agreement is ambiguous, either because of the language of the agreement itself or outside

circumstances, then the Court looks beyond the four corners of the document to ascertain the parties' intent. *Id.*

I.M. Wilson claims that the August 5, 1992 registration letter was a clear assignment transferring to it permanent ownership of the GRISHKO mark. The agreement that I.M. Wilson points to is not nearly so clear, nor is the parties' conduct outside that agreement. Reasonable jurors could find that either I.M. Wilson or Grishko is the current owner of the mark.

1. **Reasonable jurors could find that the parties never explicitly agreed to transfer ownership**

The distribution agreement, signed in 1990 and re-signed in 1992, did not transfer ownership of the mark. Shortly after Ms. Wilson signed the 1992 agreement, she decided that she wanted to own the mark because she planned to put significant work into advertising the mark in the United States. Following a series of phone calls between March and June 1992, Mr. Grishko supposedly agreed that I.M. Wilson should own the mark. Mr. Grishko insists he did not do so. The next month, in July 1992, I.M. Wilson applied to register the mark. The USPTO initially rejected the application because I.M. Wilson had not submitted written permission from Grishko to register the mark. So Mr. Grishko signed a letter, dated August 5, 1992, that stated, "I agree that I.M. Wilson, Inc. is the owner of the Trademark, GRISHKO and its good will in the Unites [sic] States of America. I further consent to the use of my name in that trademark." Doc. No. 230-7, at 240. Pointing to this letter, I.M. Wilson asserts that Grishko clearly transferred full and permanent ownership of the mark to I.M. Wilson. Grishko disagrees, asserting that both the letter and the parties' conduct before and after is ambiguous.

### i. The registration letter signed on August 5, 1992

I.M. Wilson points to the registration letter that Mr. Grishko signed on August 5, 1992 so that I.M. Wilson could register the mark: "I agree that I.M. Wilson, Inc. is the owner of the Trademark, GRISHKO and its good will in the Unites [sic] States of America. I further consent to the use of my name in that trademark." Doc. No. 230-7, at 240.  To I.M. Wilson, this letter is a clear assignment, permanently transferring all rights to the mark to I.M. Wilson. But the letter bears few of the traditional marks of a trademark assignment.

At two sentences long, the letter is unusually short as a document to do what I.M. Wilson says it does. As the Court has already noted, reasonable minds "would not ordinarily expect an agreement irrevocably transferring the ownership of a valuable mark—particularly one's own surname—to be concluded in two lines of text." *I.M. Wilson*, 500 F. Supp. 3d at 401. Indeed, the letter reads like, well, a letter, and not a contract; the letter is on Grishko stationary and is signed "sincerely yours" by Mr. Grishko. Doc. No. 230-7, at 240. Further, the letter is phrased in the present tense, asserting that I.M. Wilson *is* the owner. That indicates that some kind of ownership had previously been transferred, suggesting that this letter is not *itself* an assignment. The letter is also sparse on details or terms of any agreement, material or otherwise. For example, the letter does not identify the term of ownership, such as whether I.M. Wilson owns the mark forever, or just as long as the distribution agreement remains in force. *Cf. Sköld*, 917 F.3d at 192–93. Nor does the letter identify the consideration that I.M. Wilson provided in exchange for supposed ownership of the mark. *Cf. Glamorene Prods. Corp. v. Procter & Gamble Co.*, 538 F.2d 894, 895 (C.C.P.A. 1976).

Context further suggests that the letter is not an assignment. The letter was drafted by I.M. Wilson's counsel, and provided to Mr. Grishko only in English, not in Russian or with a Russian translation. And, as I.M. Wilson has conceded, this letter would not even exist if not for the

USPTO's requirement that I.M. Wilson submit some sort of documentation to prove its right to then register the mark. Further, the distribution agreement specifically provided that any alterations or additions had to be in writing and signed by both parties. This purported assignment is arguably an alteration of or addition to the earlier distribution agreement, which granted I.M. Wilson an exclusive license in the mark. The assignment, by transferring the mark altogether, alters the terms of use of the mark. But this alleged assignment was not signed or countersigned by Ms. Wilson, as would have been required under the terms of their distribution agreement.

The Court has previously found the registration letter to be ambiguous. *See I.M. Wilson*, 500 F. Supp. 3d at 400–01. The letter remains ambiguous. The Court thus must look beyond this registration letter to determine the parties' intent.

### ii. Prior oral agreement

Ms. Wilson says that, prior to the registration letter, she and Mr. Grishko had entered into an oral agreement to transfer ownership. Assignments of a *registered* trademark must be in writing. 15 U.S.C. § 1060. But nonregistered trademarks (so-called "common law" trademarks) can be transferred via oral contract. *McCarthy on Trademarks* § 18.4. Grishko, through I.M. Wilson, sold GRISHKO products in the United States prior to I.M. Wilson registering the mark with the USPTO. At that point, the GRISHKO mark was a common law mark. So these parties *could* have entered an oral contract to transfer ownership of the mark.

I.M. Wilson suggests that is what happened here. Ms. Wilson recalls that Mr. Grishko "talked on the phone a lot" from March through June 1992 and "came to the conclusion that … [Ms. Wilson] should have the trademark in the U.S." Irene Wilson P.I. Hr'g Tr. 58:20–59:16, Doc. No. 230-4. But Ms. Wilson's own self-serving testimony is not enough to prove the existence of an oral contract.

Where "there is no documentary evidence" of the oral transfer, the purported transferee needs to prove ownership though "the clear and *uncontradicted* oral testimony of a person in a position to have actual knowledge." *McCarthy on Trademarks* § 18.4 (emphasis added). Though Ms. Wilson claims that she and Mr. Grishko agreed to transfer ownership of the mark to I.M. Wilson, Mr. Grishko remembers no such conversation. Ms. Wilson has not identified the particular date and time that she and Mr. Grishko discussed the transfer. Nor can she remember exactly what was said. She vaguely recalls that, over the course of several months, she and Mr. Grishko agreed that "[she'll] take the US market, [and he] can have the rest of the world." Irene Wilson Dep. Tr. 22:9–12, Doc. No. 231-1. Mr. Grishko denies any such conversation, claiming that he never had "discussions with Ms. Wilson about her owning … the Grishko trademark in the United States before she filed the application." Nikolay Grishko P.I. Hr'g Tr. 69:22–25, Doc. No. 230-5. This purported oral contract thus boils down to credibility: is Ms. Wilson misremembering, or is Mr. Grishko? That credibility determination is for the jury, not the Court. *Anderson*, 477 U.S. at 255.

* * * * *

I.M. Wilson has not shown as a matter of law that the registration agreement transferred permanent ownership of the mark. Nor has it conclusively proved that Ms. Wilson and Mr. Grishko had an oral agreement to transfer ownership. Reasonable jurors could thus find that the parties did not have an *explicit* agreement to transfer ownership.

### 2. Reasonable jurors could find that the parties never implicitly agreed to transfer ownership

Reasonable jurors could also find that the parties never *implicitly* intended to make I.M. Wilson the owner of the GRISHKO mark. For an "implied agreement to transfer" ownership, the parties' conduct must clearly "manifest[] agreement." *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir. 1997); *accord Taylor v. Thomas*, 624 F. App'x 322, 326 (6th Cir.

2015). As I.M. Wilson sees it, the parties clearly intended for I.M. Wilson to own the mark. Grishko begs to differ, insisting that though I.M. Wilson had permission to use and register the mark during the term of the licensing agreement, it did not permanently own the mark.

I.M. Wilson publicly asserted ownership of the mark. I.M. Wilson registered the mark in its name. And I.M. Wilson told the USPTO that it owned the mark. For example, in response to the USPTO's concern that Mr. Grishko had not specifically consented to registration of his name, I.M. Wilson suggested that it did not need to show such consent because Mr. Grishko's prior letter had made I.M. Wilson the sole owner of the trademark. Post-registration, I.M. Wilson continued to assert ownership in USPTO filings. Accepting these representations eventually, the USPTO called I.M. Wilson the "owner[] of the mark." Doc. No. 230-7, at 235.

These representations and labels are by no means dispositive, however. For an implied assignment, *both* parties must intend to transfer ownership. I.M. Wilson can call itself the "owner" all it wants, but that does not show that Grishko intended to transfer ownership (and, in fact, Grishko disputes I.M. Wilson's assertions). And the USPTO was not a party to the agreement between I.M. Wilson and Grishko, so its calling I.M. Wilson the "owner" does not make it so. After all, domestic distributors are permitted to register trademarks in their name but on behalf of the foreign manufacturer. *See* Trademark Manual of Examining Procedure § 1201.06(a). Registration alone cannot prove that the parties intended for I.M. Wilson to be the true owner of the mark.

That said, until this litigation, Mr. Grishko did not tell I.M. Wilson to stop calling itself the mark's owner. To the contrary, Mr. Grishko sometimes referred to I.M. Wilson as the owner. He did so in the registration letter, which called I.M. Wilson the "owner" of the mark. Doc. No. 230-7, at 240. He did so again in 1999, instructing Ms. Wilson that "I.M. WILSON, INC. should take

all necessary measures to protect its interests in the USA and Canada as the owner of GRISHKO trademark." Doc. No. 230-9, at 3. And in a letter to a retailer in 2009, Mr. Grishko referred to himself as "the owner of the Grishko trademark in the whole world, except the USA." Doc. No. 230-9, at 7.

Mr. Grishko now explains that he did not understand the legal import of calling I.M. Wilson the "owner" of the mark. Mr. Grishko has repeatedly disavowed any knowledge of trademark law in the United States. Indeed, at the time Mr. Grishko granted Ms. Wilson consent to register the mark, "trademarks were hardly used at all" in the Soviet Union. Nikolay Grishko P.I. Hr'g Tr. 73:16–17, Doc. No. 230-5. I.M. Wilson has put on no evidence of its own to rebut this characterization. Because of his claimed unfamiliarity with trademark law, Mr. Grishko reasons, he should not be faulted for his imprecise language. He considered calling I.M. Wilson the owner—and letting it register the mark—to be "more or less … a technicality," with "no vital bearing on the [true or permanent] ownership of the mark." *Omag Optik Und Mechanik A.G. v. Weinstein*, 85 F. Supp. 631, 635 (S.D.N.Y. 1949). The jury, not this Court, will have to assess the veracity of this explanation.

Further, though Mr. Grishko did sporadically *call* I.M. Wilson the owner, Grishko *acted* as if it owned the mark. In choosing new model marks for new shoe models, for example, Grishko proceeded with its chosen marks over I.M. Wilson's objections. In another example, Grishko proceeded to name one shoe NOVA, though I.M. Wilson complained that the name evoked "smoked salmon." Doc. No. 232-5, at 704. And Grishko required that I.M. Wilson send proposed advertisements for its approval. For instance, in 2013, I.M. Wilson modified the stylization of the "Grishko" mark; Grishko instructed it to return to the original stylization. After appealing to Grishko to reconsider—and pointing out all the perceived faults in the original stylization—I.M.

Wilson begrudgingly returned to Grishko's preferred stylization. This deference situates I.M. Wilson as a licensee for the simple reason that owners need not obtain permission to use, or modify, their mark.

Mr. Grishko did assert his right to control his name on at least one occasion. In 2014, Ms. Wilson told Mr. Grishko that she might be selling her business and the rights to the GRISHKO mark. Doc. No. 230-9, at 10. Mr. Grishko responded that he would stop the new distributor from selling GRISHKO products if he did not consider them a worthwhile company. *Id.* at 9–10. If Mr. Grishko had considered I.M. Wilson the owner of the mark, he would not and could not have asserted control over it. *See Taylor*, 624 F. App'x at 326.

Based on this conflicting conduct and representations, this Court cannot find as a matter of law that the parties implicitly agreed to transfer ownership of the mark to I.M. Wilson.

### 3. Reasonable jurors could find that Grishko did not intend to permanently transfer ownership to I.M. Wilson

Even if I.M. Wilson had conclusively proven that Grishko assigned ownership of the mark, I.M. Wilson has not proved that any such assignment was *permanent*. The assignee of a mark might own the mark forever, or its ownership might have a temporal limit, such that it owns the mark only for a specified term. Restatement (Second) of Contracts § 331; *see Blue Planet Software, Inc. v. Games Int'l, LLC*, 334 F. Supp. 2d 425, 434 (S.D.N.Y. 2004).

Such temporal limits are common enough in agreements between foreign manufacturers and domestic distributors that the baseline assumption is that when a distribution "agreement comes to an end, any rights which the distributor may have had in the mark during the life of the agency immediately revert to the manufacturer." *Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 111 (E.D.N.Y. 2012) (internal quotation marks omitted); *accord Software AG*, 2008 WL 563449, at *17. If the domestic distributor refuses to return the mark to

the foreign manufacturer, the distributor has breached the distribution agreement, and the foreign manufacturer can sue for breach of contract. *See Software AG*, 2008 WL 563449, at *17.

Ms. Wilson claims that she and Mr. Grishko agreed that I.M. Wilson would own the mark "forever." Irene Wilson Dep. Tr. 21:23–22:5, Doc. No. 231-1. Mr. Grishko counters that he granted I.M. Wilson permission to use the mark "only … during the life of the contract, the duration of the contract, but not for a thousand years." Nikolay Grishko P.I. Hr'g Tr. 73:18–20, Doc. No. 230-5. Reasonable jurors could believe either party.

On one hand, I.M. Wilson planned to expend significant resources in promoting the mark and reasonably wanted to retain ownership in exchange for its efforts. On the other hand, the GRISHKO mark is based on Mr. Grishko's surname, and he indisputably owns the mark in the rest of the world. Given that the licensing agreement could be terminated by either party at any point without cause, jurors might find it "unreasonable to believe that [Grishko], in [granting I.M. Wilson permission to register the trademark], meant to permit, or to risk, [I.M. Wilson's] termination of the contract …, with [I.M. Wilson] remaining the owner of the mark … in the United States." *Omag Optik*, 85 F. Supp. at 635.

Based on this conflicting evidence, reasonable jurors could find that the parties agreed that I.M. Wilson could own the mark during the term of the distribution agreement but that upon termination of the agreement I.M. Wilson would have to give up all rights in the mark and transfer the registration over to Grishko.

### 4. Reasonable jurors could find that I.M. Wilson did not offer consideration for the assignment

Contracts, including trademark assignments, require consideration to be valid. *Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman*, 795 F.2d 291, 299 (3d Cir. 1986). Grishko contends, even if the parties did have an explicit or implicit agreement to transfer ownership of the

mark, that assignment is invalid because I.M. Wilson provided no consideration in exchange for ownership. I.M. Wilson counters that, though it did not pay for the mark, it did promise to spend significant time, resources, and energy on advertising the GRISHKO brand in the United States, which would in turn arguably benefit Grishko and its global brand. *Int'l Armament Corp. v. Matra Manurhin Int'l, Inc.*, 630 F. Supp. 741, 746 (E.D. Va. 1986).

I.M. Wilson's promise of future effort might not count as consideration, however, because it is arguably not a *new* duty under the contract. *See Shedden v. Anadarko E. & P. Co., L.P.*, 136 A.3d 485, 490 (Pa. 2016). The distribution agreement signed two years prior already contemplated that I.M. Wilson would spend time and money advertising in the United States. Specifically, the agreement stated that Grishko "shall from time to time provide [I.M. Wilson] with photo-ready advertising copy for use in connection with [I.M. Wilson's] promotion, marketing and sale of the Goods in the United States," indicating that I.M. Wilson would be paying for at least *some* advertising in the United States. Doc. No. 230-6, at 279. Indeed, as Ms. Wilson testified at the preliminary-injunction hearing, she "immediately" started to promote the GRISHKO mark once she signed the distribution agreement in 1990—years before Ms. Wilson told Mr. Grishko that she wanted to own the GRISHKO mark in exchange for her efforts. Irene Wilson P.I. Hr'g Tr. 15:6–10, Doc. No. 50. Based on this pre-existing duty, reasonable jurors could find that I.M. Wilson had already promised to perform all the marketing that it now claims to have offered as new consideration for the assignment. *See* Restatement (Second) of Contracts § 73; Pa. Standard Civil Jury Instr. § 19.40 (2020).

### B. In the absence of a contract, reasonable jurors could find that either party is the true owner of the trademark

The distribution agreement and the registration letter were signed nearly 30 years ago, and the signatories, Ms. Wilson and Mr. Grishko, do not have perfect memories. The parties have

submitted hundreds of documents, but not one is dispositive of intent. Based on this conflicting record, reasonable jurors could find that the parties never actually agreed on who would own the trademark in the United States. If that were the case, then Grishko, as the foreign manufacturer, "is the presumptive trademark owner unless" I.M. Wilson, as the domestic distributor, "rebuts that presumption using a multi-factor balancing test designed to examine the distribution agreement in effect between the parties." *Covertech Fabricating*, 855 F.3d at 171. Those six factors are:

- Who created the mark?
- Who first put the mark on the product?
- Whose name appeared on the product's packaging and marketing?
- Who controlled the nature and quality of the product?
- To whom did customers make complaints and seek replacements or refunds?
- Who paid for advertising and promotion of the product?

*Id.* Ultimately, ownership demands on an "individualized analysis" of "the roles and responsibilities of the parties and the expectations of consumers." *Id.*

Here, reasonable jurors could find that these factors lean towards Grishko or I.M. Wilson. Ms. Wilson claims to have been the first to suggest using GRISHKO as a mark. But the mark is derived from Mr. Grishko's own surname, and many prestigious ballet companies have titled themselves after their founders' surnames. Cobblers at Grishko handcraft each shoe and affix the mark to them, placing marks on the insole and outsole of the shoe and on the packaging. Grishko's name is featured heavily on both packaging and promotional materials, with I.M. Wilson's address and name relegated to the bottom of the advertisements, if it was listed at all. Both parties perform some sort of quality control on the shoes, Grishko upon manufacture and I.M. Wilson upon receipt. I.M. Wilson processed complaints and refunds. I.M. Wilson paid for all the advertisements. In short, Grishko produced the product, and I.M. Wilson marketed it. Both efforts are essential to developing a mark's goodwill. Reasonable jurors could thus conclude that either Grishko or I.M.

Wilson "is known as the … source" of the ballet slippers and so "possesses the goodwill associated

with the" slippers in the United States. *Premier Dental*, 794 F.2d at 854, 856.

### C.   I.M. Wilson does not own the GRISHKO mark as a matter of law simply because the mark is now incontestable

Though trademark owners do not have to register their marks to claim ownership in the

mark, if they do register the mark on the principal federal registry, that registration counts as

"prima facie evidence" of the mark's validity and "the registrant's ownership of the mark." 15

U.S.C. § 1115(a). If, five years after that initial registration, the registrant certifies that no court,

nor the USPTO, has ruled against its ownership, the mark becomes "incontestable." § 1065. The

registration then serves as "conclusive evidence … of the registrant's ownership of the mark," and

the mark can be challenged only on certain grounds, such as if either the initial registration or the

certificate of incontestability was fraudulent. § 1115(b). This certificate of incontestability is the

Lanham Act's method to "quiet title in the ownership of [a] mark." *Park 'N Fly, Inc. v. Dollar*

*Park & Fly, Inc.*, 469 U.S. 189, 198 (1985).

The GRISHKO marks are all registered in I.M. Wilson's name, and four of them are

incontestable. I.M. Wilson takes refuge behind this label, claiming that because these incontestable

marks are in I.M. Wilson's name, Grishko cannot now assert that it is the true owner. The Court

has twice before basically accepted this argument, in ruling on I.M. Wilson's motion for a

preliminary injunction and I.M. Wilson's third motion to dismiss. Upon closer review, however,

the Court must now conclude that I.M. Wilson's reading of the law is incorrect. I.M. Wilson's

"argument would perhaps be valid if [it] and [Grishko] were separate and independent companies."

*Excell Consumer Prods. Ltd. v. Smart Candle LLC*, No. 11-cv-7220, 2013 WL 4828581, at *21

(S.D.N.Y. Sept. 10, 2013). But I.M. Wilson served as the exclusive domestic distributor for

Grishko, a foreign manufacturer. That existing contractual and agency relationship complicates ownership. *See id.*

The Court chooses neither of the parties' choreographies. Strip this case down to its bare facts, viewed in the light most favorable to the manufacturer, it comes down to this:

The foreign manufacturer grants the domestic distributor permission to register a trademark in the United States. The foreign manufacturer did not intend to transfer ownership of the mark to the domestic distributor, or if it did, the foreign manufacturer intended for the domestic distributor to transfer the mark back if the exclusive licensing agreement ended. The domestic distributor registers the mark, truthfully telling the USPTO that it has permission to do so. Five years later, the domestic distributor submits a certificate of incontestability, once again with the foreign manufacturer's permission, making the mark incontestable.

The relationship sours, and the companies decide to terminate the exclusive license. The domestic distributor refuses to stop using the mark (or refuses to transfer back ownership of the mark) and instead sues the foreign manufacturer for trademark infringement. Pointing out that the mark is now incontestable, the domestic distributor says that the foreign manufacturer cannot now claim that it is the true owner of the mark. Instead, the foreign manufacturer must resort to proving that the registration of the mark was fraudulent, which it was not, given that the domestic distributor registered the mark with the foreign manufacturer's permission.

The domestic distributor has committed quite the coup d'état. Because it had the foresight to register the trademark, rather than have the foreign manufacturer do it, the domestic distributor has now functionally taken the mark from the foreign manufacturer and left the foreign manufacturer with no opportunity—not even a breach-of-contract claim—to prove that it is the real owner based on their prior existing agreement.

The Lanham Act, plainly and reasonably read, does not permit such an outcome. That a trademark is classified as incontestable does not mean that courts and juries cannot consider any agreements which permitted the registrant to apply for the trademark and submit the certificate of incontestability in the first place.

The Lanham Act exists against the backdrop of contract and agency law. *See United States v. Texas*, 507 U.S. 529, 534 (1993). Parties have long relied on contracts to delineate ownership and to permit concurrent uses of trademarks. *See, e.g., Payrate v. L.N. Renault & Sons, Inc.*, 247 F. Supp. 1009, 1014 (S.D.N.Y. 1965). For example, an exclusive licensing agreement might permit the domestic distributor to register the trademark but require the distributor to convey the trademark back to the foreign manufacturer at the termination of the agreement. *See, e.g., Software AG, Inc. v. Consist Software Sols., Inc.*, No. 08-cv-289, 2008 WL 563449, at *16–17 (S.D.N.Y. Feb. 21, 2008).

The Lanham Act, in setting up a framework for incontestable marks, did not deign to automatically—and silently—displace any and all such contracts setting the terms of registration. *See Leigh Ellis & Co. v. Davis*, 260 U.S. 682, 688–89 (1923). "Commercial agreements traditionally are the domain of state law," and "[s]tate law is not displaced merely because the contract relates to intellectual property." *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979). Given the vital role that contracts play in setting ownership of trademarks, if Congress had intended to override all existing contracts between the true owner and the registrant, it presumably would have said so explicitly. *See Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952); *Texas*, 507 U.S. at 533–35.

Nor did or could the Lanham Act plausibly intend, through the mere act of submitting a certificate of incontestability, to turn the agent into the principal. Under the Lanham Act, only the

"*owner* of a trademark" may register it. 15 U.S.C. § 1051 (emphasis added). USPTO has long interpreted the term "owner" to permit domestic distributors to register a foreign manufacturer's mark in the United States if the domestic distributor can show "written consent from the owner of the mark to registration in the applicant's name." Trademark Manual of Examining Procedure § 1201.06(a); *see In re Geo. J. Ball, Inc.*, 153 U.S.P.Q. 426 (T.T.A.B. 1967); *cf. Scandinavia Belting Co. v. Asbestos & Rubber Works of Am.*, 257 F. 937, 955–56 (2d Cir. 1919). In other words, the domestic distributor can register the mark in its name but on the foreign manufacturer's "behalf," making the domestic distributor the beneficial owner of the mark and leaving the foreign manufacturer the true owner. *Watec Co., Ltd. v. Liu*, 403 F.3d 645, 654 (9th Cir. 2005); *accord Ushodaya Enters., Ltd. v. V.R.S. Int'l, Inc.*, 63 F. Supp. 2d 329, 335 (S.D.N.Y. 1999); 4 Louis Alman & Malla Pollack, *Callman on Unfair Competition, Trademarks and Monopolies* § 20:56 (4th ed.). Reading the Lanham Act's incontestability provision to make the domestic distributor the true owner after five years would eviscerate this contractual and agency relationship and turn on its head the principle that a licensee cannot acquire ownership of a trademark through registration. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 979 (9th Cir. 2006); *Desly Int'l Corp. v. Otkrytoe Aktsionernoe Obschchestvo "Spartak,"* No. 13-cv-2303, 2016 WL 4532113, at *5 (E.D.N.Y. Aug. 29, 2016).

In sum, faced with an incontestable trademark registration registered by a domestic distributor on behalf of a foreign manufacturer, courts must look beyond the face of the incontestable registration to discern the true owner of the registration. *Callmann on Unfair Competition* § 20:56; *see Harrison-Hoge Indus., Inc. v. Panther Martin S.R.L.*, No. 05-cv-2851, 2008 WL 905892, at *34–35 (E.D.N.Y. Mar. 31, 2008); *cf. Miller*, 454 F.3d at 979. To read the Lanham Act otherwise is to permit an acontextual reading of a procedural formality to override

valid contracts between the distributor and manufacturer. *Cf. Fed. Treasury Enter. Sojuzplodoimport v. Spirits Int'l N.V.*, 623 F.3d 61, 67–69 (2d Cir. 2010).

This interpretation admittedly reverses course from the Court's prior reading of the law in this case. The Court does not do so lightly. True, once an issue is settled in a case, it should typically remain settled. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988). Still, a trial court has broad discretion to "reconsider its own decisions prior to final judgment" to correct legal errors. *Williams v. Hilton Grp.,* 261 F. Supp. 2d 324, 331 (W.D. Pa. 2003); *see* Fed. R. Civ. P. 54(b) ("[A]ny order or other decision . . . that adjudicates fewer than all the claims . . . may be revised at any time before the entry of judgment."). This Court has danced with these parties for three years now, and has received detailed briefing and thousands of pages of exhibits. Thanks to this additional time and information and clarified arguments of the parties, the Court now has a fuller understanding of both the circumstances of this particular dispute and the legal nuances of the relationship between a foreign manufacturer and a domestic distributor, leading the Court to a different legal conclusion than it came to at the beginning of the case. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). No party will be prejudiced by this changed interpretation. *See Williams*, 261 F. Supp. 2d at 331. Throughout this case, Grishko has continued to argue that the incontestable registrations do not prove ownership. Likewise, I.M. Wilson, perhaps suspecting that it might not be able to hide behind the incontestable registrations after all, has fully briefed its claim that, even without the incontestable registrations, it is the true owner of the GRISHKO mark.

Thus, I.M. Wilson cannot rest its claim of ownership on an easier theory of incontestable registrations. Instead, it continues to have the opportunity to claim the same rights if it can prove,

through either an agreement or the parties' conduct, that it is the true owner of the GRISHKO mark.

* * * * *

I.M. Wilson and Grishko have both insisted that, based on the record, it is the indisputable owner of the GRISHKO mark. As explained above, the record is not nearly so clear. With ample "ambiguous and contradictory" documents and testimony, the parties have put on quite the show. *TMT N. Am.*, 124 F.3d at 884. But the jury, not this Court, must sift through this evidence and decide what, and who, is most persuasive. The Court thus denies summary judgment on the parties' federal and state trademark infringement, cyberpiracy, and Tariff Act claims.

### D. Grishko did not wait too long to bring its infringement claims

I.M. Wilson raises one final procedural challenge: even if Grishko is the owner of the GRISHKO mark, it asserts, Grishko cannot now claim infringement or stop I.M. Wilson from using the mark because it has permitted I.M. Wilson to claim ownership of the mark for over 20 years.

The Lanham Act does not have a statute of limitations. *See* 15 U.S.C. § 1225 *et seq.* Yet trademark owners cannot observe potential infringement and then wait to sue. Under the equitable doctrine of laches, the trademark owner is barred from bringing a claim for infringement if the owner (1) engaged in "inexcusable delay in bringing suit" and (2) that delay prejudiced the accused infringer. *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 220 (3d Cir. 2021). To help decide what counts as an inexcusable delay, courts look to "the most analogous statute of limitation." *Id.* (internal quotation marks omitted). If that time period has expired, the claim is presumed untimely, and the trademark owner must prove that it had good reason for the delay and that the delay did not prejudice the accused infringer. *Id.* at 220–21.

Here, the most analogous statute is Pennsylvania's Unfair Trade Practices and Consumer Protection Law, which provides a private right of action for unfair competition. 73 Pa. Stat. §§ 201-2(4), 201-9.2; *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 137 (3d Cir. 2005). Claims under the UTPCPL must be brought within six years of the claimed wrong. 42 Pa. Cons. Stat. § 5527(b); *Santana Prods.*, 401 F.3d at 138. That means that Grishko should have brought its infringement claims within six years of the alleged infringement.

To hear I.M. Wilson tell it, Grishko is about 17 years past that deadline. In 1999, Mr. Grishko tried to register stylized "Grishko" and "Nikolay Grishko" trademarks with the USPTO. The USPTO rejected the applications, explaining that I.M. Wilson already held similar registrations. Grishko then allegedly asked I.M. Wilson for permission to register the marks, and I.M. Wilson apparently said no, though the testimony on this point is muddled. As I.M. Wilson sees it, Grishko should have known at that point that I.M. Wilson intended to claim permanent ownership of the mark and Grishko should have brought an infringement suit then.

This argument ignores the nature of the accused infringement. Grishko is asserting not that I.M. Wilson infringed *during* the term of the distribution agreement but that I.M. Wilson infringed once the distribution agreement *terminated* and I.M. Wilson continued to use the mark on its own shoes. The distribution agreement terminated in 2016, but, under the terms of the agreement, I.M. Wilson could use the mark until 2017. Grishko filed its counterclaims against I.M. Wilson two years later, making them timely.

I.M. Wilson suggests that Grishko should have done more from the start of the business relationship to make clear that *it* was the true owner of the mark. But "[a] plaintiff is not obligated to sue until it *knows* or *should know* that the defendant's conduct constitutes trademark infringement." *Kars 4 Kids*, 8 F.4th at 221. Mr. Grishko has explained that he understood that I.M.

Wilson would stop claiming ownership of the GRISHKO mark once the distribution agreement terminated. If true, then Mr. Grishko had no reason to believe that I.M. Wilson intended to assert permanent ownership of the mark, and so had no need "to sue for a declaration of ownership" or to fear "impending infringement." *Kling v. Hallmark Cards, Inc.*, 225 F.3d 1030, 1038–39 (9th Cir. 2000) (emphasis omitted).

Laches is an equitable defense, and so must be decided by the Court. *See Kars 4 Kids*, 8 F.4th at 217. Until the Court can hear for itself Mr. Grishko's testimony as to *when* he understood I.M. Wilson to claim permanent ownership of the mark, the Court cannot find that Grishko should have known to sue earlier. *See Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1349–50 (Fed. Cir. 2009).

## II.    Reasonable jurors could find that either I.M. Wilson or Grishko owned the shoe model marks

*En avant.* Until now, this dispute has been about GRISHKO, the so-called brand or house mark. But I.M. Wilson and Grishko have also accused each other of infringing other model marks used on different types of ballet slippers: NOVA, NOVA PRO, NOVA FLEX, MAYA I, ALICE, TRIUMPH, and 2007 GRISHKO. Grishko developed and affixed these model marks to the ballet slippers, and I.M. Wilson then advertised those particular models in the United States. I.M. Wilson has registered some, but not all, of these model marks with the USPTO. Grishko insists that the registrations belong to it, and that it has common law rights in the non-registered marks. Once again, ownership is dispositive of the parties' claims; if Grishko owns the model mark, then I.M. Wilson has infringed those marks, and vice versa.

### A.  The model marks are inherently distinctive and source identifying

To be a trademark, a name or symbol must be capable of distinguishing the trademarked product from similar products. *USPTO v. Booking.com B.V.*, 140 S. Ct. 2298, 2302 (2020). I.M.

Wilson suggests that the model marks at issue here are not protectable trademarks—a confusing argument, considering that I.M. Wilson uses three of these model marks and has filed trademark registrations for them.

Potential marks fall into five categories on "an increasing scale" of distinctiveness: generic, descriptive, suggestive, arbitrary, and fanciful. *Id.* A generic mark identifies the product itself and can never be protected. *Id.* at 2303. Descriptive marks, which relate to a feature or use of the product, can be protected, but only if the mark has acquired secondary meaning, such that the public recognizes the mark as identifying a particular product and its source. *Id.* In comparison, suggestive, arbitrary, and fanciful marks are all "inherently distinctive"; the mark's "inherent qualities alone" permit customers to recognize the product. *Id.* at 2302.

The model marks at issue here are all inherently distinctive. MAYA I and ALICE are both arbitrary, as is 2007 GRISHKO; the women's names and the number 2007 have no apparent connection to the ballet slippers on which they appear. NOVA, NOVA PRO, and NOF FLEX are suggestive, hinting that the dancer wearing those shoes will shine bright like a star. So is TRIUMPH, which indicates that the dancer's performance will be a success. These distinctive marks "identify" the slipper models that bear them "and distinguish [them] from those manufactured or sold by others." 15 U.S.C. § 1127.

I.M. Wilson suggests that the model marks cannot be "standalone mark[s]" because the model marks have no "independent trademark significance" from the GRISHKO mark. *Quiksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 757–58 (9th Cir. 2006); *see Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 1374–75 (Fed. Cir. 2002). But the model marks have been consistently used "in a manner separate and distinct" from the house mark. *Quiksilver*, 466 F.3d at 757. In both I.M. Wilson's and Grishko's slippers, the house mark is on the outsole, and the model mark on the

insole. The model marks receive their own promotion, with certain marks having had their own full-page advertisements. *Id.* at 757–58. The model marks also have their own reputations; customers and retailers often refer to the model marks by name. *Id.; Bose Corp.*, 293 F.3d at 1374. Thus, reasonable jurors could find that the model marks are independent trademarks.

## B. Reasonable jurors could find that Grishko used the model marks in commerce first and have used them continuously since

To prove ownership of the model marks, either I.M. Wilson or Grishko must show that it used the mark in commerce before anyone else and it has continuously used the mark since. *Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000). Grishko developed the model marks and affixed them to the ballet slippers. I.M. Wilson then sold the slippers in the United States. Pointing to its status as exclusive distributor, I.M. Wilson argues that it owns the mark because it sold the slippers to customers first and has continued to do so. Grishko counters that I.M. Wilson made those sales on Grishko's behalf and in its name.

Manufacturers that sell their trademarked products exclusively through a distributor can still claim priority in the trademark. *Viacom Int'l v. IJR Cap. Inv., LLC*, 891 F.3d 178, 188 (5th Cir. 2018); *McCarthy on Trademarks* § 18:46. The distributor sells the trademarked product with the manufacturer's permission and under its supervision, meaning that the sales "inure to the benefit" of the manufacturer, not the distributor. 15 U.S.C. § 1055; *see Doeblers' Pa. Hybrids*, 442 F.3d at 823.

According to Grishko, I.M. Wilson licensed the model marks during the term of the distribution agreement, but Grishko retained control over the use of the mark and the quality of the slippers. If true, I.M. Wilson's sales of the trademarked slippers inured to Grishko's benefit as the licensor. Once I.M. Wilson stopped serving as its distributor, Grishko sold the shoes itself until

forced to stop by the injunction. From this, reasonable jurors could find that Grishko used the mark first and has used it continuously since. *See I.M. Wilson, Inc.*, 500 F. Supp. 3d at 403.

### C. I.M. Wilson has not proved as a matter of law that Mr. Grishko intended to transfer ownership of the model marks

I.M. Wilson asserts that, if the model marks are protectable after all, I.M. Wilson did not license the model marks—it owned them. Returning to the August 5, 1992 registration letter in which Mr. Grishko gave permission for I.M. Wilson to register the mark, I.M. Wilson posits that the letter also assigned ownership of the model marks: The letter made I.M. Wilson the owner of both the GRISHKO mark and its goodwill. Goodwill cannot be separated from the mark. Hence, I.M. Wilson reasons, the registration letter *necessarily* conveyed the model marks. Otherwise, Grishko would have the title to the model marks but none of their goodwill.

Set aside the fact that the model marks at issue here did not exist at the time of the registration letter. Model marks have their own good will, meaning that a model mark can be transferred to a new owner. 4 *Callmann on Unfair Competition* § 17A:5. Think of Nestlé selling its Butterfinger brand, or Procter & Gamble selling its CoverGirl brand.[4] Though a model mark might be associated with a particular house mark, in most cases, the two are not inextricably intertwined. *See Bose Corp.*, 293 F.3d at 1374–75.

The Court explained this to I.M. Wilson back at the motion to dismiss stage. Despite that forewarning, I.M. Wilson still "has been unable to cite any on-point case law for the proposition that the transfer of a house mark and its goodwill automatically transfers the … model marks."

---

[4] Aaron Smith, *Nestle Selling U.S. Candy Brands to Nutella Company*, CNN (Jan. 16, 2018), https://money.cnn.com/2018/01/16/news/companies/nestle-ferrero/index.html; Lauren Debter, *Procter & Gamble Agrees to Sell 43 Beauty Brands for $12.5 Billion*, Forbes (July 9, 2015), https://www.forbes.com/sites/laurengensler/2015/07/09/procter-gamble-beauty-business-coty/?sh=2386bc556576.

*I.M. Wilson Inc.*, 500 F. Supp. 3d at 402. I.M. Wilson must go beyond the face of the registration letter to prove to the jury that Grishko assigned the model marks to it.

**III.**     **Reasonable jurors could find that Grishko's shoe design is protectable trade dress**

Once Grishko terminated the distribution agreement, I.M. Wilson contracted with another manufacturer to produce near-identical pointe shoes bearing the GRISHKO mark to be sold in the United States. Pointing to these copycat shoes, Grishko accuses I.M. Wilson of infringing its trade dress.

Trade dress is "the overall look of a product," including a product's packaging, design, and "its size, shape, and color." *Ezaki Glico Kabushiki Kaisha v. Lotte Int'l Am. Corp.*, 986 F.3d 250, 255 (3d Cir. 2021) (internal quotation marks omitted). To be protectable, the product's design must be distinctive, such that customers recognize the source based on the design. Take, for example, Christian Louboutin's red-bottomed shoes. *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 212 (2d Cir. 2012). In deciding if the design is distinctive, such that it has taken on secondary meaning in the eyes of the consuming public, courts in the Third Circuit consider several factors:

- For how long has this design been used?
- Has the company been the exclusive user of this design?
- How many products have been sold, and to how many customers?
- How big is the company?
- How much has the company spent on advertising this design?
- Do customers recognize the design as belonging to the company?
- Did the competitor copy the design?
- Did the competitor's use create actual confusion?

*Commerce Nat'l Ins.*, 214 F.3d at 438.

Further, the design cannot be functional. The design cannot enhance the "purpose" or "quality of the article" but instead must be purely "ornamental." *Ezaki Glico*, 986 F.3d at 256–57 (internal quotation marks omitted). Trademark law "protect[s] the owner's goodwill and prevent[s] consumers from being confused about the source of a product." *Id.* at 256. It does not "create patent-like rights" permitting owners to indefinitely pull functional features out of the public domain. *Id.* (internal quotation marks omitted). Again, consider the Louboutin red soles.

Grishko has claimed that its pointe shoe design has a distinctive overall appearance based on the combination of:

- Light pink satin with matching matte trim;
- The GRISHKO mark on the bottom of the outsole;
- The gold model mark on the insole;
- The phrase "Handmade by Grishko Ltd." situated between two horizontal lines in the middle of the insole;
- The unique identification numbers handwritten inside the fold of the left inner seam;
- The sole and size markings on the narrowest part of the sole;
- The crosshatch pattern embossed in the top of the sole; and
- The stitch patterns used to hold the shoe together.

Grishko's Third Am. Counterclaims ¶¶ 45–46; Doc. No. 271, at 4.

I.M. Wilson nitpicks each of these features. Some, I.M. Wilson asserts, are functional. The stitches hold the shoe together. The size markings and identification numbers identify the particular shoes. The crosshatching leaves grooves in the sole, improving traction and preventing slips. Other features, I.M. Wilson asserts, are nondistinctive and in the "public domain," such that they may be "freely copied." *Am. Greetings Corp. v. Dan-Dee Imps., Inc.*, 807 F.2d 1136, 1145 (3d Cir. 1986). Light pink ballet shoes are ubiquitous. *I.M. Wilson, Inc.*, 500 F. Supp. 3d at 408.

Many shoes include trademarks on the insole and outsole. The running stitch used is a common sewing stitch. And at least one other manufacturer uses similar cross-hatching.

Though conceding that at least some of these features might be functional or common, Grishko argues that the shoe design *as a whole* is distinctive and ornamental. *See Fair Wind Sailing, Inc. v. Dempster*, 764 F.3d 303, 311 (3d Cir. 2014); *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 203–04 (2d Cir. 1979). Reasonable jurors could certainly agree. Grishko chose a particular combination of functional and ornamental features, each of which contributes to the overall look and feel of the pointe shoe. *Ezaki Glico*, 986 F.3d at 258; *Am. Greetings Corp.*, 807 F.2d at 1144. Each marking is placed in a specific location, like the insole, the outsole, or the inside of the shoe, though it could be placed elsewhere. The markings are all arranged in a certain order, and each uses specific fonts and colors. For example, the insole contains the model mark, in gold cursive, with the phrase "Handmade by Grishko Ltd." underneath. *Cf. Freixenet, S.A. v. Admiral Wine & Liquor Co.*, 731 F.2d 148, 153 (3d Cir. 1984).

This particular arrangement of these features has arguably acquired secondary meaning. *Am. Greetings Corp.*, 807 F.2d at 1143–44; *Commerce Nat'l Ins.*, 214 F.3d at 438. Grishko claims to be the sole manufacturer to have adopted this design for pointe shoes, and Grishko has used this design for over three decades. Grishko employs more than 600 cobblers, who handmake each shoe. Grishko has sold more than one million pairs of pointe shoes, for an estimated $45 to $65 million dollars, and has spent significant money on advertising outside the United States. Customers recognize shoes bearing this design as being produced by Grishko. *Freixenet, S.A.*, 731 F.2d at 152. And in producing its own shoes, I.M. Wilson copied not just the individual features but the exact *font*, *color*, and *placement* of each feature on the shoe in an attempt to convey to customers

that its shoe is the same as that produced by Grishko. *Id.*; *SK & F, Co. v. Premo Pharma. Lab'ys, Inc.*, 625 F.2d 1055, 1063–64 (3d Cir. 1980).

Reasonable jurors could find that Grishko's pointe shoe design is protectable as trade dress, and that I.M. Wilson copied that trade dress in having another manufacturer produce near-identical shoes. The Court thus denies I.M. Wilson's motion for summary judgment on trade dress.

## IV.   I.M. Wilson did not engage in false advertising

Grishko also accuses I.M. Wilson of false advertising. For false advertisement, Grishko must prove that I.M. Wilson made material misrepresentations about its shoes that mislead customers and injured Grishko. *Penrod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 248 (3d Cir. 2011). Grishko identifies two purported ways in which I.M. Wilson engaged in false advertising. Both theories fail on the merits.

### A.   Grishko has not shown that it was harmed by I.M. Wilson's calling itself the exclusive North American distributor

First, Grishko complains that I.M. Wilson held itself out as the exclusive distributor for *all* of North America when, in reality, it was the exclusive distributor for the United States but not Canada or Mexico. If true, I.M. Wilson's misrepresentation has "a tendency to deceive a substantial portion of the intended audience" of retailers or dancers purchasing pointe shoes. *Id.* (internal quotation marks omitted). And "the deception is material in that it is likely to influence purchase decisions," as retailers or dancers might choose to buy from I.M. Wilson out of fear that the other distributors' shoes might be fakes. *Id.* (internal quotation marks omitted).

But Grishko has pointed to nothing in the record showing that this misstatement created "a likelihood of injury to" *Grishko*, instead of the other North American distributors. *Id.* Grishko has received the same profits, as the same number of pointe shoes have been sold, just through one distributor rather than several. And Grishko has not suggested, much less shown, that the

misrepresentation damaged the goodwill of the GRISHKO mark or hurt its relationship with its other distributors. *Cf. Schlotsky's, Ltd. v. Sterling Purchasing & Nat'l Distrib. Co.*, 520 F.3d 393, 400–01 (5th Cir. 2008). In short, Grishko has failed to articulate, much less prove, an actual injury based on I.M. Wilson's purported misrepresentation.

### B. I.M. Wilson's filing of orders with its own shoes cannot count as false advertising

Grishko also complains that after it terminated the licensing agreement, I.M. Wilson began to fill pending orders for GRISHKO shoes with new made-in-China shoes.

For false advertising, I.M. Wilson had to have made a public "representation of fact" "in commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). Merely omitting material information about the product is not enough; I.M. Wilson must have made some sort of "affirmative" representation that, on its own or in combination with the omission of material facts, mislead potential customers. *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.*, 915 F. Supp. 360, 366 (S.D. Fla. 1996); *accord McCarthy on Trademarks* § 27:65. After all, "[t]he absence of any statement is neither 'false' nor a 'representation.'" *Universal City Studios, Inc. v. Sony Corp. of Am.*, 429 F. Supp. 407, 410 (C.D. Cal. 1977); *see* Restatement (Second) of Torts § 525 cmt. B.

Grishko has not pointed to any *specific* affirmative representation that I.M. Wilson made to customers that would have required I.M. Wilson to turn around after the termination of the distribution agreement and affirmatively inform the customer that the shoes shipped were actually made in China. For instance, Grishko has not included a single order form, receipt, web page, flyer, or conversation in which I.M. Wilson told a customer, prior to the termination of the distribution agreement, that the pair of pointe shoes that she would be purchasing from I.M. Wilson was made in Russia. In the absence of any such affirmative representation, no reasonable juror could find that I.M. Wilson falsely advertised its shoes.

**V.    Grishko's new NIKOLAY mark does not infringe on I.M. Wilson's GRISHKO mark**

I.M. Wilson has also attempted to add a second trademark dispute. At the start of this litigation, the Court entered a preliminary injunction barring Grishko from selling goods bearing the GRISHKO mark in the United States. Grishko then formulated a new mark, NIKOLAY, which it began to use on its U.S. products. Though the Court later lifted the preliminary injunction, Grishko is still using the NIKOLAY mark in the United States. I.M. Wilson has now accused Grishko of using the NIKOLAY mark to siphon goodwill from the GRISHKO mark. It seeks at least partial disgorgement of Grishko's profits on the NIKOLAY shoes.

Under the Lanham Act, a company cannot "confus[e]" or "deceive" U.S. customers into believing that its product is "made or sponsored by the owner of" a competing trademark. 15 U.S.C. §§ 1114(1), 1125(a)(1)(A); *Societe Comptoir De L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dep't Stores, Inc.*, 299 F.2d 33, 36 (2d Cir. 1962). For example, a company cannot say, "If you like (competitor's) Product A, you'll love (our) Product B," as it suggests that the two products come from the same source. *See Charles of the Ritz Grp. Ltd. v. Quality King Distribs., Inc.*, 636 F. Supp. 433, 437 (S.D.N.Y. 1986). But competitors can criticize each other's products, telling customers, "Competitor's Product A doesn't work. Buy our Product B instead." And a company can tell potential customers that its product is a copy of a competitor's product: "Like competitor's Product A? Our Product B is the same design, but cheaper." *See Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 668 (8th Cir. 1987); *Societe Comptoir*, 299 F.2d at 36;. Indeed, such "comparative advertising is not only permissible, but encouraged," because such advertisements give customers more information with which to make their purchasing decisions. *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 423 (S.D.N.Y. 2002).

I.M. Wilson contends that Grishko has falsely associated its NIKOLAY mark with the GRISHKO mark, leading customers to believe that the two brands come from the same source. To the contrary, Grishko has made clear that it does *not* want to be affiliated with the GRISHKO shoes sold in the United States. Grishko's website states that its products are sold under the NIKOLAY brand in the United States and the GRISHKO brand elsewhere in the world. Doc. No. 212-2, at 4. Grishko's social media posts have called the GRISHKO-named shoes sold by I.M. Wilson "awful," and encouraged customers to switch to NIKOLAY shoes. Doc. No. 212-2, at 17. In short, Grishko has "take[n] care to distinguish [it]self from" I.M. Wilson and its pointe shoes. *Sykes Lab'y, Inc. v. Kalvin*, 610 F. Supp. 849, 854 (C.D. Cal. 1985).

Not *every* use of the word "Grishko" automatically counts as a use of the GRISHKO mark. "Grishko" can refer to the United States trademark. But it can also refer to the international trademark, or Grishko the company, or Mr. Grishko himself. No doubt, Grishko is permitted to identify itself by name, as is Mr. Grishko. "The registering of a proper noun as a trade-mark does not withdraw it from the language, nor reduce it to the exclusive possession of the registrant which may be jealously guarded against any and all use by others." *G.D. Searle & Co. v. Hudson Pharma. Corp.*, 715 F.2d 837, 842 (3d Cir. 1983). I.M. Wilson has conceded this:

> Q: [I]s it IMW's position that Mr. Grishko cannot tell, regardless of what trademark he uses on goods, he cannot tell any US customer or any US retailers that they're manufactured by Grishko Limited, is that your position?
>
> A: No, he can tell people they are from Grishko Limited.

Doc. No. 247, at 5.

Yet I.M. Wilson ignores these nuanced meanings and the customer's ability to differentiate between them. For example, I.M. Wilson points to an email to a retailer in which Grishko asserted that "Nikolay shoes ... are the same as Grishkos," and that "[t]here is no [sic] differences between Grishko and Nikolay." Doc. No. 243-3, at 56. To I.M. Wilson, this is a direct attempt to ride on

the goodwill of its "Grishko" mark. But in context, this email cannot reasonably be read to say that Grishko's NIKOLAY shoes come from I.M. Wilson, or even that the NIKOLAY shoes are the same as I.M. Wilson's GRISHKO shoes. Instead, the email makes clear that Grishko's NIKOLAY shoes are the same shoes that *used to be sold* under the GRISHKO mark in the United States.

Likewise, I.M. Wilson also points to another email to a retailer, in which Grishko encouraged the retailer to share a social media post stating "Eager to find Grishko pointe shoes? – Search for Nikolay." Doc. No. 243-3, at 49. But I.M. Wilson has not shown that the retailer actually made this post, meaning that Grishko has at most *attempted* to associate the two marks. But attempted association is not actionable under the Lanham Act. Plus, in context, this proposed post could not reasonably be read as to suggest that NIKOLAY shoes and GRISHKO shoes come from the same source. Grishko is not saying, "Looking for the GRISHKO shoes sold by I.M. Wilson? Buy NIKOLAY." Instead, it is saying, "Looking for the Russian-made shoes that used to sell under the name GRISHKO and are currently sold under the name GRISHKO elsewhere in the world? Buy NIKOLAY."

This comparison between the new NIKOLAY product and the old GRISHKO product is proper comparative advertising. Prior to this lawsuit, all GRISHKO shoes were handmade in Russia. Now, the NIKOLAY shoes are made in Russia through the same process, while I.M. Wilson's GRISHKO shoes are made in China. In other words, NIKOLAY shoes *are* the same as the old GRISHKO shoes, but under a "new" mark. *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 369 (1924). In referencing the GRISHKO mark, Grishko does not seek to trade on "the good will of the name, but the good will of the goods." *Saxlehner v. Wagner*, 216 U.S. 375, 380–81 (1910).

Grishko has a competitive right to reference the GRISHKO mark in order to explain that to the public. *G.D. Searle & Co..*, 715 F.2d at 842; *Saxony Prods., Inc. v. Guerlain, Inc.*, 513 F.2d

716, 722 (9th Cir. 1975). "Indeed it is difficult to see any other means that might be employed to inform the consuming public of the true origin of the [pointe shoe] design." *Smith v. Chanel, Inc.*, 402 F.2d 562, 565 (9th Cir. 1968). Though I.M. Wilson might prefer that Grishko not mention the GRISHKO mark at all, the Lanham Act "does not confer a right to prohibit the use of the" mark altogether, *Prestonettes,* 264 U.S. at 368, nor "compel a competitor to resort to second-best communication," *G.D. Searle & Co.*, 715 F.2d at 842 n.12.

That said, Grishko's references to the GRISHKO mark must not create a reasonable likelihood that customers would be confused. *G.D. Searle & Co.*, 715 F.2d at 841; *Saxony Prods.*, 513 F.2d 722. Through their public criticism of I.M. Wilson and its claimed GRISHKO mark, Grishko has made crystal clear to potential customers that they do *not* sell the current GRISHKO shoes in the U.S. *See SSP Agric. Equip., Inc. v. Orchard-Rite Ltd.*, 592 F.2d 1096, 1103 (9th Cir. 1979). Grishko has thus eliminated any "belief in the mind of the public that" NIKOLAY shoes are "made or sponsored" by I.M. Wilson. *Smith*, 402 F.2d at 565.

Grishko offers that, since the preliminary injunction, it has attempted to strike a balance between exercising its right to use the GRISHKO mark internationally and distancing itself from I.M. Wilson's current GRISHKO mark in the United States. To be sure, "Congress did not intend the Lanham Act to be used as a sword to eviscerate completely a foreign corporation's foreign trademark." *Sterling Drug, Inc. v. Bayer AG*, 14 F.3d 733, 746 (2d Cir. 1994). "In today's economy, some 'spill-over' advertising from one nation to another is inevitable." *McCarthy on Trademarks* § 29:7. To respect a foreign company's foreign trademark rights, "incidental spill-over of advertising from one nation to another [must] be significant and substantial before" domestic courts get involved. *Id.* I.M. Wilson has not shown that the spill-over here is substantial, given the

lengths to which Grishko has gone to criticize the GRISHKO products now sold in the United States by I.M. Wilson.

At bottom, I.M. Wilson has produced no evidence from which reasonable jurors could conclude that Grishko's references to the GRISHKO mark veered into association, rather than comparison and criticism. The Court thus grants Grishko's motion for summary judgment on this claim.[5]

## VI.  Reasonable jurors could find that I.M. Wilson breached its contract with Grishko

Onto the contract side of this dispute. Grishko has asserted counterclaims for breach of contract and, in the alternative, unjust enrichment against I.M. Wilson.

For a breach of a contract, Grishko must show that the parties had a contract, that I.M. Wilson breached the contract, and that Grishko was damaged by the breach. *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003). Reasonable jurors could find that the parties agreed—either as part of the distribution agreement, or in a later oral agreement or through their conduct—that I.M. Wilson would stop using the house and model marks and transfer all U.S. trademark registrations to Grishko once the distribution agreement ended. After terminating the distribution agreement, Grishko requested that I.M. Wilson transfer the registrations to it, but I.M. Wilson refused, arguably breaching that contract.

If the evidence at trial shows that the parties did not have an enforceable contract after all, Grishko argues that the Court should not permit I.M. Wilson to be unjustly enriched by keeping the mark without making any payments to Grishko. For this equitable remedy, Grishko must prove

---

[5] I.M. Wilson suggests that this claim should be saved for trial, as I.M. Wilson has not finished its discovery because the Court paused disclosure of the NIKOLAY sales data. But this sales data has nothing to do with the merits of the claim. The Court has expressly ordered Grishko to hand over "all communications to consumers or retailers that contain both I.M. Wilson's GRISHKO mark and [Grishko's] NIKOLAY mark," and I.M. Wilson has not accused Grishko of failing to do so. Doc. No. 226, at 2.

that I.M. Wilson received a benefit from Grishko "under such circumstances that it would be inequitable for [I.M. Wilson] to retain the benefit without payment of value." *Durst v. Milroy Gen. Contracting, Inc.*, 52 A.3d 357, 360 (Pa. Super. Ct. 2012) (internal quotation marks omitted). If the Court were to accept Grishko's narrative based on the evidence at trial, the Court could certainly find such inequitable circumstances here. The Court thus denies I.M. Wilson's motion for summary judgment on these claims.

## VII.   I.M. Wilson can seek damages for the sales that Grishko made in the United States during the term of the distribution agreement

I.M. Wilson has *not* brought its own breach-of-contract claim. To Grishko, that means that I.M. Wilson cannot recover damages for its complaints that sound in breach of contract rather than infringement.

Under the distribution agreement, Grishko could not sell its products in the United States except through I.M. Wilson. Doc. No. 230-6, at 279. During the term of the distribution agreement, Grishko started selling products directly to consumers in the United States through its website grishkoshop.com and a Canadian distributor. As I.M. Wilson saw it, those sales violated the plain terms of the distribution agreement.

Instead of suing for breach of contract, however, I.M. Wilson has lumped these sales in with its infringement claim. In other words, I.M. Wilson says that Grishko infringed I.M. Wilson's trademark by using the GRISHKO mark once the distribution agreement *ended* and by selling GRISHKO products in the United States through channels other than I.M. Wilson *during* the term of the distribution agreement.

According to Grishko, I.M. Wilson should not be able to recover any damages at all for the sales made during the term of the distribution agreement because that is a contract claim masquerading as an infringement claim. As Grishko reasons, for I.M. Wilson to recover damages

for these sales, it must resort to contract, not trademark law. But I.M. Wilson did not bring a claim for breach of contract. So, Grishko asserts, I.M. Wilson cannot recover for those sales made during the term of the distribution agreement.

In effect, Grishko is requesting that this Court apply the gist-of-the-action doctrine to trademark law. The gist-of-the-action doctrine forbids tort claims that are basically contract claims dressed up to look like a tort. *Earl v. NVR, Inc.*, 990 F.3d 310, 314–15 (3d Cir. 2021). This doctrine aims to keep contract and tort law in their own lanes. *See Bruno v. Erie Ins. Co.*, 106 A.3d 48, 69 (Pa. 2014). Though this doctrine has quite the pedigree as applied to negligence claims, *see id.* at 69 n.16, no court of appeals has extended the doctrine to trademark claims. To the contrary, trademark owners routinely recover damages for both infringement and breach of contract. *See Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 123 (3d Cir. 1980); *Masters v. UHS of Del., Inc.*, 631 F.3d 464, 470–71 (8th Cir. 2011); *Watec Co., Ltd. v. Liu*, 403 F.3d 645, 651, 652 (9th Cir. 2005); *Babbit Elecs., Inc. v. Dynascan Corp.*, 38 F.3d 1161, 1178 (11th Cir. 1994).

When a company grants a license to use its trademark, it waives the right to sue that licensee for infringement, so long as the licensee uses the mark as permitted by the terms of the license. *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008); *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed. Cir. 1995). But if the licensee uses the mark outside the scope of the license, that use is actionable as infringement because the licensee has done so "without consent." *Franchised Stores of N.Y., Inc. v. Winter*, 394 F.2d 664, 668 (2d Cir. 1968); *accord McCarthy on Trademarks* § 25:30. The use is also an actionable breach of contract; the license set terms of use, and the licensee did not adhere to those terms. The licensee has committed two legal wrongs: it has caused customer confusion and engaged in unfair competition in violation of the Lanham Act, and it has gone back on its word and broken its private agreement in breach of a contract. The

trademark owner is entitled to recover for both wrongs. *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 345 (6th Cir. 2010).

Hence, even though I.M. Wilson did not bring a claim for breach of the distribution agreement, I.M. Wilson may still argue at trial that Grishko infringed its trademark during the term of the distribution agreement and so seek recovery for the sales that Grishko made in the United States during the term of that agreement. The Court denies Grishko's motion for summary judgment on this issue.

## VIII.   Reasonable jurors could find that I.M. Wilson's executives actually participated in infringing Grishko's GRISHKO mark

Both sides have also brought claims against certain of the companies' executives. Specifically, I.M. Wilson has sued Mr. Grishko, and Grishko has sued four I.M. Wilson executives: founder and president Irene Wilson, chairman Leonard Gage, chief financial officer Christine Wilson, and chief business officer Justin Wilson. Grishko hopes to hold the four I.M. Wilson executives personally liable for continuing to use the GRISHKO mark once the parties' distribution agreement ended.

To hold an executive liable for her role in company's wrongdoing, the injured party must show that the executive was an "actual participant in the tort," such that she "authorized" the company's actions or at least knew of them and "approved." *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 606 (3d Cir. 1978); *accord Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983). The four I.M. Wilson executives have now moved for summary judgment, claiming that Grishko has not shown that they were actually involved in the accused infringement. In response, Grishko points to internal documents showing how each executive participated in the accused trademark infringement.

Start with Irene Wilson, the founder and president. Once the distribution agreement with Grishko ended, Ms. Wilson orchestrated and signed a new agreement with a different manufacturer to produce new GRISHKO shoes. She also sent out a personal letter to retailers and customers asserting that I.M. Wilson owns the GRISHKO mark and encouraging them to purchase the new GRISHKO shoes. No doubt, Ms. Wilson "was the central figure in" I.M. Wilson, and reasonable jurors could find that she clearly "authorized and approved the acts of" purported infringement. *Donsco, Inc.*, 587 F.2d at 606. Thus, the Court denies her motion for summary judgment.

Now take Leonard Gage, the chairman of the board of directors and husband to Ms. Wilson. Mr. Gage helped coordinate I.M. Wilson's agreement with the Chinese manufacturer to produce the new GRISHKO shoes, sending drafts of the agreement back and forth and arranging visits to meet with the manufacturer. This coordination is enough for reasonable jurors to conclude that he was an active participant in the infringement as well. *See Bank of Landisburg v. Burruss*, 524 A.2d 896, 901 (Pa. Super. Ct. 1987). As a result, the Court denies his motion for summary judgment, too.

Next, consider Christine Wilson, the chief financial officer and daughter of Ms. Wilson and Mr. Gage. She worked extensively with the Chinese manufacturer in developing the new pointe shoes, sending images of the trademarks to be used and directing the manufacturer to use the same colors as Grishko. From these documents, reasonable jurors could find that Ms. Christine Wilson was intimately involved with the purported infringement. *Id.* The Court also denies her motion for summary judgment.

Finally, there is Justin Wilson, the purported chief business officer and son of Ms. Wilson and Mr. Gage. Though he is listed as vice-president on company documents, Grishko has produced no evidence that Mr. Wilson was actually involved in I.M. Wilson's day-to-day activities, much

less that he was involved in the accused infringement. *Cf. Donsco, Inc.*, 587 F.2d at 606. Grishko has not identified a single email in which Mr. Wilson communicated with the Chinese manufacturer, or in which Mr. Wilson spoke to a retailer or customer. Nor did Grishko depose Mr. Wilson to ask him about his personal involvement.

Instead, Grishko rests on the fact that Mr. Wilson attended board meetings, where the board discussed placing the GRISHKO mark on the made-in-China shoes. But mere attendance at a board meeting is insufficient for reasonable jurors to conclude that Mr. Wilson personally knew and approved of I.M. Wilson's alleged infringement, such that his acquiescence facilitated the infringement. *See Kaites v. Pa. Dep't of Env't Res.*, 529 A.2d 1148, 1151–52 (Pa. Commw. Ct. 1987). Grishko suggests that because I.M. Wilson is a small, family-owned company, Mr. Wilson *had* to have been involved in the decision-making. But Mr. Wilson could have well been a silent board member, with no actual authority to "influence[] the corporate actions that constituted the violations." 3A William Fletcher, *Law of Corporations* § 1135 (Sept. 2021); *see Chester-Cambridge Bank & Tr. Co. v. Rhodes*, 31 A.2d 128, 130–31 (Pa. 1943).

Because Grishko has pointed to no evidence in the record that Mr. Wilson was actually involved in or approved of the purported infringement, the Court grants Mr. Wilson's motion for summary judgment. The Court denies the other executives' motions.

CONCLUSION

Their *pas de deux* interrupted, I.M. Wilson and Grishko now fight over the GRISHKO mark. Each has optimistically suggested that the evidence in the record is clear enough that it should be declared the owner of the mark as a matter of law. But disputes of material fact abound. The jury must sort through the remains to piece together who the parties intended to be the permanent owner of the mark.

The Court grants summary judgment to I.M. Wilson on Grishko's claim for false advertising. The Court also grants summary judgment to Justin Wilson on all claims against him. Otherwise, the Court denies the parties' motions for summary judgment in full. An appropriate order follows.

BY THE COURT:

**GENE E.K. PRATTER**
UNITED STATES DISTRICT JUDGE